# EXHIBIT A, PART 1

A                                Court of Appeal

# Lucasfilm Ltd and others *v* Ainsworth and another

## [2009] EWCA Civ 1328

2009 Nov 3, 4, 5;                                        Rix, Jacob, Patten LJJ
B      Dec 16

*Conflict of laws — Jurisdiction — Copyright — US claimants alleging infringement of*
*copyright by English defendants — Claimants bringing claim in United States for*
*breach of copyright and obtaining judgment in default — Claimants*
*subsequently bringing claim in High Court for breach of US copyright and for*
*enforcement of default judgment — Whether action for breach of US copyright*
C      *justiciable in England — Whether US default judgment enforceable against*
*defendants in England — Civil Jurisdiction and Judgments Act 1982 (c 27), Sch 1*
*(as substituted by Civil Jurisdiction and Judgments Act 1982 (Amendment)*
*Order 1990 (SI 1990/2591), art 12(1), Sch 1), art 2*
*Copyright — Infringement — Sculpture — First defendant producing helmet for use*
*by US claimants as costume in film — Helmet based on claimants' drawings and*
*models produced using sculpting techniques — Defendants later producing*
*replicas of helmet and advertising them for sale on Internet — Some replica*
D      *helmets sold to US customers — Claimants bringing claim in United States*
*for breach of copyright and obtaining judgment in default — Claimants*
*subsequently commencing claim in High Court for copyright infringement under*
*English law and for infringement of US copyright and enforcement of US default*
*judgment — Whether model helmet protected by copyright as "sculpture" —*
*Whether action for breach of US copyright justiciable in England — Whether*
E      *US default judgment enforceable against defendants in England — Whether*
*implied assignment of first defendant's copyright to claimant — Copyright,*
*Designs and Patents Act 1988 (c 48), ss 4, 51 — Civil Jurisdiction and Judgments*
*Act 1982, Sch 1 (as substituted by Civil Jurisdiction and Judgments Act 1982*
*(Amendment) Order 1990, art 12(1), Sch 1), art 2*

In 1976 the first defendant was commissioned by the claimant to make a
military-style helmet to be used as a part of a costume in a series of science fiction
F      films. He based the helmet on paintings and drawings and a clay model supplied by
the claimants, incorporating his own improvements and using sculpting techniques.
In 2004 he and the second defendant company, operating in England, began
producing plastic replicas of the helmet for public sale, advertising them on a
website. Some of the replica helmets were sold to buyers in the United States of
America, where the claimants began proceedings for, inter alia, breach of copyright.
The defendants challenged the United States court's jurisdiction but took no further
G      part in the proceedings, which resulted in a default judgment awarding the claimants
substantial damages. The claimants then brought proceedings in England seeking
(1) damages for infringement of copyright, on the basis that the helmet was
protected as a "sculpture" for the purposes of section 4 of the Copyright, Designs
and Patents Act 1988[1]; (2) enforcement of their United States copyright; and
(3) recognition and enforcement of the United States default judgment. The first
defendant counterclaimed to enforce his own copyright in the helmet. On the first
H      issue the judge set out a number of factors for determining whether a three-
dimensional object was a "sculpture" for the purposes of section 4 which included,
in particular, whether the object's visual appeal was part of its purpose, and held

---

[1] Copyright, Designs and Patents Act 1988, s 4: see post, para 20.
S51: see post, para 84.

A

that since the helmet was primarily utilitarian in function it was not a "sculpture" and therefore the defendants had a defence to the claim under section 51 of the Act, which permitted the copying of a design document or model for anything other than an artistic work. On the second issue the judge held that the principles underlying the Brussels Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters (1968)[2] recognised a distinction between title (for land) and validity and registration aspects (for registrable intellectual property rights) on the one hand and trespass/infringement on the other;

B

that where the subsistence of a foreign copyright was not in issue the English court could determine questions of its infringement if it were appropriate to do so having regard to the doctrine of forum conveniens; and that United States copyright subsisted in the helmet and had been infringed by the defendants. On the third issue the judge held that the United States default judgment was not enforceable in England. On the counterclaim the judge held that it had been implicit in the agreement between the parties that any copyrights in the items produced by the first defendant for the claimants belonged to the claimants and the first defendant was required to assign any such copyrights to them.

C

On the claimants' appeal on the first and third issues, on the defendants' cross-appeal on the second issue and on the first defendant's application for permission to appeal against the dismissal of his counterclaim—

*Held*, dismissing the appeal and allowing the cross-appeal, (1) that it was not possible or wise to attempt to devise a comprehensive or exclusive definition of "sculpture" for the purposes of section 4 of the Copyright, Designs and Patents Act 1988 sufficient to determine the issue in every case; that the judge had been right to adopt the multi-factorial approach which he had; that, taking into account the legislative history of section 4, a "sculpture" had to be a work at least intended to be a work of art; that although the helmets had been created using sculpting techniques the manner of their creation did not in the absence of some element of artistic expression make them "sculptures" within the meaning of section 4; that the fact that the helmets functioned as equipment for fictitious characters did not lessen their utilitarian character and lack of artistic purpose; and that, accordingly, the defendants could rely on a defence under section 51 of the 1988 Act to the claimants' English copyright claim in respect of the first defendant's use of the claimants' drawings and model on which he had based his design for the helmet (*post*, paras 70–72, 75, 77, 80, 82, 87, 209).

D

E

*Wham-O Manufacturing Co v Lincoln Industries Ltd* [1985] RPC 127 and *Breville Europe plc v Thorn EMI Domestic Appliances Ltd* [1995] FSR 77 considered.

F

*Britain v Hanks Bros & Co* (1902) 86 LT 764 distinguished.

(2) That article 2 of the Brussels Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters, by which persons domiciled in a Convention state were ordinarily sued in the courts of that state, did not confer on the courts of the those states an universal international subject matter jurisdiction in relation to claims in rem against persons domiciled in the European Union; that the rule relating to foreign land, whereby the court had no jurisdiction to entertain an action for determination of the right or its infringement, applied also to intellectual property rights; that there were sound public policy reasons for holding that such rights, whether registered or not, should not be justiciable in the absence of a treaty governing the position; that infringement of an intellectual property right was essentially a local matter involving local policies and local public interest and should be left to local judges; that, further, different countries had conflicting policies relating to intellectual property and enforcement of non-EU rights could involve a clash of those policies; that the judge had been wrong to invoke the doctrine of forum conveniens to assume jurisdiction; and that, accordingly, the court had no

G

H

---

[2] Civil Jurisdiction and Judgments Act 1982, Sch 1 (as substituted), art 2: see post, para 123.

A    jurisdiction to enforce the claimants' United States copyright (*post*, paras 105, 129,
     148, 175–183, 185–186, 209).
          *British South Africa Co v Cia de Moçambique* [1893] AC 602, HL(E) applied.
          *Pearce v Ove Arup Partnership Ltd* [1997] Ch 293; [2000] Ch 403, CA and
     *Owusu v Jackson* (Case C-281/02) [2005] QB 801, ECJ considered.
          (3) That an English court would enforce a judgment of a foreign court if the
     judgment debtor, at the time the foreign proceedings were instituted, were present in
B    the foreign country; that since the selling of goods from one country to another did
     not amount to the presence of the seller in that country, it was not possible to say that
     advertising into a foreign country could render the advertiser present there; that the
     defendants' advertisement of the disputed products on the Internet was not
     fundamentally different from other methods used by business persons to present
     themselves and their products when not personally present and did not create,
     outside the jurisdiction or jurisdictions where the website owners were to be
C    found, the presence partaking in some sense of allegiance which was a necessary
     ingredient in the enforceability of foreign judgments; and that, accordingly, the
     claimants' United States default judgment was not enforceable in England (*post*,
     paras 192–195, 209).
          *Adams v Cape Industries plc* [1990] Ch 433, CA applied.
          (4) Granting permission for, but dismissing, the first defendant's appeal on the
     counterclaim, that in the circumstances the first defendant's agreement with the
D    claimants necessarily implied an obligation on the former to assign any copyrights to
     the latter (*post*, paras 208, 209).
          Decision of Mann J [2008] EWHC 1878 (Ch); [2009] FSR 103 reversed in part.

     The following cases are referred to in the judgment of the court:

     *Adams v Cape Industries plc* [1990] Ch 433; [1990] 2 WLR 657; [1991] 1 All ER
          929, CA
E    *Atkinson Footwear Ltd v Hodgskin International Services Ltd* (1994) 31 IPR 186
     *Badische Anilin und Soda Fabrik v Hickson* [1906] AC 419, HL(E)
     *Brancusi v United States* (1928) TD 43063; 54 Treas Dec 428
     *Breville Europe plc v Thorn EMI Domestic Appliances Ltd* [1995] FSR 77
     *Britain v Hanks Bros & Co* (1902) 86 LT 764
     *British Leyland Motor Corpn Ltd v Armstrong Patents Co Ltd* [1986] AC 577;
          [1986] 2 WLR 400; [1986] 1 All ER 850, HL(E)
F    *British South Africa Co v Cia de Moçambique* [1893] AC 602, HL(E)
     *Caproni v Alberti* (1891) 65 LT 785
     *Catalyst Investment Group Ltd v Lewinsohn* [2009] EWHC 1964 (Ch); [2010]
          Ch 218; [2010] 2 WLR 839; [2010] Bus LR 350; [2010] 1 All ER (Comm) 751
     *Clarke's Design, In re* [1896] 2 Ch 38, CA
     *Coin Controls Ltd v Suzo International (UK) Ltd* [1999] Ch 33; [1998] 3 WLR 420;
          [1997] 3 All ER 45
G    *Davis (J & S) (Holdings) Ltd v Wright Health Group Ltd* [1988] RPC 403
     *Designers Guild Ltd v Russell Williams (Textiles) Ltd (trading as Washington DC)*
          [2000] 1 WLR 2416; [2001] 1 All ER 700, HL(E)
     *Dow Jones & Co Inc v Gutnick* [2002] HCA 56; 210 CLR 575; 194 ALR 433
     *Foster v Driscoll* [1929] 1 KB 470, CA
     *Gesellschaft für Antriebstechnik mbH & Co KG v Lamellen und Kupplungsbau
          Beteiligungs KG* (Casc C-4/03) [2006] ECR I-6509; [2006] FSR 967, ECJ
H    *Great Western Railway Co v Owners of SS Mostyn* [1928] AC 57, HL(E)
     *Griggs Group Ltd v Evans* [2005] EWCA Civ 11; [2005] FSR 706, CA
     *Griggs (R) Group Ltd v Evans* [2004] EWHC 1088 (Ch); [2005] Ch 153; [2005]
          2 WLR 513
     *Hesperides Hotels Ltd v Aegean Turkish Holidays Ltd* [1979] AC 508; [1978]
          3 WLR 378; [1978] 2 All ER 1168, HL(E)

*King Features Syndicate Inc v O & M Kleeman Ltd* [1941] AC 417; [1941] 2 All ER   A
 403, HL(E)
*Konkola Copper Mines plc v Coromin Ltd* [2005] EWHC 898 (Comm); [2005] 2 All
 ER (Comm) 637; [2005] 2 Lloyd's Rep 555; [2006] EWCA Civ 5; [2006] 1 All
 ER (Comm) 437; [2006] 1 Lloyd's Rep 410, CA
*Littauer Glove Corpn v FW Millington (1920) Ltd* (1928) 44 TLR 746
*London Film Productions Ltd v Intercontinental Communications Inc* (1984)
 580 F Supp 47                                                              B
*Metix (UK) Ltd v GH Maughan (Plastics) Ltd* [1997] FSR 718
*Owusu v Jackson* (Case C-281/02) [2005] QB 801; [2005] 2 WLR 942; [2005] 2 All
 ER (Comm) 577; [2005] 1 Lloyd's Rep 452; [2005] ECR I-1383, ECJ
*Pearce v Ove Arup Partnership Ltd* [1997] Ch 293; [1997] 2 WLR 779; [1997] 3 All
 ER 31; [2000] Ch 403; [2000] 3 WLR 332; [1999] 1 All ER 769, CA
*Plastus Kreativ AB v Minnesota Mining and Manufacturing Co* [1995] RPC 438
*Potter v Broken Hill Pty Co Ltd* (1906) 3 CLR 479                         C
*Pytram Ltd v Models (Leicester) Ltd* [1930] 1 Ch 639
*Ray (Robin) v Classic FM plc* [1998] FSR 622
*Roche Nederland BV v Primus* (Case C-539/03) [2006] ECR I-6535; [2007] FSR
 106, ECJ
*Satyam Computer Services Ltd v Upaid Systems Ltd* [2008] EWHC 31 (Comm);
 [2008] 1 All ER (Comm) 737
*TS Production LLC v Drew Pictures Pty Ltd* [2008] FCAFC 194; 172 FCR 433    D
*Tyburn Productions Ltd v Conan Doyle* [1991] Ch 75; [1990] 3 WLR 167; [1990]
 1 All ER 909
*Usher v Barlow* [1952] Ch 255; [1952] 1 All ER 205, CA
*Voda v Cordis Corpn* (2007) 476 F 3d 887
*Vogel v R & A Kohnstamm Ltd* [1973] QB 133; [1971] 3 WLR 537; [1971] 2 All ER
 1428
*Wham-O Manufacturing Co v Lincoln Industries Ltd* [1985] RPC 127
*Wildash v Klein* (2004) 61 IPR 324                                         E

No additional cases were cited in argument.

The following additional cases, although not cited, were referred to in the skeleton
arguments:

*Hay & Hay Construction Co Ltd v Sloan* (1957) 12 DLR 2d 397               F
*Hensher (George) Ltd v Restawile Upholstery (Lancs) Ltd* [1976] AC 64; [1974]
 2 WLR 700; [1974] 2 All ER 420, HL(E)
*Hi-Tech Autoparts Ltd v Towergate Two Ltd* [2002] FSR 254
*Wellington (Duke of), In re, Glentanar v Wellington* [1947] Ch 506; [1948] Ch 118;
 [1947] 2 All ER 854, CA

**APPEAL from Mann J and APPLICATION for permission to appeal**          G
 By claim forms the claimants, Lucasfilm Ltd, Star Wars Productions Ltd
and Lucasfilm Entertainment Co Ltd, brought actions against the
defendants, Andrew Ainsworth and Shepperton Design Studios Ltd, for
breach of copyright, passing off and breach of confidence in relation to
plastic models of helmets which had featured in the "Star Wars" series of
films, and sought to enforce an award of US$10m for copyright and trade
mark infringements made on 26 September 2006 by the United States        H
District Court, Central District of California, Western Division. On 31 July
2008 Mann J (i) held that the helmets did not have an independent copyright
as "sculptures" or "works of artistic craftsmanship" and that the defendants
therefore had defences under sections 51 and 52 of the Copyright, Designs

A  and Patents Act 1988; (ii) rejected claims in passing off and breach of
confidence and the claim to enforce the United States judgment; but
(iii) upheld a claim to equitable ownership of such copyrights as the
defendants might have acquired anywhere in the world; and (iv) enforced
the claimants' United States copyright by restraining the defendants from
advertising in any publication directed to the United States of America or
sending to the United States of America replicas of identified props,
B  including in particular the helmets.

By an appellant's notice the claimants appealed with permission of the
judge against the decisions that the helmet produced by the first defendant
was not a "sculpture" for the purposes of the 1988 Act and that the award of
the Californian court was not enforceable in England.

By a respondent's notice the defendants cross-appealed against the
C  decision that the claimants' United States copyright was justiciable in
England.

By an appellant's notice the first defendant sought permission to appeal
against the decision that any copyright he had obtained in, inter alia,
the helmet belonged to the claimants.

The facts are stated in the judgment of the court.

D    *Michael Bloch QC* and *Alan Bryson* (instructed by *Harbottle &
Lewis LLP*) for the claimants.

It is sufficient for an article to be treated as a sculpture that it is produced
by a sculptural process: see *Breville Europe plc v Thorn EMI Domestic
Appliances Ltd* [1995] FSR 77; *Wham-O Manufacturing Co v Lincoln
Industries Ltd* [1985] RPC 127; *Caproni v Alberti* (1891) 65 LT 785; *Pytram
E  Ltd v Models (Leicester) Ltd* [1930] 1 Ch 39 and *Wildash v Klein* (2004)
61 IPR 324.

The test proposed in *Metix (UK) Ltd v GH Maughan (Plastics) Ltd*
[1997] FSR 718 (that the article qualifies as a sculpture for the purposes of
the Copyright, Designs and Patents Act 1988 if those involved in making the
article consider themselves, or are considered to be, artists or if they have
been concerned with the article's shape or appearance otherwise than for the
F  purpose of achieving a precise functional effect) is different from that
proposed by the judge. [Reference was made to *J & S Davis (Holdings) Ltd
v Wright Health Group Ltd* [1988] RPC 403.] The judge's decision cannot
be reconciled with *Britain v Hanks Bros & Co* (1902) 86 LT 765.

Section 51 of the 1988 Act was intended to prevent the effective assertion
of copyright in industrial articles, which were not in themselves artistic
G  works, by the assertion of copyright in design documents or models made in
the design or development phase: see *British Leyland Motor Corpn Ltd v
Armstrong Patents Co Ltd* [1986] AC 577.

The judge was wrong to conclude that *Adams v Cape Industries plc* [1990]
Ch 433 requires the defendant's physical presence in the foreign jurisdiction
for jurisdiction to be established. He was wrong to regard Internet trading as
equivalent to methods of cross-border trade in use in 1990.

H    English courts do not decline to determine matters of foreign law because
they may raise difficult, or even unsettled, points of foreign law: see *R Griggs
Group Ltd v Evans* [2005] Ch 153. The rule in *British South Africa Co v Cia
de Moçambique* [1893] AC 602 that the court has no jurisdiction to
entertain an action for damages for trespass to foreign land should be

construed narrowly: see *Potter v Broken Hill Pty Co Ltd* (1906) 3 CLR 479    A
and *Tyburn Productions Ltd v Conan Doyle* [1991] Ch 75. No established
rule precludes jurisdiction over a claim for infringement of foreign
copyright: see *Pearce v Ove Arup Partnership Ltd* [2000] Ch 403.
[Reference was also made to *TS Productions LLC v Drew Pictures Pty Ltd*
(2008) 172 FCR 433 and *Pearce v Ove Arup Partnership Ltd* [2000]
Ch 403.] A distinction should be drawn between actions which go to the    B
validity of the foreign right and actions which assume its validity and are
merely for appropriate relief: see *Satyam Computer Services Ltd v Upaid
Systems Ltd* [2008] 1 All ER (Comm) 737; *Hesperides Hotels Ltd v Aegean
Turkish Holidays Ltd* [1979] AC 508 and *London Film Productions Ltd v
Intercontinental Communications Inc* (1984) 580 F Supp 47. Article 2 of the
Brussels Convention on Jurisdiction and the Enforcement of Judgments in
Civil and Commercial Matters (1968) confers personal jurisdiction on the    C
courts of a member state in respect of acts done elsewhere in the European
Union. It has the same effect as regards acts done outside the EU: see *Owusu
v Jackson* (Case C-281/02) [2005] QB 801. [Reference was also made to
*Gesellschaft für Antriebstechnik mbH & Co KG v Lamellen und
Kupplungsbau Beteiligungs KG* (Case C-4/03) [2006] ECR I-6509 and
*Catalyst Investment Group Ltd v Lewinsohn* [2010] Ch 218.]    D
  *Coin Controls Ltd v Suzo International (UK) Ltd* [1999] Ch 33 was
wrongly decided.

  *Alastair Wilson QC* and *George Hamer* (instructed by *S C Andrew LLP*)
for the defendants.
  The judge gave appropriate consideration to all the material factors
concerning the question whether or not the articles were sculpture: see    E
*Designers Guild Ltd v Russell Williams (Textiles) Trading Ltd (trading as
Washington DC)* [2000] 1 WLR 2416. [Reference was also made to *Caproni
v Alberti* 65 LT 785; *Britain v Hanks Bros & Co* 86 LT 785; *Pytram Ltd v
Models (Leicester) Ltd* [1930] 1 Ch 639 and *Wildash v Klein* 61 IPR 324.]
If "sculpture" is interpreted too widely many designs which would have been
thought to be registrable would be excluded from registration. The Act
seeks to apply design law rather than copyright law to artistic works which    F
are design documents or models, thereby reducing the effective period of
protection: see *In re Clarke's Design* [1896] 2 Ch 38.
  As to whether the US judgment is enforceable in England on the grounds
that the defendants had a sufficient presence in the US for the purposes of
private international law, the distinctions which the claimants base on the
allegedly different world created by the Internet are insufficient to outweigh
the principles in *Adams v Cape Industries plc* [1990] Ch 433. The    G
*Moçambique* principle should apply to intellectual property disputes: see
*Coin Controls Ltd v Suzo International (UK) Ltd* [1999] Ch 33, 43, which
was not wrongly decided. *Owusu v Jackson* (Case C-281/02) [2005] QB 801
is not authority for extension of subject matter jurisdiction to claims about
events outside the EU. [Reference was made to *Atkinson Footwear Ltd v
Hodgskin International Services Ltd* (1994) 31 IPR 186 and *Plastus Kreativ
AB v Minnesota Mining and Manufacturing Co* [1995] RPC 438, 447.]    H

  *Bloch QC* replied.

  The court took time for consideration.

A    16 December 2009.  JACOB LJ handed down the following judgment of
the court.

      1    This is the judgment of the court.  All its members have contributed to
each part of it.  It is an appeal and cross-appeal from a judgment of
Mann J of 31 July 2008 [2009] FSR 103.

      2    Lucasfilm Ltd and two other claimants (collectively "Lucasfilm",
B    there being no material distinction between the claimants for present
purposes) sue Mr Andrew Ainsworth and his company.  Nothing turns on
the presence of the latter.

      3    Mr Michael Bloch QC and Mr Alan Bryson argued the case for
Lucasfilm.   Mr Alastair Wilson QC and Mr George Hamer that of
Mr Ainsworth.

C    *The principal facts*

      4    These are set out by the judge at paras 26–84.  Most of the detail no
longer matters so we confine ourselves to the essentials.

      5    In the course of making the first "Star Wars" film a number of
works were created.   They include some paintings and drawings by a
Mr McQuarrie showing scenes including stormtroopers in their helmets
D    and armour and a clay model of a stormtrooper helmet made by a
Mr Pemberton.   Mr Ainsworth was asked to produce a final version in
plastic based on the model and McQuarrie works and did so, incorporating
his own improvements.  In doing so he used what can fairly be called
"sculpting" techniques.   We say a little more about the detail of what
happened when we come to Mr Ainsworth's cross-claim.

E    6    So far as United Kingdom law is concerned it is accepted that the
two-dimensional works produced (e g the scene paintings) are copyright
works.  Whether the models for the helmet are in themselves copyright works
depends on whether they are "sculptures" within the meaning of section 4 of
the Copyright Designs and Patents Act 1988.

      7    Mr Ainsworth has admittedly made and sold copies of the helmet
F    and armour.  The appeal has concentrated on the stormtrooper helmet,
there being no separate point about the armour or helmets made for other
characters.  He accepts that he has reproduced the paintings but says he
has a defence to an infringement claim under sections 51 or 52 of the
1988 Act.

      8    As far as the position under United States law is concerned, it is now
G    accepted that US law regards what Mr Ainsworth did as an infringement of
various US copyrights.  Lucasfilm claims that the English court should itself
enforce US copyright law against Mr Ainsworth.

      9    Lucasfilm has obtained a default judgment for trade mark and
copyright infringement in California against him in the sum of US$20m.
That sum sounds strange to English ears given that he only sold about
$US14,500 worth.   No less than $10m of the $20m is "compensatory
H    damages" by US law.  Lucasfilm claims that the English court should
recognise and enforce the judgment to the extent of the $10m
"compensatory" element.  Perhaps not wanting to seem oppressive, it only
seeks to enforce its US judgment to the extent that it cannot succeed on its
claim to enforce its US copyrights directly in the English courts.

10    Mr Ainsworth claims that if the work he did in producing the helmet    A
amounts to the creation of a work of sculpture, he is the owner of the
copyright in it.

11    Although there are a mass of other works relied upon by Lucasfilm
(e g as to the design of parts of the armour) this case turns on the helmets—as
was effectively agreed by the parties. If Mr Ainsworth has infringed
copyrights relating to these he loses, if not, not. It is not necessary to go into    B
the detail of other works relied on or referred to in the evidence.

### The holdings of the judge

12    Mann J rejected all of Lucasfilm's copyright infringement claims
under UK law. He held that the models for the helmets did not have
an independent copyright as being "sculptures" or "works of artistic
craftsmanship" and that Mr Ainsworth had defences under section 51    C
and 52.

13    The judge also rejected claims in passing off and breach of
confidence and the claim to enforce the US judgment.

14    He upheld Lucasfilm's claim to equitable ownership of such
copyrights as Mr Ainsworth might have acquired anywhere in the world
as a result of his work in the creation of the original helmet and    D
rejected Mr Ainsworth's own conditional cross-claim for infringement.
Mr Ainsworth was ordered to execute all necessary assignments of such
copyright as may subsist anywhere in the world in his work.

15    Finally he upheld Lucasfilm's claim to enforce US copyright here,
granting an injunction restraining Mr Ainsworth from advertising in any
publication directed to the USA or sending to the USA replicas of identified
props—including particularly the stormtrooper helmets.    E

### The issues on the appeal

16    These have narrowed compared with those before the judge. No
appeal is pursued in respect of passing off, breach of confidence or the claim
that the prototype helmets were works of artistic craftsmanship. What
Lucasfilm does appeal are the findings that the prototypes were not    F
"sculptures" and the findings that there is a defence under section 51 or 52.
It also appeals the decision not to enforce the US default judgment.

17    Mr Ainsworth cross-appeals the decision to enforce the
US copyright. He also seeks permission to appeal (for it was refused by
the judge and by Jacob LJ provisionally on the papers) the finding that all the
copyrights (if any) in the work done by Mr Ainsworth for Lucasfilm belong    G
in equity to Lucasfilm and that he should make a consequential assignment.

### Sculpture

18    This issue is primarily relevant to the defences under sections 51
and 52 of the 1988 Act. It is also of great significance as to the term of
protection. If the prototype helmet is a "sculpture" Lucasfilm will get the
full term of protection for an artistic work, 70 years from the year of death    H
of the author. If the helmet is not a work of sculpture then there is a
much shorter period of protection (under the copyright in the painting and
drawings)—broadly 15 years from first marketing of reproductions—
a period which has now expired.

A     19   The issue also determines whether Mr Ainsworth could have acquired his own copyright in the helmets which he produced based on the refinements he made to the facial details when working on the prototype. This is dealt with by the judge at para 36. Lucasfilm contends that the helmets and armour and the toy stormtroopers which were subsequently produced (and which are reproductions of the stormtrooper helmet and armour) are "sculptures" within the meaning of what is now section 4(1) of the 1988 Act.

B     20   Section 4 defines "artistic work" in the following terms:

*"Artistic works*

"(1) In this Part 'artistic work' means— (a) a graphic work, photograph, sculpture or collage, irrespective of artistic quality, (b) a work of architecture being a building or a model for a building, or (c) a work of artistic craftsmanship.

"(2) In this Part— 'building' includes any fixed structure, and a part of a building or fixed structure; 'graphic work' includes— (a) any painting, drawing, diagram, map, chart or plan, and (b) any engraving, etching, lithograph, woodcut or similar work; 'photograph' means a recording of light or other radiation on any medium on which an image is produced or from which an image may by any means be produced, and which is not part of a film; 'sculpture' includes a cast or model made for purposes of sculpture."

    21   In order to deal with some of the arguments about the meaning of these provisions it is necessary to say something about the legislative history of this definition. Copyright protection for sculptures was first granted by an Act of 1798 (38 Geo 3, c 71). It was not unlimited. It extended to models or casts of any bust, any part of the human figure, any statue of the human figure or the head of any animal, any part of any animal or the statue of any animal. The word "sculpture" was not used in the Act and the range of models or casts protected seems to reflect 18th century taste and fashion. The first reference to sculpture comes in a subsequent Act of 1814 (54 Geo 3, c 56) (referred to in the chronological table of statutes as the Sculpture Copyright Act) which extended the protection granted by the 1798 Act to

"any new and original sculpture, or model, or copy, or cast of the human figure or human figures, or of any bust or busts, or of any part or parts of the human figure, clothed in drapery or otherwise, or of any animal or animals, or of any part or parts of any animal combined with the human figure or otherwise, or of any subject being matter of invention in sculpture, or of any alto or basso-relievo representing any of the matters or things hereinbefore mentioned . . ."

    22   The 1814 Act records in its Preamble that it was passed for giving further encouragement to the "Art of making new models and casts of busts and other things" and for giving further encouragement to such arts. It remained in force until repealed by the Copyright Act 1911 (1 & 2 Geo 5, c 46). This defined an "artistic work" as including "works of painting, drawing, sculpture and artistic craftsmanship, and architectural works of art and engravings and photographs". A work of sculpture included casts and models: see section 35(1).

23   Section 22 of the 1911 Act provided:                               A

"(1) This Act shall not apply to designs capable of being registered
under the Patents and Designs Act 1907 [(7 Edw 7, c 29)], except
designs which, though capable of being so registered, are not used or
intended to be used as models or patterns to be multiplied by any
industrial process.
"(2) General rules under section 86 of the Patents and Designs Act    B
1907 may be made for determining the conditions under which a design
shall be deemed to be used for such purposes as aforesaid."

24   The 1907 Act gave registered designs a maximum of 15 years'
protection for what it rather confusingly called "copyright in the design": see
section 53. The right was a true monopoly, unlike a copyright which only
provides protection against copying. "Design" was defined in section 93 as    C
meaning:

"any design (not being a design for a sculpture or other thing within the
protection of the Sculpture Copyright Act 1814) applicable to any article,
whether the design is applicable for the pattern, or for the shape or
configuration, or for the ornament thereof, or for any two or more of such
purposes, and by whatever means it is applicable, whether by printing,    D
painting, embroidering, weaving, sewing, modelling, casting, embossing,
engraving, staining, or any other means whatever, manual, mechanical,
or chemical, separate or combined."

25   The position therefore at the time of the 1911 Act was that works of
sculpture as defined continued to attract full copyright protection and were
not excluded by the operation of section 22 because of the definition of    E
"design" in the 1907 Act. This had been the case since soon after the
introduction of copyright protection for designs. The Copyright of Designs
Act 1839 (2 & 3 Vict c 17) gave one year's protection to

"a new and original design made for the modelling, or the casting, or
the embossment, or the chasing, or the engraving, or for any other kind of
impression or ornament on any article of manufacture"                      F

and three years' if it was made of metal. This created the potential for works
of sculpture to be protected under both the 1814 and the 1839 Acts but this
changed when sculpture was excluded from the definition of "design" in the
Copyright of Designs Act 1842 (5 & 6 Vict c 100).

26   Sculptures were included in the system of registration for designs
under the Copyright of Designs Act 1850 (13 & 14 Vict c 104) but continued    G
to enjoy the period of protection granted by the Sculpture Copyright Acts.
The 1850 Act was repealed by the Patents, Designs and Trade Mark Act
1883 (46 & 47 Vict c 57) which granted five years' protection for a
registered design and removed sculptures from the system of registration by
defining "design" so as to exclude a design for sculpture within the
protection of the Sculpture Copyright Act 1814: see section 60. This was the
definition and treatment that was carried forward when the 1883 Act was    H
repealed and replaced by the Patents and Designs Act 1907.

27   The 1907 Act was amended by the Patents and Designs Act 1919
(9 & 10 Geo 5, c 80) which included a new definition of "Design".
Section 19 provided:

A      " 'Design' means only the features of shape, configuration, pattern, or ornament applied to any article by any industrial process or means, whether manual, mechanical, or chemical, separate or combined, which in the finished article appeal to and are judged solely by the eye; but does not include any mode or principle of construction, or anything which is in substance a mere mechanical 'device'."

B      28   This definition removed the express exclusion of sculpture and therefore had the effect of excluding a work of sculpture from copyright protection under the 1911 Act unless the design was not used or intended to be used as a model for multiplication by an industrial process: see section 22(1). Rule 89 of the Designs Rules 1920 (SR & O 1920/337) made reproduction in more than 50 single articles as the test of whether there was multiplication by an industrial process. The consequence of this was that

C sculpture which was not to be mass produced in numbers exceeding 50 retained full copyright protection but could also in theory be protected as a design under the 1919 Act. But, in cases which were not within the exception to section 22(1) (ie models for production in numbers over 50), only registered design protection was available.

     29   The consequences of this change caught a number of copyright

D owners unawares. In *Pytram Ltd v Models (Leicester) Ltd* [1930] 1 Ch 639 a model of a wolf-cub's head was produced from a papier-mâché mould in order to be used as a totem by the Boy Scouts Association. They failed to register it as a design under what at the time was the 1907 Act and sued for infringement of their copyright under the 1911 Act. Clauson J accepted that the item was an artistic work under the 1911 Act but held that it also fell

E within the definition of a "design" under the 1907 Act as amended by the 1919 Act. As a consequence of the amended definition of "design", it was excluded from protection under the 1911 Act and no protection existed for it under the 1907 Act because it had not been registered.

     30   On Clauson J's reasoning, full copyright protection would have ceased in 1911 when the 1911 Act repealed the Sculpture Copyright Act 1814 and so rendered otiose and ineffective the reference in parenthesis to

F the 1814 Act contained in the definition of design in section 93 of the 1907 Act: see para 24 above. The new definition in section 19 of the 1919 Act did no more than to recognise this.

     31   In the *Pytram* case the judge found as a fact that the wolf's head had been made with the intention of being reproduced in large quantities. There was therefore no room for disputing that it was outside the exception

G contained in section 22(1) of the 1911 Act. But in *King Features Syndicate Inc v O & M Kleeman Ltd* [1941] AC 417 the owners of copyright in drawings of "Popeye, the Sailor" brought proceedings for infringement of their copyright against the importers of Popeye dolls and other toys. The defendants contended that the copyright in the original work had been lost by the operation of section 22 of the 1911 Act because the designs were capable of registration under the 1907 Act (although not registered) and the

H plaintiffs had previously licensed other companies to manufacture dolls and other items based on those designs. The House of Lords rejected this argument (which had been accepted by the majority in the Court of Appeal) on the ground that the condition of use or intention to use for multiplication by an industrial process had to be satisfied or not at the date when the design

first came into existence. If it was not satisfied at that time then full *A* copyright protection under the 1911 Act could not be lost by the grant of subsequent licences for the multiple reproduction of the design.

32   In 1947 the Swan Committee on the Patents and Designs Act recommended that the policy of allowing a copyright owner to be able to retain protection for his work under the 1911 Act after he had consented to the reproduction of the whole or a substantial part of his work as a *B* registered design should be reconsidered particularly in relation to copyright in artistic works. In para 310 of its final report (Cmd 7206) the committee noted that:

> "Our attention has also been directed to the position of works of sculpture. Prior to 1919, these works had always been excluded from the definition of 'design' in the design provisions of the Acts. The 1919 Act abolished this exclusion, and the decision in the case of *Pytram Ltd v* *C* *Models (Leicester) Ltd* [1930] 1 Ch 639 makes it clear that a work of sculpture intended to be reproduced more than 50 times enjoys no protection unless it is registered under the design provisions. Although questions of artistic copyright do not come within our terms of reference, we wish to express the opinion that there seems to be no sufficient reason to draw a distinction between the sculptor and the painter, writer or *D* composer, and that accordingly works of sculpture should be excluded from the definition of designs registrable under the design provisions."

33   The Registered Designs Act 1949 (12, 13 & 14 Geo 6, c 88) therefore added to the definition of a "design" in section 1(3) a further provision in section 1(4) empowering the Board of Trade to make rules for excluding from registration under the Act designs for articles which were primarily *E* literary or artistic in character.

34   This power was exercised in the form of rule 26 of the Designs Rules 1949 (SI 1949/2368) which provided:

> "There shall be excluded from registration under the Act designs to be applied to any of the following articles, namely— (1) works of sculpture other than casts or models used or intended to be used as models or *F* patterns to be multiplied by any industrial process. (2) wall plaques and medals. (3) printed matter primarily of a literary or artistic character, including bookjackets, calendars, certificates, coupons, dressmaking patterns, greetings cards, leaflets, maps, plans, postcards, stamps, trade advertisements, trade forms, and cards, transfers, and the like."

35   The combination of the 1949 Act and the Rules was therefore *G* effective to exclude the articles specified in rule 26 from registration as designs. The reference in section 22(1) of the 1911 Act to the Patent and Designs Act 1907 fell to be read in accordance with the Interpretation Act 1889 (52 & 53 Vict c 63) as a reference to the 1949 Act: see *Usher v Barlow* [1952] Ch 255. The exclusion from full copyright protection contained in section 22(1) therefore no longer applied regardless of whether the articles specified in rule 26 were intended to be used as models for the multiple *H* reproduction of the design. They remained for all purposes under the umbrella of the 1911 Act. But the position was different in the case of sculptures. As a result of the qualification contained in rule 26(1), an intention to use models or casts for mass production purposes meant that

A   they continued to attract Designs Act protection and so, to that extent, they
    continued to be excluded by section 22(1) from full copyright protection.
    The reference to multiplication by an industrial process in rule 26(1) is the
    50-plus test.

      36   The wording of rule 26(1) was obviously taken from the exception in
    section 22(1) of the 1911 Act and must therefore be given the meaning
    explained by the House of Lords in the *King Features* case [1941] AC 417,
B   the effect of which was set out in the Swan Report. A model or cast in respect
    of which the 50-plus test is satisfied would therefore only be eligible for
    registered design protection if the use or intention to use existed from the
    date of its creation.

      37   When the 1911 Act was repealed by the Copyright Act 1956
    (4 & 5 Eliz 2, c 74) transitional provisions were included in Schedule 7 to
C   exclude from protection under the 1956 Act artistic works made before
    1 June 1957 which were capable of registration under the Registered Designs
    Act 1949 and were intended to be used as a model or pattern to be multiplied
    by any industrial process: see paragraph 8(2) of Schedule 7. Paragraph 8(2)
    included an express reference to the time when the work was made thereby
    confirming the construction of section 22(1) of the 1911 Act applied by the
    House of Lords in the *King Features* case.
D
      38   In relation to new works, sculptures remained excluded by the
    1949 Act and rule 26(1) of the Designs Rules from registration as designs
    except in the case of models intended for multiple production and this
    position was continued following the passing of the 1988 Act. Although
    section 1 of the 1949 Act was replaced with a new section, the old
    section 1(4) continues in the form of what is now section 1(5) which
E   provides that: "The Secretary of State may by rules provide for excluding
    from registration under this Act designs for such articles of a primarily
    literary or artistic character as the Secretary of State thinks fit."

      39   Rule 26 of the Registered Design Rules 1989 (SI 1989/1105)
    continues to exclude from registration "works of sculpture, other than casts
    or models used or intended to be used as models or patterns to be multiplied
    by any industrial process".
F
      40   It will be necessary to return to some of this legislative history when
    considering the defences relied on by Mr Ainsworth under sections 51 and
    52 of the 1988 Act. But in relation to the issue of how one should construe
    the word "sculpture" in what is now section 4(1)(a) of the 1988 Act, two
    things are clear. The first is that (contrary to some of the arguments
    addressed to us) one gets little or no real assistance from the relationship
G   between copyright and registered design right in determining the limits of
    protection which the use of the word "sculpture" was intended to have. We
    can ignore for the purposes of this appeal the effect of Directive 98/71/EC of
    the European Parliament and of the Council of 13 October 1998 on the legal
    protection of designs (OJ 1998 L289, p 28). If one concentrates on the
    position under the 1949 Act the definition of "design" emphasises that
    registered designs are intended to protect features of an industrial article
H   which have eye appeal and not merely functional aspects of the design.
    Features of shape and configuration can be included in the former.

      41   But a design feature comprising a shape which has eye appeal is
    obviously capable of including a cast or model for a sculpture. The express
    exclusion of such casts or models from registered design protection by

rule 26 except for those intended to be used for multiplication by an  A
industrial process indicates that, but for rule 26, all such items could be
eligible for dual protection under both the 1988 and the 1949 Acts provided
that they have the element of novelty required for registration as a design.

42   That said, the second point is that the definitions of "design" and
"artistic work" are not the same and are concerned to identify different
things. A model or cast could be registrable as a design under the 1949 Act if
it is new and original and has the necessary features of shape or ornament  B
which create visual appeal. The existence of those features (and only those
features) in what might otherwise be a purely functional object are what
attract protection. Even where the visual design features are those of shape,
a distinction has to be drawn between the features which are part of the
design and those which are intrinsic to the article in question: i e the
difference between the shape of a thing and a thing of that shape: see  C
*In re Clarke's Design* [1896] 2 Ch 38, 43.

43   The emphasis in copyright is different. Copyright protection in
artistic works is defined (now in section 4 of the 1988 Act) by reference to
various categories of work with no distinction between their aesthetic merits
and appeal and their functionality. A graphic work can include a diagram or
plan which is designed to have only practical utility. But it is still protected  D
as an artistic work. Equally it can comprise a painting which (however bad
it may be in artistic terms) is unlikely to be anything but decorative. The key
therefore to copyright protection is that the work created by the author falls
within one or other of the descriptions contained in the 1988 Act: i e, that it
is such a work. It does not depend upon a further analysis or identification
of its design features.

44   The issue of construction raised by this appeal has therefore to be  E
determined by reference to the copyright provisions of the 1988 Act
themselves. The fact that a model or cast which qualifies as a sculpture may
have design features which also entitle it to registration as a design in those
respects tells one little about how to define the limits of copyright protection.
They are simply different issues. A work of sculpture in the traditional fine
art sense would undoubtedly have the qualities of eye appeal necessary to
make its shape registrable as a design. But the converse does not follow.  F
A principally utilitarian object with design features which could attract
registered design protection is not necessarily a work of sculpture under the
1988 Act.

45   The helmet and armour were made in 1976 when the relevant
definition of "artistic work" was that contained in section 3 of the 1956 Act.
This included paintings, sculptures, drawings, engravings and photographs  G
irrespective of artistic quality and is not therefore materially different from
the provisions of section 4 of the 1988 Act. It is common ground that the
substance of these provisions has not changed between 1911 and the present
day. For convenience, we will therefore refer to the provisions of section 4.

46   Although this defines an artistic work, there is no definition of
sculpture beyond the direction that it includes a cast or model made for the
purposes of sculpture. The closest one ever gets to a more comprehensive  H
definition is in the Sculpture Copyright Act 1814 which specified in some
detail the type of sculptures or models which qualified for protection.
Although there is no definition of sculpture as such even in that statute, it is
clear from the words used that the Act was concerned with sculpture in its

A   traditional and conventional sense of a work of art. That much is apparent
    both from the terms of the preamble to the Act and from the description of
    the types of work included.

    47   Notions of what constitutes a work of sculpture have expanded over
    the years. In *Wham-O Manufacturing Co v Lincoln Industries Ltd* [1985]
    RPC 127, 155–156, Davison CJ quoted the *Encyclopaedia Britannica*:

B       "In the *New Encyclopaedia Britannica*, vol 16, p 421 [now 15th ed
        (1992), vol 27, p 42] there appears an article on the 'Art of Sculpture'.
        The following passages are of some interest: 'Sculpture is not a fixed term
        that applies to a permanently circumscribed category of objects or sets of
        activities. It is, rather, the name of an art that grows and changes and is
        continually extending the range of its activities and evolving new kinds of
        objects. The scope of the term is much wider in the second half of the
C       20th century than it was only two or three decades ago, and in the present
        fluid state of the visual arts, nobody can predict what its future extensions
        are likely to be. Certain features, which in previous centuries were
        considered essential to the art of sculpture, are not present in a great deal
        of modern sculpture and can no longer form part of its definition. One of
        the most important of these is representation. Before the 20th century,
D       sculpture was considered a representational art; but its scope has now
        been extended to include non-representational forms. It has long been
        accepted that the forms of such functional three-dimensional objects as
        furniture, pots and buildings may be expressive and beautiful without
        being in any way representational, but it is only in the 20th century that
        non-functional, non-representational, three-dimensional works of art
E       have been produced . . . 20th century sculpture is not confined to the two
        traditional forming processes of carving and modelling or to such
        traditional natural materials as stone, metal, wood, ivory, bone and clay.
        Because present-day sculptors use any materials and methods of
        manufacture that will serve their purposes, the art of sculpture can no
        longer be identified with any special materials or techniques. Through all
        of these changes there is probably only one thing that has remained
F       constant in the art of sculpture, and it is this that emerges as the central
        and abiding concern of sculptors: the art of sculpture is the branch of the
        visual arts that is especially concerned with the creation of expressive
        form in three dimensions.' "

    Likewise the dictionary definitions of "sculpture" recognise that taste has
    changed. In the *Shorter Oxford English Dictionary* it is described as:
G
        "Originally, the process or art of carving or engraving a hard material
        so as to produce designs or figures in relief, in intaglio, or in the round.
        In modern use, that branch of fine art which is concerned with the
        production of figures in the round or in relief, either by carving, by
        fashioning some plastic substance, or by making a mould for casting in
        metal . . ."

H
    48   The recognition of abstract shapes as works of art was established
    early in the 20th century if not before. In 1928 the sculptor Constantin
    Brancusi successfully argued that his bronze sculpture "Bird in Flight" was
    exempt from US import duties (Customs wanted to charge on the basis of its
    scrap metal value!) as a sculpture and work of art: see *Brancusi v United*

*States* (1928) TD 43063. Today no one would dispute that abstract   A
sculpture is a branch of the fine arts.

49    But the word sculpture can also be used to describe the process by
which an object is created. Most usually this will consist of moulding or
carving the relevant material into the desired shape or, in the case of a metal
cast sculpture, of creating the necessary cast or mould.

50    The latter process is not, of course, confined to works of art. Casting   B
or moulding is an industrial process commonly used where the end product
is made of plastic or metal of some kind. It is used in the production of
millions of ordinary household objects, none of which would usually be
described as sculptures. A motor car is but one obvious example. Some
would have qualified for protection as registered designs so as to be excluded
under section 22(1) of the 1911 Act. But would they have qualified as
"sculpture"?                                                          C

51    The judge gave a clear no to this question. His view was that the
stormtrooper helmet, although created by a process of moulding, was
primarily utilitarian in function [2009] FSR 103, paras 121–122:

> "121. First, the original stormtrooper helmet. This has, as its genesis,
> the McQuarrie drawings. The purpose of the helmet was that it was to be
> worn as an item of costume in a film, to identify a character, but in   D
> addition to portray something about that character—its allegiance, force,
> menace, purpose and, to some extent, probably its anonymity. It was a
> mixture of costume and prop. But its primary function is utilitarian.
> While it was intended to express something, that was for utilitarian
> purposes. While it has an interest as an object, and while it was intended
> to express an idea, it was not conceived, or created, with the intention   E
> that it should do so other than as part of character portrayal in the film.
> That, in my view, does not give it the necessary quality of artistic creation
> inherent in the test suggested by Laddie J. Not everything which has
> design appeal is necessarily a sculpture. I think that the ordinary
> perception of what is a sculpture would be over-stretched by including
> this helmet within it, and when rationalised the reasons are those just
> given. It is not that it lacks artistic merit; it lacks artistic purpose.   F
> I therefore find that the Stormtrooper helmet is not a sculpture.
>
> "122. The same reasoning applies to the armour, and to the other
> helmets. They all shared the same sort of original purpose."

52    He took the same view, at para 123, about the toy stormtroopers:

> "Next, it is necessary to consider the toy Stormtroopers, and other   G
> characters, which are taken as being reproductions of the armour and
> helmets for the purposes of section 52. These are, as already described,
> articulated models which are sold as toys and which are intended for the
> purposes of play. Play is their primary, if not sole, purpose. While their
> appearance is obviously highly important (if they did not look like the
> original, the child would not be so interested) they are not made for the
> purposes of their visual appearance as such. While there is no accounting   H
> for taste, it is highly unlikely that they would be placed on display and
> periodically admired as such. The child is intended to use them in a
> (literally) hands-on way, in a form of delegated role play, and that is
> doubtless how they are actually used. That means, in my view, they are

A  not sculptures. They can be distinguished from the model in *Britain v Hank Bros & Co* (1902) 86 LT 764 which apparently had a significant element of being admirable for its own visual sake. That does not apply to the Stormtrooper, whose only real purpose is play. In reaching this conclusion I am not saying that the *Britain* model is better at what it portrays than the Stormtrooper model. That would be to make judgments about artistic quality, which the statute understandably
B  forbids. It is making a judgment about whether there is anything in the model which has an artistic essence, in the sense identified above. I conclude that there is not."

53  In order to reject their classification as sculpture the judge concentrated on purpose. Purely functional items (even though well designed and visually attractive) did not, in his view, qualify as sculptures
C  because they were not created primarily for the purpose of their visual appeal. Essentially functional objects should look to protection for their visual merits as registered designs.

54  In putting forward this test the judge was expressly conscious of the need not to make value judgments about the artistic quality of the designs involved. The definition of "artistic work" in the Copyright Acts makes that
D  impermissible. But, after a review of the authorities, he set out a list of guidelines which he considered could be derived from the cases. We set it out verbatim, from para 118:

  "From those authorities, and those approaches, a number of guidance factors can be extracted. I call them guidance rather than points of principle, because that gives them the right emphasis. The judges
E  deciding the cases have not sought to lay down hard and fast rules in an area where subjective considerations are likely to intrude, and I will not attempt to do so either. However, I do think the following points emerge from the cases or from the concepts involved: (i) Some regard has to be had to the normal use of the word. (ii) Nevertheless, the concept can be applicable to things going beyond what one would normally expect to be art in the sense of the sort of things that one would expect to find in
F  art galleries. (iii) It is inappropriate to stray too far from what would normally be regarded as sculpture. (iv) No judgment is to be made about artistic worth. (v) Not every three-dimensional representation of a concept can be regarded as a sculpture. Otherwise every three-dimensional construction or fabrication would be a sculpture, and that cannot be right. (vi) It is of the essence of a sculpture that it should have,
G  as part of its purpose, a visual appeal in the sense that it might be enjoyed for that purpose alone, whether or not it might have another purpose as well. The purpose is that of the creator. This reflects the reference to 'artist's hand' in the judgment of Laddie J in *Metix (UK) Ltd v GH Maughan (Plastics) Ltd* [1997] FSR 718, with which I respectfully agree. An artist (in the realm of the visual arts) creates something because it has visual appeal which he wishes to be enjoyed as such. He may fail,
H  but that does not matter (no judgments are to be made about artistic merit). It is the underlying purpose that is important. I think that this encapsulates the ideas set out in the reference works referred to in *Wham-O* [1985] RPC 127 and set out above (and in particular the *Encyclopaedia Britannica*). (vii) The fact that the object has some other

use does not necessarily disqualify it from being a sculpture, but it still has
to have the intrinsic quality of being intended to be enjoyed as a visual
thing. Thus the model soldier in *Britain* might be played with, but it still,
apparently, had strong purely visual appeal which might be enjoyed as
such. Similarly, the Critters in *Wildash v Klein* (2004) 61 IPR 324 had
other functions, but they still had strong purely visual appeal. It explains
why the Frisbee itself should be excluded from the category, along with
the moulds in *Metix* and *J & S Davis (Holdings) Ltd v Wright Health
Group Ltd* [1988] RPC 403. It would also exclude the wooden
model in *Wham-O* and the plaster casts in *Breville Europe plc v Thorn
EMI Domestic Appliances Ltd* [1995] FSR 77, and I would respectfully
disagree with the conclusions reached by the judges in those cases that
those things were sculptures. Those decisions, in my view, would not
accord with the ordinary view of what a sculpture is, and if one asks why
then I think that the answer is that the products fail this requirement and
the preceding one—there is no intention that the object itself should have
visual appeal for its own sake, and every intention that it be purely
functional. (viii) I support this analysis with an example. A pile of bricks,
temporarily on display at the Tate Modern for two weeks, is plainly
capable of being a sculpture. The identical pile of bricks dumped at the
end of my driveway for two weeks preparatory to a building project is
equally plainly not. One asks why there is that difference, and the answer
lies, in my view, in having regard to its purpose. One is created by the
hand of an artist, for artistic purposes, and the other is created by a
builder, for building purposes. I appreciate that this example might be
criticised for building in assumptions relating to what it seeks to
demonstrate, and then extracting, or justifying, a test from that, but in the
heavily subjective realms of definition in the artistic field one has to start
somewhere. (ix) The process of fabrication is relevant but not
determinative. I do not see why a purely functional item, not intended to
be at all decorative, should be treated as a sculpture simply because it is
(for example) carved out of wood or stone."

55   Mr Bloch appeals against this analysis by the judge and his
application of it to the stormtrooper items on essentially two grounds. He
contends that the definition of "artistic work" in the Copyright Acts since
1911 concentrates on what the specific objects are rather than on whether
they have any particular artistic qualities or merit. The test is therefore
essentially descriptive. What they are must depend, he says, on how they
were made. A drawing is no more than the product of the draftsman's skill
applying a particular technique. Artistic or visual purpose is irrelevant to its
qualifying as a drawing. The same approach should be used in respect of
sculpture. If the object has been sculpted by a physical process to which
that description can be applied then the outcome should be a sculpture.
Nothing more is needed. In this case the helmets and armour were made
after moulds had been carved to the required shape and then used to create
the finished article.

56   But he also submits that even if the judge's test is right and the object
has to be made in order to display some kind of visual appeal then the helmet
and armour qualify. They were designed to project to the audience for the
film a representation of a fictional soldier whose character could be derived

A   from the image of the design itself. They are not real helmets and suits of armour. They were, Mr Bloch submits, purely representational in character and never had any utility beyond that of a film prop. But, in that capacity, they were designed to be highly visual and embody a considerable level of artistic skill and design.

57   It is convenient at this point to examine the cases which provide the foundation for the judge's test. They begin with *Caproni v Alberti* (1891) 65 LT 785: a case under the Sculpture Copyright Act 1814. The defendant copied three casts made by the plaintiff of various arrangements of fruit and leaves. The defence was that the 1814 Act did not refer to casts of flowers, leaves or fruit and that such casts did not fall within the words "any subject being matter of invention in sculpture". It was not suggested that the casts which were copied were not otherwise works of sculpture. The judge rejected this argument but his decision offers no real guidance as to what is necessary to constitute a sculpture. He found that the cast had been produced by carving an artistic reproduction of the fruit and leaves so that this was not, on any view, a borderline case.

58   The next decision chronologically is *Britain v Hanks Bros & Co* (1902) 86 LT 765. This also involved a claim to copyright under the 1814 Act. The defendants made copies of various metal models of soldiers produced by the plaintiffs. Their claim to copyright in these items was disputed. The defendants' argument was that the 1814 Act applied only to substantial works of art and not to metal toys of no artistic merit. Wright J directed himself that the question whether the model figure fell within the Act had to be decided upon evidence as to its artistic character. The models were of real soldiers and were found by the judge to be artistic productions of the mounted yeoman they depicted.

59   It is difficult again to take too much from this case. It is clear that the judge rejected the defendants' contention that the models were mere toys of no artistic merit. On his view, the metal figures produced therefore qualified as sculptures or models of the human figure within the meaning of the 1814 Act. They appear to have been high quality lead soldiers cast from a model which had been made with recognisable artistic skill. It was certainly the view of the Copyright Committee of the British Board of Trade ("Gregory Committee") which reported in October 1952 (Cmd 8662) and recommended various changes to the Copyright Act that toy soldiers and other models did not qualify for copyright protection under the 1911 Act because of the operation of section 22(1) and Design Rule 26. Their only protection would be as registered designs assuming that they could satisfy the requirement of novelty. But, as mentioned earlier, this involves an acceptance that they would otherwise qualify as works of sculpture. It is, however, clear from the report that the Gregory Committee had in mind toy soldiers made from a prototype model which had the qualities necessary to make it a work of sculpture. This certainly seems to be consistent with the view of the judge in *Britain v Hanks Bros & Co* about the quality of the models he was considering. On this basis, that case was concerned with something which was not merely a toy and which, in the hands of a collector, might not be used for that purpose at all. By comparison, the toy stormtroopers were not replicas of real soldiers and were sold essentially for use as toys. The judge was not presented with evidence about how they were made or whether the prototype could itself be regarded as a sculpture.

All we know is that they were reproductions in miniature of the full-sized    A
armour and helmet.

60   We have already mentioned the decision of Clauson J in the *Pytram*
case [1930] 1 Ch 639 where the plastic model of the wolf cub's head was
held to be a sculpture within the meaning of the 1911 Act. The case was
primarily concerned with the effect on copyright protection of the
amendment to the definition of "design" in the Patents and Designs Act    B
1907. Given the judge's view about the effect of this on section 22(1), it was
not necessary to decide whether the model of the head was a sculpture
within the meaning of the 1911 Act and the judge proceeded on the
assumption that it was. The case does not therefore really assist on the point
that we have to consider, although we have no reason to doubt its
correctness. The object in question was an artistic creation of an animal's
head which was in a real sense a sculpture.                                    C

61   The next case considered by Mann J was the decision of Falconer J in
*Breville Europe plc v Thorn EMI Domestic Appliances Ltd* [1995] FSR 77.
The plaintiff company claimed copyright in various plastic shapes which
they had produced in order to create moulds for the heated plates in a
sandwich toaster. Falconer J did not have to consider the question whether
the plastic shapes amounted to sculptures because he had already found that
the defendants had not appropriated the plaintiff's designs contained in their    D
drawings in producing their own machine. But he said, at p 94:

> "Turning to the plaster shapes or sculptures, the defendants contended
> that these were not sculptures within the meaning of section 3 of the
> Copyright Act [1956] on the ground, as I understand Mr Young, that they
> were purely mechanical or functional devices and he referred me to    E
> section 1 of the definition of 'sculpture' in the original statutory provision
> relating to copyright in sculptures, section 1 of the Sculpture Copyright
> Act 1814, which is to be found reproduced in *Laddie, Prescott &
> Vitoria's Modern Law of Copyright*, p 671. I do not see why the word
> 'sculpture' in section 3 of the Copyright Act 1956 should not receive its
> ordinary dictionary meaning except in so far as the scope of the word is
> extended by section 48(1) which provides that '"sculpture" includes any    F
> cast or model made for the purposes of sculpture'. The *Concise Oxford
> Dictionary* defines sculpture as the 'Art of forming representations of
> objects etc or abstract designs in the round or in relief by chiselling stone,
> carving wood, modelling clay, casting metal, or similar processes; a work
> of sculpture', a definition forming the basis of para 3.15 on 'sculptures' in
> the textbook just mentioned where it is suggested that: 'Since copyright
> may subsist irrespective of artistic quality it would seem that, for    G
> example, carved wooden patterns intended for the purpose of casting
> mechanical parts in metal or plastic might well be susceptible of
> protection, although the point has not yet received much attention from
> practitioners.' "

62   As Mann J recognised, this case would assist Lucasfilm because it
rests on the method of production of the item in question rather than its    H
purpose. Falconer J relied on the decision of the New Zealand Court of
Appeal in *Wham-O Manufacturing Co v Lincoln Industries Ltd* [1985]
RPC 127. There it was held that a preparatory wooden model for what
became the Frisbee was protected by copyright as a sculpture even though

A   the finished article (which was made in plastic by a process of injection from
a metal mould based on the wooden model) could not be one.

    63  Davison CJ said, at pp 156–157:

    "One must ask in the present case, what was the original work of the
author which created the article sought to be classed as a sculpture? It
was not directly the creation of the final disc. It was the creation variously
B   of drawings, wooden models and finally dies or moulds from which the
finished plastic product was formed. It would seem that where a model
which is a sculpture has been created and a cast or mould is later made
from that model for the purposes of reproducing the model in metal and
plastic or some other form then the articles so produced may be classified
as sculptures. But it appears to us to be straining the meaning of the word
    'sculpture' to apply it to the discs produced by the injection moulding
C   process used in the present case where the moulds concerned have simply
been created by a process of engraving and no original model has been
created. Copyright subsists in 'original works'—see section 7 [of the
Copyright Act 1962 (NZ)]—but no original work in the nature of the
finished disc has been created before the injection moulding process has
created them. We do not overlook that the definition of sculpture in
D   section 2 of the Act 'includes any cast or model made for purposes of
sculpture'. But that is a different matter from a cast or model used to
make the sculpture. Furthermore it appears to be implicit in the
definitions of sculpture to which we have already referred and from the
article in the *New Encyclopaedia Britannica*, particularly the passage
reading: 'The art of sculpture is the branch of the visual arts that is
    especially concerned with the creation of expressive form in three
E   dimensions' that sculpture should in some way express in three-
dimensional form an idea of the sculptor. It seems to us inappropriate to
regard utilitarian objects such as plastic flying discs, manufactured as
toys, by an injection moulding process, as items of sculpture for the
purposes of the Copyright Act. They lack any expressive form of the
creator and any idea which the creator seeks to convey. In the result,
F   we are unable to hold that the final plastic products—the discs—
are sculptures in terms of the Act and entitled to copyright protection as
sculptures."

    64  Mann J thought that the distinction drawn between the original
prototype model and the finished product was somewhat arbitrary. But,
correct or not, it does not arise in this case. The helmet and armour were
G   produced by using a mould which was carved by Mr Ainsworth in order to
reproduce the designs contained in the McQuarrie pictures and the clay
model made by Mr Pemberton. If the finished products are sculpture then so
was the mould used to create them. The New Zealand Court of Appeal
accepted that this would have been the case in *Wham-O Manufacturing Co v
Lincoln Industries Ltd* [1985] RPC 127 had the mould itself been carved
    or sculpted rather than merely engraved. What therefore constituted
H   the essential distinguishing factor between the wooden prototype and the
finished product in that case was the court's definition of sculpture to
exclude merely utilitarian objects such as the Frisbee.

    65  We are not concerned on this appeal with whether the McQuarrie
paintings or the Pemberton clay models were artistic works, though the

paintings at least obviously were.  The sculpture issue relates only to    A
the articles (the helmet and the armour) which Mr Ainsworth produced.
To qualify as artistic works they have to be sculpture.  If they are, then the
defences under sections 51 and 52 of the 1988 Act are not available to him.
We have some difficulty in accepting that the wooden model of the Frisbee
should, on the reasoning of the Court of Appeal in the *Wham-O* case, have
been accorded a different treatment to that of the plastic Frisbee which it was
used to design and create.  As a prototype, it was essentially utilitarian in    B
nature in that it embodied a design for the well-known toy.  Put simply, it
was a model of a Frisbee and nothing else.  It was not intended to be a
depiction of any animate object (like the wolf-cub's head in the *Pytram* case
[1930] 1 Ch 639) nor was it made as the model for an abstract work of art.
It was therefore far removed from the creation of expressive form described
in the extract from the *New Encyclopaedia Britannica* quoted by Davison    C
CJ in his judgment.

66   The same goes for the plastic shapes considered by Falconer J in the
*Breville* case [1995] FSR 77.  No ordinary citizen—indeed no ordinary
lawyer—would regard a sandwich toaster or any part of it as a work of
sculpture—even if it did produce "scalloped" sandwiches.  So why should a
copyright lawyer take a different view?  A total or almost total emphasis on    D
the manner of creation, as in the *Breville* case and *Wham-O* case [1985]
RPC 127 produces a result which offends common sense and in our view is
wrong.  There must, as Mann J said, be some element of artistic expression
however unsuccessful.

67   It is unnecessary to say anything about the decision of Whitford J in
*J & S Davis (Holdings) v Wright Health Group Ltd* [1988] RPC 403 which
concerned a model of a dental impression tray.  The judge rejected the    E
submission that it was a sculpture largely on the grounds of its ephemeral
nature.  The only remarkable thing about the case is that anyone could have
thought the work in question could remotely be considered a "sculpture".

68   But the decision of Laddie J in *Metix (UK) Ltd v GH Maughan
(Plastics) Ltd* [1997] FSR 718 is more interesting.  Copyright was claimed in
some moulds used for making cartridges for what are described as flow    F
mixers.     The cartridges had the appearance of a double-barrelled
hypodermic syringe through which different chemicals were passed using a
plunging mechanism and then mixed to create a chemical reaction.  The
design was obviously intended to have a purely industrial application
but the plaintiff sought permission to amend its pleadings to allege
copyright infringement based on the moulds being works of sculpture.
Laddie J refused the application.  He said, at pp 721–722:    G

"The law has been bedevilled by attempts to widen out the field
covered by the Copyright Acts.  It is not possible to say with precision
what is and what is not sculpture, but I think Mr Meade was close to the
heart of the issue.  He suggested that a sculpture is a three-dimensional
work made by an artist's hand.  It appears to me that there is no reason
why the word 'sculpture' in the 1988 Act, should be extended far beyond    H
the meaning which that word has to ordinary members of the public.
There is nothing in the particulars in this case which suggests that the
manufacturers of these moulds considered themselves, or were considered
by anybody else, to be artists when they designed the moulds or that they

A    were concerned in any way with the shape or appearance of what they
     were making, save for the purpose of achieving a precise functional effect.
     Nothing in the particulars given here suggests that any consideration of
     appeal to anything other than functional criteria was in mind or achieved.
     In these circumstances, it appears to me that there is no arguable case
     pleaded for the existence of sculpture copyright in the moulds for these
B    products and I will not allow the statement of claim containing such a
     claim to be served on TAH (Europe) Inc."

     69    Finally, there is the Australian case of *Wildash v Klein* (2004)
     61 IPR 324 which concerned three-dimensional depictions of animals made
     out of wire. Some of these were also functional in that they incorporated a
     candle holder but all were decorative. Angel J held, at paras 11–12, that they
C    were sculpture:

          "11. I am satisfied that the works in question are sculptures. As
     Pincus J said in *Greenfield Products Pty Ltd v Rover-Scott Bonnar Ltd*
     (1990) 95 ALR 275, 284; 17 IPR 417, 427: 'Although the definition of
     "sculpture" is not exhaustive, in so far as the word remains undefined it
     must be given its ordinary meaning, in accordance with orthodox
D    principles of construction.' In *Lincoln Industries Ltd v Wham-O
     Manufacturing Co* [1984] 1 NZLR 641, 662; 3 IPR 115, 131 the New
     Zealand Court of Appeal concluded that 'sculpture should in some way
     express in three-dimensional form an idea of the sculptor'. Having said
     that it 'is not possible to say with precision what is and what is not
     sculpture', Laddie J in *Metix (UK) Ltd v GH Maughan (Plastics) Ltd*
E    [1997] FSR 718, 722 concluded that at 'the heart of the issue . . .
     a sculpture is a three-dimensional work made by an artist's hand.
     It appears to me that there is no reason why the word 'sculpture' in the
     [UK] Act, should be extended far beyond the meaning which that word
     has to ordinary members of the public.'
          "12. I am satisfied that the works in question are 'sculptures'. They are
     three-dimensional craft pieces hand made with a degree of skill in the
F    medium employed which are designed to have aesthetic appeal to
     potential purchasers. That some of the works in this case are also
     functional, such as the wall and table candle holders and 'mozzie coil'
     holders, does not prevent them being 'sculptures' within the meaning of
     that term in the Act. Although in *Wham-O Manufacturing Co*, the New
     Zealand Court of Appeal concluded that it was 'inappropriate to regard
     utilitarian objects such as plastic flying discs, manufactured as toys, by an
G    injection moulding process, as items of sculpture for the purposes of the
     Copyright Act', this was so because 'They lack[ed] any expressive form of
     the creator and any idea which the creator seeks to convey': [1984]
     1 NZLR 641, 662; 31 IPR 115, 131. The works in question here
     demonstrate the expression of such ideas."

     70    Against this background, we can return to the judge's guidelines
H    which are quoted in para 54 above and to Mr Bloch's criticisms of them.
     The first point concerns the normal use of the word "sculpture". Most of the
     cases proceed on the footing that one should not stray too far from the
     ordinary meaning of the word but there is considerable disagreement as to
     what that is. One of the difficulties is that the word can be used to describe

both the physical process of moulding or carving necessary to create the A
finished object and that object itself. Copyright has, of course, to exist in the
product of one's skill and labour. Not in the skill and labour itself. In
looking therefore at the finished article, it seems to us wrong to interpret the
use of the word "sculpture" in the 1911 Act (and therefore in succeeding
Copyright Acts) divorced from the earlier legislative history. The 1814 Act
was clearly concerned to identify sculpture as an artistic work. Its B
transposition into a wider category of "artistic work" under the 1911 Act
does not mean that one can ignore that context. Although some of the items
included in the list such as a map or diagram may have a high level of
functionality that should not be used as a guide to the interpretation of every
item which the statutory definition contains. Sculpture, like painting
(however good or bad it may be), does connote the work of the artist's hand
and the visual purpose attributed to it by the judge in this case. Put simply, it C
has, broadly speaking, to be a work at least intended to be a work of art.

71   We therefore accept points (i)–(vi) on the judge's list. Mr Bloch
criticises the reference in point (v) to the three-dimensional representation
of a concept on the largely metaphysical basis that all things in the world
are representations of a concept. But that seems to be an issue about
terminology. What the judge was referring to is clearly set out in the D
second sentence of that paragraph. Mr Bloch declined to accept that the
well-designed saucepan or car would not be a sculpture but we think
that this merely serves to confirm the correctness of the point made by
the judge.

72   In point (vii) Mann J deals with questions of the object's utility. This
is in many ways the most important and difficult issue because it highlights
the existence of a grey area in which, even on the approach outlined in points E
(i)–(vi), there may be difficulties in drawing the line between sculpture and
an object which, though well designed, does not qualify as such. Mr Bloch
submits that the creation of these difficulties is due to the judge's
concentration on the artistic or visual purpose of the work without which
possibly fine distinctions would not have to be made. But, unless one is
prepared to accept that almost any moulded version of a functional object is F
to be included in the definition, a line has to be drawn somewhere and some
form of differentiation made.

73   One can think up any number of marginal examples to test where the
boundary lies. Mr Bloch posed the example of a statue of a saint created as
an object of veneration for use in a church. Its religious purpose or function
would not alter its status as a sculpture. The same goes for props. G
A sculpture made for use in a play or film does not, he submits, make it any
more utilitarian than the statue of the saint and, again, should not affect its
status as a sculpture for the purpose of inclusion in the definition of artistic
work.

74   None of this is necessarily controversial but we are not convinced
that these examples really help. A plaster statue of a saint can, in artistic
terms, be very good or very bad. There are many examples of both. But H
most people would, we think, accept that both kinds were sculptures
notwithstanding their religious purpose. Similarly, a well-designed stage
prop may be highly artistic and one knows of stage sets for opera and ballet
designed by a number of artists of great note. Again their status as an artistic

A  work would not be negated by the use to which their designs were intended
   to be put.

   75   The issue in this case and the judge's approach to it does not turn on
   the purpose for which it is actually used but on the purposive nature of the
   object: what the judge described [2009] FSR 103, para 118 (vii) as its
   "intrinsic quality of being intended to be enjoyed as a visual thing". As we
   read his judgment, the purpose of the object is simply one of the relevant
B  guides to whether it qualifies as a sculpture. A precise definition of that
   term is not possible which is why the judge has outlined a number of
   considerations which should act as signposts to the right answer. One can
   demonstrate this by an example. Most people would not regard a real
   soldier's helmet as a sculpture. Although made of pressed metal from a
   mould, its essential functionality as such is to take it outside any reasonable
C  use of that term. A medieval suit of armour, however highly decorated, is no
   different. Although now of largely historical interest, it was made for a
   practical purpose which, again, characterises it as an object of utility rather
   than an artistic work. This view of these objects would not change if they
   were used as props for a play or film. Their use in that context would not
   alter their nature or their description.

D  76   But if the soldier's helmet appears on a bronze statue of a soldier as
   part of an artistic representation of the man and his kit no one would, we
   think, dispute that it formed part of a sculpture. It has no practical utility.
   It cannot be used as a helmet and, to that extent, it is not one.

   77   The result of this analysis is that it is not possible or wise to attempt
   to devise a comprehensive or exclusive definition of "sculpture" sufficient
   to determine the issue in any given case. Although this may be close to
E  adopting the elephant test of knowing one when you see one, it is almost
   inevitable in this field. We therefore consider that the judge was right to
   adopt the multi-factorial approach which he did.

   78   We turn then to the second aspect of Mr Bloch's appeal on this point
   which is whether the judge correctly applied the various guidelines he has set
   out. In doing so we observe that this is the type of case referred to by Lord
   Hoffmann in *Designers Guild Ltd v Russell Williams (Textiles) Ltd (trading
F  as Washington DC)* [2000] 1 WLR 2416 in which an appellate court must
   pay considerable respect to the assessment made by the fact-finding judge
   and should not reverse his decision unless it is satisfied that he erred in
   principle.

   79   The first class of item to consider are the helmet and armour.
   Mr Bloch seeks to avoid our example of a real soldier's helmet being used as
G  a prop in a film by stressing the fictional and imaginary nature of the
   stormtroopers and what they were. These were not, he submits, the helmet
   and armour of a real soldier and are therefore no more part of reality than
   the horn of a unicorn would be. That is not a real horn and this is not, in any
   real sense, a helmet.

   80   But that argument confuses the fictional nature of the stormtrooper
   with his physical depiction in the film. Although invented, the helmet and
H  armour are still recognisable as such and have a function within the confines
   of the film as the equipment of the stormtrooper. They are, to that extent, no
   different from and serve the same purpose as any real helmet or armour used
   in a film. The judge made this point by referring to the primary function of
   the helmet and armour as being utilitarian and lacking in artistic purpose.

A

This is simply a shorthand for the application of the various considerations set out in his para 118. He was, in our view, entitled to come to that conclusion on the facts of this case. We also think that he was right to do so. Neither the armour nor the helmet are sculpture.

81   That leaves the toy stormtroopers. Mr Bloch submits that the distinction which the judge made based on *Britain v Hanks Bros & Co* 86 LT 764 is untenable and that the facts of that case are indistinguishable from those under consideration on this appeal. The toy stormtroopers would not, of course, have qualified as sculptures under the 1814 Act because they are not statues or models of the human figure but that particular qualification no longer exists. It is, however, clear from the judgment of Wright J that the submission he had to deal with was that the models were toys of no artistic merit whereas, on the evidence, the opposite was the case.

B

C

82   As already indicated, we think the judge was right to point to the existence of what can loosely be described as a work of art as the key to the identification of sculpture. On this basis, artistic and accurate reproductions of soldiers could qualify notwithstanding that some children might wish to play with them. But in most modern cases toy soldiers, whether real or fictional, will not be works of art and will not differ materially in artistic terms from the plastic Frisbee in the *Wham-O* case [1985] RPC 127. They will be playthings registrable for their design qualities but nothing else. This distinction may be difficult to draw in some cases but we suspect that the cases which will qualify for protection under the Copyright Act will be relatively rare. The judge recognised the need not to make qualitative judgments about the artistic merits of the toy soldiers in *Britain v Hanks Bros & Co* 86 LT 764 compared to the stormtroopers and therefore emphasised the real purpose of the latter being one of play. But the true distinction between the two cases can be expressed in more fundamental terms. We are not dealing here with highly crafted models designed to appeal to the collector but which might be played with by his children. These are mass produced plastic toys. They are no more works of sculpture than the helmet and armour which they reproduce.

D

E

F

*Section 51*

83   Section 51 was introduced to deal with the problem identified by the House of Lords in *British Leyland Motor Corpn Ltd v Armstrong Patents Co Ltd* [1986] AC 577. A manufacturer whose product would not qualify for copyright protection because it fell outside the definition of "artistic work" might none the less be able to control the market through the artistic copyright in any drawings of the design. In the *British Leyland* case the issue was the ability of motor manufacturers to limit the production of spare parts in this way which the House of Lords dealt with by upholding a right of repair on the part of the car owner that effectively trumped the manufacturers' copyright.

G

84   A perhaps more principled solution came in the form of section 51 of the 1988 Act which provides:

H

   "*Design documents and models*
   "(1) It is not an infringement of any copyright in a design document or model recording or embodying a design for anything other than an

A  artistic work or a typeface to make an article to the design or to copy an
   article made to the design."
       "(3) In this section—'design' means the design of any aspect of the
   shape or configuration (whether internal or external) of the whole or part
   of an article, other than surface decoration; 'design document' means any
   record of a design, whether in the form of a drawing, a written
B  description, a photograph, data stored in a computer or otherwise."

   85  This, as the judge recorded, is directed to the production of a three-
   dimensional object in accordance with a design which is itself the subject of
   copyright. Except where the design is one for an artistic work, the use of the
   design to make what is illustrated is not an infringement.
   86  The judge held that the McQuarrie paintings and other drawings
C  were design documents within the meaning of section 51 and were used by
   Mr Ainsworth to create the stormtrooper helmet and armour. On the basis
   of his finding that the helmet and armour were not sculpture or works of
   artistic craftsmanship, section 51 therefore provided a defence to a claim of
   infringement based on his use of those works.
   87  The judge's decision that the McQuarrie paintings and drawings
   were design documents has not been challenged on this appeal. The
D  application of section 51 was resisted only on the ground that the helmets
   and armour were sculpture. The judge was therefore right to find that it
   provides Mr Ainsworth with a defence to the UK copyright claim.

   *Section 52*

   88  The application of section 51 makes it unnecessary for
E  Mr Ainsworth to rely on section 52. We can therefore deal with the point
   quite shortly.
   89  So far as relevant, section 52 provides:

       "*Effect of exploitation of design derived from artistic work*
       "(1) This section applies where an artistic work has been exploited, by
   or with the licence of the copyright owner, by— (a) making by an
F  industrial process articles falling to be treated for the purposes of this part
   as copies of the work, and (b) marketing such articles, in the United
   Kingdom or elsewhere.
       "(2) After the end of the period of 25 years from the end of the calendar
   year in which such articles are first marketed, the work may be copied by
   making articles of any description, or doing anything for the purpose of
   making articles of any description, and anything may be done in relation
G  to articles so made, without infringing copyright in the work."
       "(4) The Secretary of State may by order make provision— (a) as to the
   circumstances in which an article, or any description of article, is to be
   regarded for the purpose of this section as made by an industrial process;
   (b) excluding from the operation of this section such articles of a
   primarily literary or artistic character as he thinks fit."
H      "(6) In this section . . . (b) references to the marketing of an article are
   to its being sold or let for hire or offered or exposed for sale or hire."

   90  The reference in section 52(1)(a) to an industrial process is the
   50-plus test referred to earlier. This is set out in the Copyright (Industrial
   Processes and Excluded Articles) (No 2) Order 1989 (SI 1989/1070) which

was made pursuant to the power contained in section 52(4). The Order also  *A*
excludes from the operation of section 52: "(a) works of sculpture, other
than casts or models used or intended to be used as models or patterns to be
multiplied by any industrial process."

91   This is obviously modelled on and reproduces the provisions of
rule 26 of the Designs Rules 1949.

92   Mr Ainsworth's case before the judge was that copies of the
stormtrooper helmet and armour have been reproduced industrially for  *B*
more than 25 years. It was conceded by Lucasfilm that the artistic work in
the form of the McQuarrie works had been exploited by the making of
articles by an industrial process; that more than 50 such articles were made
and sold; that the manufacture took place outside the UK; and that the
exploitation took place both before and after the coming into force of the
1988 Act on 1 August 1989. There was, however, no agreement as to when  *C*
precisely the relevant exploitation began or whether it began more than 25
years before Mr Ainsworth produced his own copies.

93   Because exploitation began before 1 August 1989 it is necessary to
look at the transitional provisions contained in the 1988 Act. Section 10 of
the 1956 Act was designed to deal with cases of double protection for a work
both as an artistic work under the 1956 Act and as a registered design.  *D*
Section 10(2) contained provisions similar to section 52 under which a
15-year copyright period applied if works which were subject to copyright
but were also the subject of a corresponding industrial design were exploited
by the production and sale either within the UK or elsewhere of articles to
which the design had been applied.

94   Paragraph 20 of Schedule 1 to the 1988 Act provided:  *E*

"(1) Where section 10 of the 1956 Act . . . applied in relation an
artistic work at any time before commencement, section 52(2) of this Act
applies with the substitution for the period of 25 years mentioned there of
the relevant period of 15 years as defined in section 10(3) of the 1956 Act.
"(2) Except as provided in sub-paragraph (1), section 52 applies only
where articles are marketed as mentioned in subsection (1)(b) after  *F*
commencement."

95   The net effect of these provisions was that if the 15-year period had
started to run under section 10 of the 1956 Act but had not expired by
1 August 1989, section 52 came into operation in respect of the works in
question but continued to apply a reduced copyright period of 15 years
rather than the 25-year period provided for under section 52.

96   It was a condition for the operation of section 10 that the  *G*
corresponding design should at least be capable of registration under the
1956 Act. Section 10(4) provided:

"For the purposes of subsections (2) and (3) of this section, no account
shall be taken of any articles in respect of which, at the time when they
were sold, let for hire, or offered for sale or hire, the design in question
was excluded from registration under the 1949 Act by rules made under  *H*
subsection (4) of section 1 of that Act (which relates to the exclusion of
designs for articles which are primarily literary or artistic in character);
and for the purposes of any proceedings under this Act a design shall be
conclusively presumed to have been so excluded . . ."

A   97  This is a reference to rule 26 of the 1949 Designs Rules which
    excluded from registration various classes of work including works of
    sculpture other than casts or models used or intended to be used as moulds
    or patterns to be multiplied by any industrial process.

    98  Because they are not sculptures the production of the stormtrooper
    toys or, for that matter, the helmet or armour would have started time
B   running under the 1956 Act. The judge held that the 15 years expired before
    Mr Ainsworth started to make his reproductions in 2004. It is therefore
    unnecessary to consider the alternative approach under rule 26(1) which
    depends on whether there was an intention at the date when the initial works
    were created that they should be exploited in this way. Nor is it necessary to
    consider the arguments advanced on both sides as to how section 52 might
    operate were we to have decided that either any one or more of the
C   stormtrooper items was a work of sculpture, or to consider whether a new
    point raised by Mr Bloch was properly open on the pleadings. Our decision
    on that point therefore leaves intact the judge's finding that Mr Ainsworth is
    entitled to rely on a section 52 defence.

    *Enforcement by English court of US copyright?*

D   99  Because Mr Ainsworth is physically within the jurisdiction of the
    courts of England and Wales, there is no doubt that these courts have
    "personal" jurisdiction. He was properly served. The question we have to
    decide is whether the court must, alternatively should, accept what conflicts
    lawyers called "subject matter" jurisdiction. Must or should this court
    accept jurisdiction to enforce Lucasfilm's US copyrights against
E   Mr Ainsworth for what he has done and threatens to do by way of sales from
    here to the US?

    100  The starting point here is that it is now common ground or
    undisputed that Lucasfilm does have US copyrights and that Mr Ainsworth
    has infringed them. The acts which constitute infringement by US law were
    all actually done in or from the UK. They consist of sales to US customers in
    the US by despatch of products from the UK, advertising on the Internet and
F   the placing of advertisements in US publications. It would seem that
    questions of where the property passes, or where the contract was made, or
    what law governs it and the like are irrelevant under US law. They might not
    be if the position were the other way round: see e g *Badische Anilin und Soda
    Fabrik v Hickson* [1906] AC 419—under the old law no UK patent
    infringement by sale and despatch from Germany. It is not necessary to
G   examine whether the concession of infringement according to US law is
    correct. What is to be noted is that the extent to which US copyright law
    extends "a long arm" to acts in fact done only in this country is itself a
    question of American, not English law. Other foreign laws might extend an
    even longer arm: if they did it would make no difference if jurisdiction here is
    automatic and compulsory.

    101  The arguments for subject matter jurisdiction fall under three
H   heads. (a) That the judgment in *Owusu v Jackson* (Case C-281/02) [2005]
    QB 801 compels it. (b) That this court in *Pearce v Ove Arup Partnership Ltd*
    [2000] Ch 403 decided that the English courts have subject matter
    jurisdiction over all acts of infringement of copyright committed anywhere
    in the world. (c) That, even if subject matter jurisdiction is not compelled,