# EXHIBIT A, PART 2

A

the courts here have a discretion to accept jurisdiction and should do so as a matter of forum conveniens.

102  We turn to examine the first two of these heads in detail.  We do not examine the third much because, as will be seen, we do not consider that the courts of England and Wales have subject matter jurisdiction.

### (a) The effect of Owusu v Jackson

B

103  It is convenient to take this first.  The point was not argued below and Mr Wilson is technically right that a necessary foundation for that argument—that Mr Ainsworth is domiciled here—was never formally pleaded or proved though it is clearly the case.  Mr Wilson only took the point so as to preserve his client's position on costs, a matter which Mr Bloch seemed inclined to accept.  Accordingly we are prepared to entertain the argument.

C

104  The Owusu case [2005] QB 801 was a reference about the Brussels Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters of 27 September 1968 (OJ 1978 L304, p 36) (as amended).  That has now been replaced by Council Regulation (EC) No 44/2001 of 22 December 2000 on jurisdiction and the recognition of enforcement of judgments in civil and commercial matters (OJ 2001 L12, p 1).  It is not suggested that this makes any difference.

D

105  The proposition is that the Owusu case decided that, for the EU, the courts of the member state of the defendant's domicile have, and must exercise, subject matter jurisdiction over any claim in any civil or commercial matter brought against the defendant unless it is one of the excluded matters provided for in article 1 of the Regulation.  It makes no difference that the claim is in respect of acts done by the defendant in a place far far away from the EU.  Or that the acts, if done by the defendant in his member state of domicile, are lawful by the law of that state.  Or that the courts of the country where the defendant actually did the allegedly wrongful act also have personal jurisdiction over him, with the obvious consequences for forum shopping that implies.  Or that the dispute concerned has no intra-member state or effect.  Or that there is no EU interest requiring or making it convenient that the member state concerned should have jurisdiction.  If correct, the rule is rigid, admitting of no exception.  We will call the postulated subject matter jurisdiction the "extra-EU jurisdiction".  It could also be called "universal international jurisdiction".

E

F

106  The postulate involves this: that the Convention and then its replacement Regulation which are essentially about allocation of jurisdiction and recognition of judgments of EU member states have, by a sidewind, created the extra-EU jurisdiction, even though the subject matter has nothing to do with the EU.

G

107  Another consequence would be this.  The courts of member states would be required to take subject matter jurisdiction over claims about extra-EU events where, if they had occurred in another member state, there would be no jurisdiction.  Article 22 of the Regulation provides for exclusive jurisdiction, regardless of domicile, in respect of a variety of identified matters, e g rights in rem in immovable property, validity of the constitution of companies, validity of entries in public registers, and validity of patents.

H

A    In each case the exclusive jurisdiction is conferred on the courts of the
     member state where the subject matter is situate. Thus the courts of the
     member state where the immovable property is, or the company has its seat,
     or the public register is or the patent is registered, have exclusive jurisdiction.
     None of that would apply to non-EU matters of the type excluded by
     article 22. So, for example, if proceedings for infringement of a US patent
B    were brought against a person domiciled in a member state, article 22 does
     not exclude jurisdiction over validity. So the defendant could challenge the
     validity of the patent. Yet the Court of Justice of the European Communities
     has held (at any rate where validity is challenged) that there is no cross-
     border jurisdiction within the EU. You cannot sue in member state A for an
     infringement of patent in member state B at least if the defendant challenges
     validity: *Gesellschaft für Antriebstechnik mbH & Co KG v Lamellen und*
C    *Kupplungsbau Beteiligungs KG* (Case C-4/03) [2006] ECR I-6509 and
     *Roche Nederland BV v Primus* (Case C-539/03) [2006] ECR I-6535. Why?
     Because article 22(4) (formerly article 16(4)) forbids it.
         108   In short, therefore, the whole of article 22 only makes sense if the
     proposed extra-EU jurisdiction is not conferred by the Regulation.
         109   There is yet another consideration strongly pointing away from the
D    postulated jurisdiction. It is this. The Convention was, and the Regulation
     is, about both jurisdiction and recognition (and enforcement) of judgments.
     No one suggests an actual judgment of the court of a non-EU member state is
     covered. Having got a judgment in, say, the United States, you cannot use
     the Regulation simply to register it in a member state and enforce it there.
     Lucasfilm does not invoke the Regulation in its claim to enforce the default
     US judgment. But the absence of a judgment-recognition rule makes no
E    sense whatever if there were extra-EU jurisdiction. Why would the legislator
     provide that even where you have actually vindicated your rights in the
     courts of a non-EU state, if you want to pursue a defendant domiciled in an
     EU member state you have to do so all over again (subject, perhaps, to some
     local rule about res judicata). The truth is that jurisdiction and recognition
     go hand-in-hand. Where the Regulation confers jurisdiction it then goes on
     to provide cross-border recognition. If it had been intended to confer extra-
F    EU jurisdiction it would have provided also for cross-border recognition.
         110   Further there is nothing reciprocal about the proposed extra-EU
     jurisdiction. If it exists, citizens of non-EU countries are entitled to sue
     anyone domiciled in an EU member state in the courts of that member state,
     but there is no necessary entitlement for a citizen domiciled in an
     EU member state to sue for wrongs done within that member state in the
G    courts of any non-EU state which has personal jurisdiction over a defendant.
     It is wholly improbable that the EU legislator would have intended to create
     such a non-reciprocal state of affairs, putting EU citizens at a disadvantage
     against non-EU citizens.
         111   Moreover although the Regulation has a clear lis pendens rule
     about parallel actions relating to the same alleged wrong in different
H    member states, there is no lis pendens rule for a similar situation concerning
     parallel actions in a court of a member state and that of a third country. Nor
     could there be, for the EU could not legislate for third countries. So here, for
     instance, if Lucasfilm had sued Mr Ainsworth both in the US and here at
     the same time, the Regulation has no rule, "first seised" or otherwise, to

deal with it. Both actions could proceed with the obvious possibility of inconsistent judgments.

112   It is also noteworthy that if this far-reaching and important jurisdiction existed, no one has noticed it from the time of the initial Brussels Convention in 1968 until now.

113   Moreover, after the oral hearing, Lucasfilm provided us with a table showing examples of cases where the courts of member states, have, it is suggested, to some extent assumed full international jurisdiction in copyright or related rights. We have not seen the decisions themselves. And Mr Ainsworth's lawyers simply do not have the resources to deal with the table, or to try to produce a counter-table. According to the summary many, though not all of the cases may have involved straightforward enforcement of contractual obligations or recognition of assignments rather than a full assumption of worldwide international jurisdiction over subject matter. And other cases involve assumption of subject matter jurisdiction for acts done in other member states, which is of no assistance here. What is important in the present context is that it is not suggested that in any of the cases where international jurisdiction was apparently taken it was done *in reliance on article 2*. It seems that if it was done, it was done on the basis of national law alone.

114   With those important considerations in mind we turn to the legislation, including its travaux préparatoires. A good starting point to see whether this extra-EU jurisdiction was ever intended is obviously the power to make the Regulation itself. It stems from article 61(c) in Part 3 of the EC Treaty (Community Policies) and comes within Title IV, "Visas, Asylum, Immigration, and other Policies related to Free Movement of Persons". Article 61(c) provides:

"In order to establish progressively an area of freedom, security and justice, the Council shall adopt . . . (c) measures in the field of judicial co-operation in civil matters as provided for in article 65 . . ."

115   So the key provision is article 65:

"Measures in the field of judicial co-operation in civil matters having cross-border implications, to be taken in accordance with article 67 and in so far as necessary for the proper functioning of the internal market, shall include: (a) improving and simplifying: the system for cross-border service of judicial and extrajudicial documents, co-operation in the taking of evidence, the recognition and enforcement of decisions in civil and commercial cases, including decisions in extrajudicial cases; (b) promoting the compatibility of the rules applicable in the member states concerning the conflict of laws and of jurisdiction; (c) eliminating obstacles to the good functioning of civil proceedings, if necessary by promoting the compatibility of the rules on civil procedure applicable in the member states."

116   There is nothing here suggesting any power to create an extra-EU jurisdiction. Quite the opposite. The judicial co-operation is between the courts of the member states, not about co-operation between the courts of a member state and those of third countries. It is all about the internal market.

117   Nor can one find anything in the recitals to the Treaty which would clearly cover the creation of such a power.

A    **118** Another starting point might be the Jenard/Schlosser Reports (Jenard Report on the Brussels Convention (OJ 1979 C59, p 1) and Schlosser Report on the Convention of 9 October 1978 on the Accession of the Kingdom of Denmark, Ireland and the United Kingdom to the Brussels Convention and the Protocol on its interpretation by the Court of Justice (OJ 1979 C59, p 71). We can find nothing in them suggesting that an extra-EU jurisdiction exists or should be created. Such an important subject would surely have been addressed by these scholars and considered explicitly. Yet it is not mentioned.

**119** What about the recitals to Council Regulation (EC) No 44/2001? Not one suggests that one can find there an explicit purpose to create an extra-EU jurisdiction. Far from it. The recitals show only an intention to cover the internal market. We set out certain recitals with our emphasis to show the point:

"(1) The Community has set itself the objective of maintaining and developing *an area of freedom, security and justice, in which the free movement of persons is ensured.* In order to establish progressively such an area, the Community should adopt, amongst other things, the measures relating to judicial co-operation in civil matters which are necessary for the sound operation of the internal market.

"(2) *Certain differences between national rules governing jurisdiction and recognition of judgments hamper the sound operation of the internal market.* Provisions to unify the rules of conflict of jurisdiction in civil and commercial matters and to simplify the formalities with a view to rapid and simple recognition and enforcement of judgments from member states bound by this Regulation are essential.

"(3) This area is within *the field of judicial co-operation in civil matters within the meaning of article 65* of the Treaty."

"(15) In the interests of the harmonious administration of justice it is necessary to minimise the possibility of concurrent proceedings and *to ensure that irreconcilable judgments will not be given in two member states.* There must be a clear and effective mechanism for resolving cases of lis pendens and related actions and for obviating problems flowing from national differences as to the determination of the time when a case is regarded as pending. For the purposes of this Regulation that time should be defined autonomously." (Emphasis added.)

**120** So we now turn to the *Owusu* case [2005] QB 801 to see whether it really had the effect contended for. The claimant, domiciled in the UK, suffered an accident in Jamaica whilst staying at a holiday villa let to him by a Mr Jackson, also domiciled in the UK. He sued Mr Jackson in contract alleging that it was a term of the contract that the beach where he had suffered the accident would be safe. It was said there was a dangerous hidden sandbank. There can be no question but that there was both personal and subject matter jurisdiction over that claim. The claimant also sued several Jamaican companies in tort, alleging that his accident was due to their negligence. Mr Jackson was served personally in England. Leave to serve the Jamaican companies out of the jurisdiction was given by the English court.

**121** Both Mr Jackson and the Jamaican defendants applied for a declaration that the English court "should not exercise its jurisdiction in

relation to the claim against them both". The basis of this claim was only
forum non conveniens. It was said that Jamaica was a more appropriate
venue for the case against all the defendants.

122  What is of great importance to note is that this was not a case
where it was suggested that the English court did not have subject matter
jurisdiction. On the contrary the very premise of a forum non conveniens
argument is that the court *has* got subject matter jurisdiction but should not
exercise it because there is a more convenient forum for the litigation.
So there can be no doubt that the question the Court of Justice had to face
had nothing to do with subject matter jurisdiction.

123  The problem for the defendants was that Mr Jackson was
domiciled in England. Article 2 of the Brussels Convention (now article 2(1)
of the Regulation) lays down the fundamental basic rule: "Subject to this
Regulation, persons domiciled in a member state shall, whatever their
nationality, be sued in the courts of that member state."

124  It may be noted that if Mr Jackson was properly sued in England
then the Jamaican defendants could be properly sued here too. But the latter
fact was a rule of English law. As Advocate General Léger clearly accepted
the jurisdictional rules of the Brussels Convention did not apply to these
defendants: see [2005] ECR I-1385, para 56. They were in the proceedings
by virtue of English procedural rules, not by virtue of the Convention.

125  Thus it was that the court concentrated only on whether article 2 of
the Convention displaced the English forum non conveniens rule. There can
be no doubt about that. Thus the court said [2005] QB 801, paras 35–36:

"35. It follows from the foregoing that article 2 of the Brussels
Convention applies to circumstances such as those in the main
proceedings, involving relationships between the courts of a single
contracting state and those of a non-contracting state rather than
relationships between the courts of a number of contracting states.

"36. It must therefore be considered whether, in such circumstances,
the Brussels Convention precludes a court of a contracting state from
applying the forum non conveniens doctrine and declining to exercise the
jurisdiction conferred on it by article 2 of that Convention."

126  It went to analyse that very question—and no other. It decided that
the doctrine was indeed displaced. It said (and ruled), at para 46:

"In the light of all the foregoing considerations, the answer to the first
question must be that the Brussels Convention precludes a court of a
contracting state from declining the jurisdiction conferred on it by
article 2 of that convention on the ground that a court of a non-
contracting state would be a more appropriate forum for the trial of the
action, even if the jurisdiction of no other contracting state is in issue or
the proceedings have no connecting factors to any other contracting
state."

127  So the *Owusu* case [2005] QB 801 establishes that where article 2
confers personal jurisdiction in a court of a member state by reason of the
defendant's domicile in that state, the court cannot refuse to hear the case
because there is a more appropriate forum abroad. It does not begin to
address a quite different question, namely given personal jurisdiction, is the
subject matter jurisdiction of the court also displaced by article 2?

A    128   Mr Bloch submitted that because article 2 does confer subject matter jurisdiction on the courts of a member state in respect of acts done elsewhere in the EU, it must also have the same effect as regards acts done outside the EU.   We do not see why—there is an enormous difference between the two.   For intra-EU events the Regulation is a carefully balanced piece of legislation.   Its components are interrelated.   Thus it provides for all the consequences of its allocation of jurisdiction rules—exclusive jurisdiction for court first seised, a lis alibi pendens rule in other courts, mutual recognition of judgments and so on.   None of that balance or interrelation is provided by the suggested extra-EU jurisdiction.   Nor could it be, for to achieve it you need to legislate for all the courts to which the rules apply and the Regulation has no effect on the courts of third countries.

B

C    129   So for all the reasons we have indicated above we think it clear that the Regulation does not create the extra-EU jurisdiction as we have defined it.   The Regulation is not setting up the courts of the member states as some kind of non-exclusive world tribunals for wrongs done outside the EU by persons who happen to be domiciled within the EU.   That is the sort of thing that is done reciprocally and by an international Convention—it goes well beyond the remit of judges whose job is to interpret the law, not to legislate. We think the point is acte clair and would accordingly not refer it.

D    130   That really concludes the matter.   However we should mention a few additional points.    First of these is that in *Gesellschaft für Antriebstechnik mbH & Co KG v Lamellen und Kupplungsbau Beteiligungs KG* [2006] ECR I-6509, the Court of Justice had regard to the *Owusu* case in the course of deciding that the exclusive jurisdiction rules of the Convention (now article 22 of the Regulation) overrode article 2 in a patent infringement action where validity is challenged.   It said, at paras 25–28:

E

"25. In the light of the position of article 16(4) within the scheme of the Convention and the objective pursued, the view must be taken that the exclusive jurisdiction provided for by that provision should apply whatever the form of proceedings in which the issue of a patent's validity is raised, be it by way of an action or a plea in objection, at the time the case is brought or at a later stage in the proceedings.

F

"26. First, to allow a court seised of an action for infringement or for a declaration that there has been no infringement to establish, indirectly, the invalidity of the patent at issue would undermine the binding nature of the rule of jurisdiction laid down in article 16(4) of the Convention.

G    "27. While the parties cannot rely on article 16(4) of the Convention, the claimant would be able, simply by the way it formulates its claims, to circumvent the mandatory nature of the rule of jurisdiction laid down in that article.

"28. Second, the possibility which this offers of circumventing article 16(4) of the Convention would have the effect of multiplying the heads of jurisdiction and would be liable to undermine the predictability of the rules of jurisdiction laid down by the Convention, and consequently to undermine the principle of legal certainty, which is the basis of the Convention (see *Besix SA v Wasserreinigungsbau Alfred Kretzschmar GmbH & Co KG (WABAG)* (Case C-256/00) [2003] 1 WLR 1113; [2002] ECR I-1699, paras 24–26; *Owusu*

H

(Case C-281/02) [2005] QB 801, para 41 and *Roche Nederland BV v    A
Primus* (Case C-539/03) [2006] ECR I-6535, para 37)."

131   None of that would make any sense if article 2 conferred subject
matter jurisdiction in respect of actions for infringement of the patents of
third countries—to which article 16(4) cannot apply.   The problems the
court identifies would then apply.

132   Secondly our decision accords with the general philosophy of the    B
leading US decision on extraterritorial jurisdiction of the US courts in
intellectual property matters, *Voda v Cordis Corpn* (2007) 476 F 3d 887 a
decision of the Federal Court of Appeals.   We refer to this in more detail
later.

133   Thirdly our view coincides with that of Colman J in *Konkola
Copper Mines plc v Coromim* [2005] 2 All ER (Comm) 637.   Simplifying the    C
facts, the defendant was domiciled in England and was party to a contract
which contained an exclusive jurisdiction clause in favour of the courts of
Zambia.   The defendant, sued in England, said that the English court should
decline jurisdiction.   The claimant said it could not by reason of the *Owusu*
case [2005] QB 801: jurisdiction was imposed by article 2 and that was that.
Article 17 of the Convention (now article 23 of the Regulation) allows
exclusive jurisdiction clauses which confer jurisdiction upon the courts of a    D
particular member state to prevail over article 2 but says nothing about
exclusive jurisdiction clauses conferring jurisdiction on the courts of third
countries.   Colman J stayed the action, basing himself on the contract, not
any form of forum non conveniens doctrine.   Quite clearly he could not have
done so if article 2 imposed an extra-EU jurisdiction in respect of all subject
matters.
                                                                              E
134   Finally as regards the *Owusu* contention is concerned, our
attention was drawn to a decision of Barling J, *Catalyst Investment Group
Ltd v Lewinsohn* [2010] Ch 218.   The question there was whether the court
could stay proceedings in a case where the same point was being litigated
between the same parties in the courts of a third country.   He held that the
*Owusu* case prevented that, essentially because the lis pendens rule is to
some extent a facet of forum non conveniens.   We do not have decide    F
whether that was correct, though we note that, if he his right, there is this
oddity: that there is a clear lis pendens rule, with associated court first seized
rule, for parallel cases within the EU but none for parallel cases where one is
running within an EU member state and one without.   What Barling J did
not decide was that article 2 conferred extra-EU subject matter jurisdiction
generally.
                                                                              G

### (b) The effect of Pearce v Ove Arup

135   In this case, the claimant sued a number of defendants in England.
The heart of the complaint was an allegation that the architect Rem
Koolhaas had infringed the claimant's Dutch copyright with his design for
the new art gallery in Rotterdam.   The other defendants were all ancillary to
that main claim.   They were the English consulting engineers, Ove Arup,    H
Mr Koolhaas's Dutch company and even the City of Rotterdam.

136   The case was one of forum shopping.   The point of choosing this
jurisdiction was that the plaintiff could get legal aid here whereas (perhaps
because the case was not seen as having any merit) not in Holland.   So Ove

A   Arup, domiciled here, were made first defendants pursuant to article 2 of the Brussels Convention. The remaining defendants, all Dutch, were joined pursuant to the provisions of article 6 of the Convention.

    137   The defendants applied to have the claim struck out, (a) on the grounds it had no realistic prospect of success and (b) because there was no jurisdiction to hear a Dutch copyright claim here. The first instance judge,

B   Lloyd J [1997] Ch 293 acceded to the application on ground (a) but went on to hold, if he were wrong on that point, that article 2 did confer subject matter jurisdiction over a claim for infringement. The Court of Appeal [2000] Ch 403 reversed his finding on (a) and upheld the decision as to jurisdiction. As a matter of interest the case then went on to full trial where the claim failed miserably.

    138   Lucasfilm contends that the effect of the Court of Appeal decision

C   was indeed that there was extra-EU jurisdiction as a matter of English law. In a previous case, *Tyburn Productions Ltd v Conan Doyle* [1991] Ch 75, Vinelott J had perhaps (we do not need to determine whether he did) decided that there was no subject matter jurisdiction in the English courts in respect of infringement of copyright in non-EU countries. In *Pearce v Ove Arup Partnership Ltd* [2000] Ch 403, 439 this court (in a judgment of the court)

D   said:

> "We do not find it necessary to decide whether Vinelott J was correct to take the view (if he did) that an action for alleged infringement of a foreign copyright by acts done outside the United Kingdom in a state not party to the Brussels Convention, in a case where no question as to the validity or registration of the right was in issue, was not justiciable in an

E     English court."

So Lucasfilm's contention is bold indeed—that the Court of Appeal, by necessary implication, did decide a point which it, itself, did not think it was deciding—it knew not what it was doing.

    139   And there is also this, that the Court of Appeal was not concerned with an allegation of infringement in a third country. So, Mr Ainsworth

F   submits, if and to the extent that it decided that such acts were justiciable here provided there was personal jurisdiction over the defendant its decision was obiter dictum and we need not follow it. Lucasfilm submits otherwise—it submitted that the ratio decidendi of the *Pearce* case [2000] Ch 403 necessarily leads to such jurisdiction.

    140   To try to understand the decision in the *Pearce* case it is necessary to

G   consider three earlier cases, *British South Africa Co v Cia de Moçambique* [1893] AC 602; *Potter v Broken Hill Pty Co Ltd* (1906) 3 CLR 479 and *Hesperides Hotels Ltd v Aegean Turkish Holidays Ltd* [1979] AC 508.

    141   The *Moçambique* case was an action brought in England for trespass to land in South Africa. The defendants disputed title to the land. The House of Lords drew a distinction between "matters which are transitory . . . and those which are local . . . in nature": Lord Herschell LC's

H   words, at p 622. It held that English courts did not have jurisdiction over the latter.

    142   Thus it is clearly the case that English law contains the concept that certain matters are not to be determined by the English courts even though the court has personal jurisdiction over the defendant. These matters are

said to be "non-justiciable". Naturally the question then is, what are these  *A*
matters?

143   As regards land the answer was provided by the House of Lords in
the *Hesperides* case [1979] AC 508. This was a claim by two Cypriot hotel
companies against a London based travel agency which advertised holidays
where people could stay at hotels belonging to the companies in Northern
Cyprus. Northern Cyprus was occupied by Turkey and the hotels had de  *B*
facto been taken over. It was said that the hotels were illegally occupied and
so the defendants were encouraging a trespass. The claim was allowed to
proceed in respect of the chattel content of the hotels but not in respect of the
trespass claim.

144   As regards that claim, the House reaffirmed the *Moçambique* case
[1893] AC 602 fully. Lord Wilberforce, [1979] AC 508, 534, adopted the
exposition in *Dicey & Morris, The Conflict of Laws*, 9th ed (1973), rule 79  *C*
of what it was that the *Moçambique* case decided:

> "Subject to the exceptions hereinafter mentioned, the court has no
> jurisdiction to entertain an action for (1) the determination of the title to,
> or the right to the possession of, any immovable situate out of England
> (foreign land); or (2) the recovery of damages for trespass to such
> immovable."  *D*

He pointed out that if either part of the rule applied, the court had no
jurisdiction—the rule went both to the existence of the right and its
infringement. The House refused the invitation to revise the rule so as to
remove or attenuate the second limb. One of the reasons for its refusal was
articulated by Lord Wilberforce at p 537:

> "Secondly: the nature of the rule itself, involving, as it clearly must,  *E*
> possible conflict with foreign jurisdictions, and the possible entry into and
> involvement with political questions of some delicacy, does not favour
> revision (assuming such to be logically desirable) by judicial decision, but
> rather by legislation."

It may be noted that the second limb of the rule, only so far as it affected
trespass to land or any other tort affecting immovable property, was  *F*
abrogated by section 30 of the Civil Jurisdiction and Judgments Act 1982. It
is not suggested that section 30 has any application to the present problem.

145   The last of the three important cases is *Potter v Broken Hill Pty Co
Ltd* 3 CLR 479, a decision of the High Court of Australia in 1906. It was in
the days when each state had its own patent registry. The patentee of a New
South Wales patent sued a defendant in Victoria for infringement of its  *G*
patent. It was held that the Victorian court had no jurisdiction. Clearly the
principal reason for the decision was that to hold otherwise would involve
the Victorian court inquiring into the validity of an act of another state, the
act in question being the grant of the patent by New South Wales. As
Griffith CJ put it at p 495: "it is the settled law of all civilised countries that
the acts of government of a state done within its own territory are not  *H*
examinable at all in the courts of another state."

146   Mr Bloch accepts that English courts have no jurisdiction to hear
claims for infringement of foreign patents where validity is in issue. But he
says, if validity is not in issue, so that there is no question of challenging the
act of a foreign state, the position is different. And since copyright rights do

A   not (at least in this case) depend upon registration in the US, no question of impugning a sovereign act of the US arises. It follows, he says, that the rule in the *Moçambique* case [1893] AC 602 does not apply to acts of infringement of copyright in a foreign state.

147   And, he says, that is what the *Pearce* case [2000] Ch 403 decided. We can now turn to it to see if he is right. The argument the court was addressing was this: that although article 2 of the Convention conferred
B   jurisdiction over Ove Arup, it did not mean that the claim was justiciable. And it was not, by virtue of the *Moçambique* principle. Lloyd J had held that the *Moçambique* principle did extend to foreign intellectual property rights because they were essentially local in nature, but that article 2 overrode that so far as acts of infringement in other member states were concerned.

C   148   The court began with an obvious disinclination to hold that the *Moçambique* case applied to claims of infringement of foreign intellectual property rights at all. It said, at pp 424–425:

"On its face the rule in the *Moçambique* case [1893] AC 602 does not provide self-evident support for the proposition that a claim for breach of a foreign statutory intellectual property right cannot be entertained by an
D   English court."

We do not share that disinclination. For a variety of reasons which we set out below we think that there are good reasons for holding that foreign intellectual property rights, registered or not, should not be justiciable here in the absence of a treaty governing the position.

149   The court then went on to consider the *Moçambique* case and
E   *Hesperides* case [1979] AC 508. After many citations from the *Moçambique* case it concluded, at p 431:

"It is, we think, clear from an analysis of the judgments in . . . *Moçambique* . . . that the House of Lords treated the question whether the English courts should entertain an action for trespass to foreign land as one of justiciability. The English courts should not claim jurisdiction
F   to adjudicate upon matters which, under generally accepted principles of private international law, were within the peculiar province and competence of another state."

150   It then went on to consider the position as regards land having regard to section 30 and article 2. It said, at p 432:

"We are satisfied that, at least in relation to land situate within a
G   contracting state, there is no longer any basis for the rule in the *Moçambique* case. The questions which the House of Lords addressed in that case are now, as a matter of English private international law, determined by section 2(1) of the 1982 Act—giving effect to the accession of the United Kingdom to the Brussels Convention."

Note that even in relation to land, the court confined its observation to land
H   situate within a contracting state (ie of the Brussels Convention). And of course that Convention had its own rules about exclusive jurisdiction concerning title to land.

151   Next the court proceeded under a heading: "The extension of the *Moçambique* rule to intellectual property cases: the Australian cases."

There follows detailed citation from *Potter v Broken Hill Pty Co Ltd*   A
3 CLR 479 and another case. Then it turned to the Brussels Convention
of 27 September 1968 on Jurisdiction and the Enforcement of Judgments
in Civil and Commercial Matters and the Jenard report and said,
at p 436:

> "But, where the action is not concerned with registration or validity,
> the Convention gives jurisdiction to the courts of the defendant's   B
> domicile, or to the courts of other contracting states in accordance with
> articles 5 and 6. The question 'Can the English court inquire into the
> validity of a patent granted by a contracting state?' is answered by
> article 16(4). The question 'Does the English court have jurisdiction to
> entertain proceedings in respect of the alleged infringement of an
> intellectual property right conferred by the law of a contracting state
> where the proceedings fall outside article 16(4)?' is answered by article 2,   C
> 5 or 6. There is, in our view, nothing in the reasoning of the High Court of
> Australia in *Potter v Broken Hill Pty Co Ltd* 3 CLR 479 which requires
> the answer: 'No, notwithstanding that the proceedings fall outside
> article 16(4) and the English court has jurisdiction to entertain the
> proceedings by reason of article 2, 5 or 6, the English court must
> nevertheless decline jurisdiction because the question is non-justiciable.'   D
> We find it impossible to accept that that answer has any place in a rational
> scheme of jurisprudence."

The whole of this passage is about an "alleged infringement of an IP right
conferred by the law of a contracting state". Mr Bloch would have us read it
without that limitation. We see no reason so to do. It is one thing to confer
jurisdiction within what is a common market and quite another to extend it   E
generally. What is said about a "rational scheme of jurisprudence" is
entirely in the context of the Convention.

152   The court then turned to the English cases, putting some on one
side as irrelevant to the question of justiciability. Next it referred to the
*Tyburn Productions* case [1991] Ch 75. We have already quoted what we
regard as the key passage for present purposes. We have no hesitation in   F
repeating it [2000] Ch 403, 439:

> "We do not find it necessary to decide whether Vinelott J was correct to
> take the view (if he did) that an action for alleged infringement of a
> foreign copyright by acts done outside the United Kingdom in a state not
> party to the Brussels Convention, in a case where no question as to the
> validity or registration of the right was in issue, was not justiciable in an   G
> English court."

153   After considering other English cases not really on the point, the
court then went on to consider an argument based on the Berne Convention
of the International Union for the Protection of Literary and Artistic Works
1886, as revised in 1971 (1990) (Cm 1212). Article 5(2) of this provides:

> "The enjoyment and exercise of these rights shall not be subject to   H
> any formality; such enjoyment and such exercise shall be independent
> of the existence of protection in the country of origin of the work.
> Consequently, apart from the provisions of this Convention, the extent of
> protection, as well as the means of redress afforded to the author to

A    protect his rights, shall be governed exclusively by the laws of the country
     where protection is claimed."

It was suggested this excluded the operation of the Brussels Convention. The
court held not so. Before us, perhaps because of this holding, no reliance
was placed on article 5(2). We therefore refrain from expressing our own
view as to what is meant by "as well as the means of redress . . . shall be
B    governed exclusively by the laws of the country where protection is
claimed". We proceed on the basis that Berne is neutral as to questions of
jurisdiction over foreign infringements of copyrights.

154    Finally the court considered the double actionability rule. That has
no relevance to our case because it was abolished by section 10 of the Private
International Law (Miscellaneous Provisions) Act 1995.

C    155    So the *Pearce* case [2000] Ch 403 did not decide the point now
before us. The argument for saying it did is at best tortured and over-subtle.
That is no basis for applying the doctrine of stare decisis. As Viscount
Dunedin said in *Great Western Railway Co v Owners of SS Mostyn* [1928]
AC 57, 73:

          "Now, when any tribunal is bound by the judgment of another court,
D    either superior or co-ordinate, it is, of course, bound by the judgment
     itself. And if from the opinions delivered it is clear—as is the case in most
     instances—what the ratio decidendi was which led to the judgment, then
     that ratio decidendi is also binding. But if it is not clear, then I do not
     think it is part of the tribunal's duty to spell out with great difficulty a
     ratio decidendi in order to be bound by it."

E    156    The upshot is this: the suggested ratio cannot readily be spelled out
of the *Pearce* case. At best it can only be done with great difficulty. We are
not bound by the *Pearce* case and must decide the point for ourselves.

157    What then of other decisions, decisions of only persuasive value
one way or the other? Tipping J, a respected judge who had some experience
of IP and is now in the Supreme Court of New Zealand, held that a plaintiff
could not sue in New Zealand for acts said to be an infringement of
F    copyright of another country, *Atkinson Footwear Ltd v Hodgskin
International Services Ltd* (1994) 31 IPR 186. He said, at p 190 (after
considering, inter alia, the *Potter* 3 CLR 479 and *Tyburn* [1991] Ch 75
cases):

          "Whether copyright exists in another country and whether the plaintiff
G    has title to it there are treated as questions in rem not in personam and
     thus outside the general proposition with which I started this discussion.
     Therefore, whether the importation of Dianne boots and their sale in
     Australia constitutes a breach of the copyright law of Australia is for the
     courts of that country to determine . . ."

He noticed a difference with passing off—the basis of which is a
H    misrepresentation, and then went on to make a very important point,
at p 191:

          "In addition to the territorial ambit of copyright law, it should also be
     noted that there has always been a reluctance to grant an injunction
     which will take effect outside the jurisdiction of the court granting it."

158    Aldous J had that same consideration in mind in a patent case,    A
*Plastus Kreativ AB v Minnesota Mining and Manufacturing Co* [1995]
RPC 438, 447 saying:

> "For myself I would not welcome the task of having to decide whether
> a person had infringed a foreign patent. Although patent actions appear
> on their face to be disputes between two parties, in reality they also
> concern the public. A finding of infringement is a finding that a monopoly    B
> granted by the state is to be enforced. The result is invariably that the
> public have to pay higher prices than if the monopoly did not exist. If that
> be the proper result, then that result should, I believe, come about from a
> decision of a court situated in the state where the public have to pay the
> higher prices. One only has to imagine a decision of this court that the
> German public should pay to a British company substantial sums of    C
> money to realise the difficulties that might arise. I believe that, if the local
> courts are responsible for enforcing and deciding questions of validity and
> infringement, the conclusions reached are likely to command the respect
> of the public. Also a conclusion that a patent is infringed or not infringed
> involves in this country a decision on validity as in this country no man
> can infringe an invalid patent."
                                                                               D
159    Note that Aldous J makes two distinct points: one is that a decision
as to infringement is essentially a local matter involving the state concerned
and the other is that a question of validity may be involved. He does not rest
his view on merely the so-called sovereign nature of a grant of a patent.

160    We do observe, however, that he added a qualification, at p 447:

> "I also believe that it would not normally be right for the courts of this    E
> country to decide a dispute on infringement of a foreign patent in respect
> of acts done outside this country provided there is an adequate remedy
> in the relevant country. The local court is able to look at the particular
> acts in the context in which they are carried out. If it happened that
> there was not an adequate remedy in the other state, then it might
> be appropriate that action be taken in a state in which there was an
> appropriate remedy."                                                         F

Mr Bloch would say that is the position here. Mr Ainsworth is not in the US.
No order of the US court can touch him—as indeed it has not. So unless the
English court has jurisdiction, Mr Ainsworth can "get away with it". But on
the other hand English law regards what he has done as entirely lawful. It is
not part of English public policy to restrain acts done here to enforce the
local IP rules of other countries.                                            G

161    Another experienced IP judge, Laddie J, clearly considered that
both limbs of the *Moçambique* rule applied and ought to apply to
IP disputes. In *Coin Controls Ltd v Suzo International (UK) Ltd* [1999]
Ch 33, 43 he said:

> "The principles which applied to land in the *Moçambique* case apply
> equally well to attempts to litigate foreign intellectual property rights in    H
> English courts. Those rights give rise to monopolies or quasi-monopolies
> which are strictly territorial in nature. In the case of patents, historically
> their purpose was to encourage and protect local industry. So courts
> following the common law tradition have declined to entertain

A     actions concerned with the enforcement of foreign intellectual property rights . . ."

And he concluded, at p 44:

"If the *Moçambique* rule has been destroyed or limited in relation to patent and similar rights, that must be as a result of our adherence to the Brussels Convention, not because of the 1982 and 1995 Acts."

B

Mr Bloch has to contend that was wrong for the purposes of his *Pearce v Ove Arup Partnership Ltd* argument. Although it was cited, the court did not say so.

162   Mr Bloch relied on a recent Australian case, *TS Production LLC v Drew Pictures Pty Ltd* (2008) 172 FCR 433. That was an action in Australia concerning title to the Australian copyright in a film. The defendants started proceedings in Illinois asserting title to copyright. It seems the US action included within it a claim to the Australian copyright. The Australian defendants applied for a stay on forum non conveniens grounds. One of the considerations was whether Australia was a "clearly inappropriate forum". Finkelstein J thought, at para 16, that the *Pearce* case [2000] Ch 403 drew a distinction between foreign disputes as to title and those as to infringement—a distinction which do we not think it did so far as disputes concerning infringement of IP rights outside the EU is concerned. The other members of the court (who gave the majority reason) expressed no view on the *Pearce* case. In the result the Australian court refused a stay and granted an anti-suit injunction restraining continuation of the US action. We do not think this case assists.

163   Mr Bloch also relied upon a decision of Mr Peter Prescott QC sitting as a deputy judge. It was *R Griggs Group Ltd v Evans* [2005] Ch 153. The case involved a dispute about the ownership of copyright in a logo created for the claimants. It was designed in England pursuant to an English contract. The issue was whether the foreign copyrights, as well as the UK copyright, belonged to the claimants. He held they did and that the English court had jurisdiction so to decide and to order the defendant to enter into any necessary assignment to perfect title. We find nothing remarkable in that. Our courts have always had an in personam jurisdiction to enforce a party properly before the court to perform an act required by English law. But Mr Prescott also considered the effect of *Pearce v Ove Arup Partnership Ltd* [2000] Ch 403. He seemed to draw from it the general principle that the court only regards as non-justiciable disputes about the existence of foreign registered rights. If and to the extent that he did, it was clearly obiter and involves a reading of the *Pearce* case which we do not endorse.

164   Mr Bloch also referred us to a decision of Flaux J in the Commercial Court, *Satyam Computer Services Ltd v Upaid Systems Ltd* [2008] 1 All ER (Comm) 737. Flaux J, obiter, considered that English courts were only precluded from considering the validity of foreign IP rights. He did so by his analysis of the cases rather than for any policy reasons. So his judgment does not take matters much further.

165   Mr Bloch showed us the US decision in *London Film Productions Ltd v Intercontinental Communications Inc* (1984) 580 F Supp 47. This was a District Court (first instance) decision of Judge Robert Carter. He held that

the US Federal Courts had jurisdiction over a New York corporation alleged     *A*
to have infringed film copyright in Chile and other South American
countries. The application for dismissal was on forum non conveniens
grounds. In a short judgment the judge accepted a principle that because a
US court had an interest in compliance by foreigners with US law, that
interest would be furthered by showing that the US courts would enforce
foreign laws. We do not think we have seen that very general and theoretical     *B*
justification for cross-border jurisdiction advanced anywhere else. And he
accepted Professor Nimmer's theory (see *Nimmer on Copyright* (1982)
para 12.01[C]) that copyright infringement constitutes "a transitory cause of
action": 580 F Supp 47, 49.

166   However to set against the *London Film Productions* case is the
more recent, higher, authority of the US Court of Appeals for the Federal
Circuit in *Voda v Cordis Corpn* 476 F 3d 887. The defendant had     *C*
manufactured in the US and was sued for patent infringement. He then
moved his manufacture abroad—to Mexico. The plaintiff sought to amend
his claim to allege infringement of the "European British, Canadian French
and German patents". Presumably sales were being made in the countries
concerned. (We are not quite clear what was meant by European—perhaps
the pleader did not appreciate there are only national patents in Europe.)     *D*
The question was whether that could be done under the provisions for
"supplementary jurisdiction". The majority said no, giving a variety of
reasons some of which were local to the US in character (e g the problems
which would be created if a jury had to apply a series of foreign laws) but
others which have general application. We go to some of these now.

167   First it noted that no international convention about intellectual
property (and there are many—the Paris Convention for the Protection of     *E*
Industrial Property 1883 (UN Treaty Series, vol 828, No 11851, p 305), the
Berne Convention of the International Union for the Protection of Literary
and Artistic Works, and the Convention on Trade Related Aspects of
Intellectual Property Rights annexed to the Agreement establishing the
World Trade Organisation, signed in Marrakesh on 15 April 1994
("TRIPS") are the main ones) has sought to create such a jurisdiction.     *F*
The court said, at p 899:

"The Paris Convention thus clearly expresses the independence of each
country's sovereign patent systems and their systems for adjudicating
those patents. Nothing in the Paris Convention contemplates nor allows
one jurisdiction to adjudicate the patents of another, and as such, our
courts should not determine the validity and infringement of foreign     *G*
patents. Accordingly, while the Paris Convention contains no express
jurisdictional-stripping statute, we relied on it in *Stein Associates Inc v
Heat and Control Inc* (1984) 748 F 2d 653, 658 to hold that
'Only a British court, applying British law, can determine validity and
infringement of British patents'."

And in response to a suggestion that the international trend was towards     *H*
harmonisation of IP and particularly patent law (with reference to
TRIPS and the Patent Co-operation Treaty) the court said, at p 900:

"Regardless of the strength of the harmonisation trend, however, we as
the US judiciary should not unilaterally decide either for our government

A or for other foreign sovereigns that our courts will become the adjudicating body for any foreign patent with a US equivalent 'so related' to form 'the same case or controversy' . . . Permitting our district courts to exercise jurisdiction over infringement claims based on foreign patents in this case would require us to define the legal boundaries of a property right granted by another sovereign and then determine whether there has been a trespass to that right."

B
168 Next the court considered comity and relations between sovereigns. It said, at p 901, a number of things:

"In this case, these considerations of comity do not support the district court's exercise of supplemental jurisdiction over Voda's foreign patent infringement claims. First, Voda has not identified any international duty, and we have found none, that would require our judicial system to adjudicate foreign patent infringement claims . . . Second, as discussed supra Part III.A.2.d, Voda has not shown that it would be more convenient for our courts to assume the supplemental jurisdiction at issue. Third, with respect to the rights of our citizens, Voda has not shown that foreign courts will inadequately protect his foreign patent rights . . . Fourth, assuming jurisdiction over Voda's foreign patent infringement claims could prejudice the rights of the foreign governments. None of the parties or amicus curiae have demonstrated that the British, Canadian, French, or German Governments are willing to have our courts exercise jurisdiction over infringement claims based on their patents."

C

D

E
169 The court went on, at p 901, to recognise the same distinction as was recognised in the *Moçambique* case [1893] AC 602:

"In addition, the local action doctrine informs us that exercising supplemental jurisdiction in this case appears to violate our own norms of what sovereigns ordinarily expect. Courts derived the local action doctrine from the distinction between local and transitory actions beginning with *Livingston v Jefferson*, written by John Marshall J riding Circuit. 15 F Cas 660 (CCD Va 1811). In *Livingston*, the plaintiff sued in a Virginia court for trespass to land located in Louisiana. The court dismissed the action, holding that it could be brought only in a Louisiana court. The Supreme Court subsequently held that 'an action for trespass upon land, like an action to recover the title or the possession of the land itself, is a local action, and can only be brought within the state in which the land lies'. *Ellenwood v Marietta Chair Co* (1895) 158 US 105, 107. The court concluded that a federal court sitting in another state had no jurisdiction to hear the trespass claim. Id. In short, the local action doctrine served to prevent courts from adjudicating claims for trespass or title to real property."

F

G

170 It said, at p 901, the same applied to patents:

H "The territorial limits of the rights granted by patents are similar to those conferred by land grants. A patent right is limited by the metes and bounds of the jurisdictional territory that granted the right to exclude . . . Therefore, a patent right to exclude only arises from the legal right granted and recognised by the sovereign within whose territory the right

is located.  It would be incongruent to allow the sovereign power of one to    *A*
be infringed or limited by another sovereign's extension of its jurisdiction.
Therefore, while our Patent Act declares that 'patents shall have the
attributes of personal property', 35 USC § 261, and not real property, the
local action doctrine constitutes an informative doctrine counselling us
that exercising supplemental jurisdiction over Voda's foreign patent
claims could prejudice the rights of the foreign governments."
                                                                                *B*

It is to be noted that the court did not draw any distinction between
existence of the right and its infringement, just as there was none between
title and trespass to real property.  We return to this point later.

171    The court concluded its considerations of comity saying, at p 903:

   "Accordingly, comity and the principle of avoiding unreasonable
   interference with the authority of other sovereigns dictate in this case that    *C*
   the district court decline the exercise of supplemental jurisdiction under
   § 1367(c)."

172    Finally so far as is relevant here, the court considered an argument
that consolidated multilateral patent infringement could be more efficient.
It said, at p 903:
                                                                                *D*
   "While there may be merit in the argument, no international treaty
   establishes full faith and credit, nor have we found any analogous
   agreement that would require foreign countries to recognise or obligate
   the enforcement of our judgments regarding foreign patents."

The same goes for copyright infringement.  If we have jurisdiction over
infringements of copyright in country X, it does not follow that the courts of    *E*
country X would recognise a judgment of our courts.

173    Mr Bloch also prayed in aid the recent American Law Institute
"Principles Governing Jurisdiction, Choice of Law, and Judgments in
Transnational Disputes" (2008) which suggests that a national court should
have subject matter jurisdiction over IP disputes in other countries.  We
acknowledge that is what it says, and it may, from an academic point of
view, seem a good idea.  For the reasons we give below we do not think it is a    *F*
good idea in practice given the current, essentially national, nature of
IP rights and their enforcement.  As the court in the *Voda* case 476 F 3d 887
said, this is not a matter for the unilateral decision of the judges of a
particular state.

*Our decision on justiciability*
                                                                                *G*
174    That concludes our examination of the authorities.  We have
decided that there is no binding authority.  So we must decide now whether
English law regards claims for infringement of foreign, non-EU (or Lugano)
copyrights as non-justiciable here.  We so hold.  We do so for the following
reasons.

175    First we think that the twofold rule in the *Moçambique* case [1893]
AC 602 applies to such claims.  The *Moçambique* principle is not limited to    *H*
claims about land, nor to claims about title or validity of the foreign right
relied upon.  Infringement of an IP right (especially copyright, which is
largely unharmonised) is essentially a local matter involving local policies
and local public interest.  It is a matter for local judges.

A    176  Secondly enforcement may involve a clash of the IP policies of different countries. This case is a good example. The effect of the injunction granted by Mann J is that the defendant is restrained from doing acts in this country which by the laws of this country are lawful. This is because American law says they are not lawful.

177  Thirdly there is the point touched upon by Aldous J [in *Plastus Kreativ AB v Minnesota Mining and Manufacturing Co* [1995] RPC 438].
B    Extraterritorial jurisdiction will involve (and does here) a restraint on actions in another country—an interference which prima facie a foreign judge should avoid. True it is that in this particular case the defendant has no intention of actually going to the US and doing acts there, but if the jurisdiction exists one could easily imagine such a case.

178  Fourthly if national courts of different countries all assume
C    jurisdiction there is far too much room for forum-shopping, applications for stays on forum non conveniens grounds, applications for anti-suit injunctions and applications for declarations of non-infringement.

179  Fifthly it is quite clear that those concerned with international agreements about copyright have refrained from putting in place a regime for the international litigation of copyrights by the courts of a single state. As we have said we do not consider whether article 5(2) of Berne precludes
D    it. A system of mutual recognition of copyright jurisdiction and of copyright judgments could have been created but it has not—a point noted by the court in the *Voda* case 476 F 3d 887.

180  Sixthly all of the other considerations which we have mentioned and which led the Court of Appeals in the *Voda* case to decline jurisdiction over foreign patent claims apply equally to enforcement of a foreign
E    copyright here.

181  Seventhly we are not impressed by the supposed difference in principle between questions of subsistence or registration of the right and its infringement. We say that for several reasons.

(i) The supposed distinction is between a foreign court adjudicating on whether the grant of a right by a state was valid and adjudicating upon whether that right is infringed. The former is said to call in question a
F    sovereign act, the latter not. But adjudicating on infringement will itself often require the foreign court to decide on the *scope* of the right granted by the foreign sovereign. In a patent case for example, the scope of the monopoly granted is often in question, quite apart from validity. Sometimes it is on the basis that if the patent is wide enough to catch the defendant it is invalid. Questioning the scope of a monopoly granted by a sovereign state in
G    a foreign court therefore carries with it the foreign court ruling on the scope of a sovereign act, which is not different in kind from ruling on its validity.

(ii) Moreover the suggested difference leads to commercial absurdities. Sometimes a particular consideration under a local law means there is no copyright. In other circumstances (perhaps even in the same country) the same consideration amounts to a defence. Mr Wilson gave us an example which he said was the position in the US (it does not actually matter whether
H    he is right, that he could be is enough for present purposes). It relates to how US law regards functional articles. Because of the rule as to functionality, there cannot be copyright in a dress as such (ie no subsistence). But there can be copyright in a drawing of a dress (so subsistence). However because of a functionality defence, it is not an infringement to copy a dress.

(iii) Nor does it make any real difference whether the right is one which        A
requires registration (e g a registered trade mark, registered design) or one
which does not (e g a right to sue for passing off/unfair competition or some
sort of unregistered design right). Commercially speaking they are all the
same sort of right—a right to exclude others.

(iv) And in any event it is really rather artificial to say that questioning
the validity of a registered right is somehow impugning the powers of a
sovereign state. The grant of registered IP rights is governed by laws. All        B
one is doing when challenging validity is to say that the right was wrongly
granted according to law. Sovereignty in any realistic sense does not come
into it.

(v) Moreover there are in principle two sorts of registered right—those
granted after examination and those granted by mere registration. Once
upon a time, for example, US copyrights required registration to be           C
enforceable (they still do for works created in the US by US citizens, though
accession to the Berne Convention means that is not so for foreigners). Is the
mere administrative process of registration a "sovereign act"?

(vi) Now of course a foreign court cannot make an order expunging a
registered right from the register of a particular country. But that makes no
real difference. For it is generally a defence to a claim for infringement that    D
the right relied upon is invalid—whether any registration of the right is
subsequently cancelled is essentially beside the point as far as a defendant is
concerned.

182    Of course in fact the Regulation does draw a distinction in principle
between questions of subsistence and enforcement. But it does so in the
context of a fully balanced scheme and where a policy decision had to be
made—could the courts of one member state revoke a patent or similar right         E
registered in another member state? That was seen as going too far and so
was not allowed at that stage of the development of a European cross-border
jurisdiction.

183    We accordingly conclude that for sound policy reasons the
supposed international jurisdiction over copyright infringement claims does
not exist. If it is ever to be created it should be by Treaty with all the         F
necessary rules about mutual recognition, lis pendens and so on. It is not for
judges to arrogate to themselves such a jurisdiction.

*The judge's decision: forum conveniens*

184    Mann J thought there was international jurisdiction. He said
[2009] FSR 103, para 266:                                                          G

"I am therefore prepared to conclude that an English court can, and in
an appropriate case should, determine at least questions of infringement
of foreign copyright cases. Those cases will include cases where
subsistence is not in issue. I would not, however, hold that questions of
subsistence can never be decided here. In land cases incidental questions
of title can apparently now be considered. I can see no reason why the         H
same should not apply to copyright."

185    He recognised that there may be cases where there were public
policy reasons why they should not be heard here. He resolved that problem
by saying it could all be dealt with by the application of forum non

A    conveniens. With respect we do not agree. We think there are real problems if this doctrine comes into play. Take this case. Mr Ainsworth sold a small amount to the US. Should jurisdiction be assumed here because he did not go to the enormous expense of going to the US to defend himself there? We do not see why. Other cases could be much more complicated. Suppose for instance there are competing parallel cases in several countries. Who is to decide which case proceeds and the others not (or do they run in parallel)?

B    The problems are potentially much more complex than the sort of case involving a claim on a contract where the issue is whether the case should be held in one jurisdiction or another. In the case of the international enforcement of copyright many jurisdictions could be involved at the same time and there could be a mass of disputes in different courts about where a case should be heard.

C    186    Accordingly we allow Mr Ainsworth's appeal on this point.

*Enforcement of the US judgment*

187    The judge refused to enforce the US judgment for $10m "compensatory damages" which Lucasfilm had obtained against Mr Ainsworth and his company. If Lucasfilm had on this appeal continued

D    to hold the English judgment which it obtained from the judge based directly on its US copyright, then it would not have sought to enforce its US judgment. In circumstances, however, where it is unable to enforce its US copyright directly in this country, it maintains its appeal under this heading and seeks to overturn the judge's decision that its US judgment cannot be recognised and enforced here.

E    188    Mr Bloch accepts that, in a situation where Mr Ainsworth neither appeared in the US proceedings nor took any other step to agree or submit to the US court's jurisdiction over him, nor had any other physical presence in the US, the issue for these purposes has to be whether he nevertheless had sufficient presence in the US to justify enforcement of the US judgment against him solely by reason of the fact that he had operated an Internet website through which he advertised his helmets and other articles and

F    thereby sold such articles to customers in the US. He also e-mailed existing customers directly.

189    For these purposes Mr Bloch also accepts that *Adams v Cape Industries plc* [1990] Ch 433 is the leading authority and binds this court. There is no discussion of the Internet in it, so that the question becomes whether the operation of an Internet website by a person (or company)

G    based in the UK amounts to presence in the US because sales have been effected through such a website to US customers. Mr Ainsworth also advertised directly in the US, and also relied on that below to constitute presence, but no longer does so.

190    Lucasfilm contended below that Mr Ainsworth's website had been particularly targeted or directed at US customers because the price of the helmets was quoted in US dollars even before it was expressed in sterling.

H    No other currencies were quoted. Also, shipping charges for the US (and Canada) were specified before shipping charges to the UK and other parts of the world. However, the judge found that to say that the website was directed to the US was to give such matters an unwarranted emphasis: para 213(i).

191   *Dicey, Morris & Collins, The Conflict of Laws*, 14th ed (2006),   A
vol 1, para 14R-048 states the relevant principle as follows: that a court of a
foreign country has jurisdiction to give a judgment capable of enforcement
or recognition in this country "If the judgment debtor was, at the time the
proceedings were instituted, present in the foreign country". That rule is
expressed in terms of presence rather than residence because of the views of
this court in *Adams v Cape Industries plc*. However, such presence,   B
although it may be temporary, reflects some form of concept or metaphor of
allegiance to the laws of the country concerned, and, in the case of a
company as distinct from an individual, requires the establishment of a fixed
place of business from which either the company defendant itself or its agent
on its behalf carries on business: see pp 530C–531B. Thus, Slade LJ giving
the judgment of the court said, at p 519:

  C

> "Nevertheless, while the use of the particular phrase 'temporary
> allegiance' may be a misleading one in this context, we would, on the
> basis of the authorities referred to above, regard the source of the
> territorial jurisdiction of the court of a foreign country to summon a
> defendant to appear before it as being his obligation for the time being to
> abide by its laws and accept the jurisdiction of its courts while present in   D
> its territory. So long as he remains physically present in that country, he
> has the benefit of its laws, and must take the rough with the smooth, by
> accepting his amenability to the process of its courts. In the absence of
> authority compelling a contrary conclusion, we would conclude that the
> voluntary presence of an individual in a foreign country, whether
> permanent or temporary and whether or not accompanied by residence, is
> sufficient to give the courts of that country territorial jurisdiction over   E
> him under our rules of private international law."

192   Therefore, does the use by Mr Ainsworth or his company of the
website referred to above amount to such presence? It has long been
recognised under our law that the mere selling of goods from country A into
country B does not amount to the presence of the seller in country B. (That
remains the case even though a contract in England to smuggle goods into   F
another country by parties who know that to be contrary to the laws of that
other country will fall foul of the English law of illegality: see *Foster v
Driscoll* [1929] 1 KB 470. Otherwise nearly every exporter would have
presence in many parts of the globe. Even a system of travelling salesmen
will not suffice to render the exporter present where his salesmen travel: see
*Littauer Glove Corpn v FW Millington (1920) Ltd* (1928) 44 TLR 746,   G
discussed and approved in *Adams v Cape Industries plc* [1990] Ch 433,
520–521. Similarly, in *Vogel v R and A Kohnstamm Ltd* [1973] QB 133 an
English seller made a contract with an Israeli buyer who had been
introduced through an agent who had his own office in Israel, but the
contract was made directly between the seller in England and the buyer in
Israel, and the seller was held to have no presence in Israel: discussed and
approved in *Adams v Cape Industries plc* [1990] Ch 433, 521–522.) On this   H
basis, it is not possible to say that advertising into a foreign country can
render the advertiser present there, as the judge himself remarked. Indeed,
no case has been cited to us where the targeting of sales in a foreign country
by outside sales material has been held to be presence for these purposes.

A    193   It is true that the Internet and its uses take us into a new world, and
that its existence as it were in the ether (but based on servers physically
located in the real world) has in general presented novel difficulties to the
law and to regulators. It is also true that a website can be both wonderfully
expressive and can also, subject to change and removal, be found repeatedly
at its web address. The question, however, is whether for current purposes
B    the Internet or a website are fundamentally different from other matters
which have enabled business persons to present themselves and their
products where they are not themselves present: such as advertisements,
salesmen, the post, telephone, telex and the like. We do not believe so, and
Mr Bloch has been unable to show us any material from other jurisdictions,
although he has searched for it, to suggest that a different answer is
necessary. (Our own researches have led us to *Dow Jones & Co Ltd v
C    Gutnick* (2002) 210 CLR 575, where the Internet is discussed by the High
Court of Australia in the different context of defamation. However, that
court was not there driven by the revolutionary omnipresence of the Internet
to a view of jurisdiction which was other than answerable to well-
established principles.)

     194   On the contrary, it might be said that the sheer omnipresence of the
D    Internet would suggest that it does not easily create, outside the jurisdiction
or jurisdictions in which its website owners are on established principle
already to be found, that presence, partaking in some sense of allegiance,
which has been recognised by our jurisprudence and rules of private
international law as a necessary ingredient in the enforceability of foreign
judgments.

     195   Therefore, we dismiss Lucasfilm's appeal on this ground.
E

*The implied assignment of copyright*

     196   In circumstances where we have held that the helmet and other
articles are not "sculpture", no rights of UK copyright arise. But there may
be rights in the nature of copyright arising from Mr Ainsworth's work in
other countries. So the question of what rights, if there had been any at all,
F    would remain with Mr Ainsworth, and whether any such rights would be
implicitly agreed to be assigned to Lucasfilm, is not necessarily academic.
Mr Ainsworth has sought to raise this issue, which the judge decided
against him, by renewing his application for permission to appeal on this
ground.

     197   Mr Bloch raised an initial point to the effect that permission to
G    appeal should not be granted because Mr Ainsworth had not sought
permission from the judge for this issue, at the same time as seeking (and
obtaining) it on other issues. Mr Bloch submitted that this reticence was
deliberately aimed at an advantage in costs of the trial, by seeking to portray
this issue (on which Mr Ainsworth had lost) as one of little importance. We
are unable to draw that inference, however. The judge made no order for
costs, on the basis that, although Lucasfilm was the overall winner, the
H    points on which it had lost (not other points on which it had won) were so
substantial that the final order for costs should be that they should lie where
they fall.

     198   Having heard full argument on the point, we consider it right to
grant permission to appeal.

199  Mr Wilson raises essentially two points.  The first is that  A
Mr Ainsworth had completed his design of the helmet before any question
of any contract arose between him and Lucasfilm into which an implied
term for the assignment of his copyright could have been inserted:
therefore he retained what he had obtained for himself and nothing should
be implied whereby he would be deprived of the fruits of his creativity.
The second is that, if anything should be implied into the subsequent  B
contract whereby he merely agreed to manufacture the 50 helmets which
were initially bought from him, it should be nothing greater than would be
necessary to enable Lucasfilm to use the helmets, buy more in case of need,
or even merchandise the relevant articles: and that would have merely
been an implied licence for such purposes on payment of a reasonable
royalty.

200  The judge dealt with the underlying facts regarding the helmet at  C
paras 36–39 and with the analysis of those facts at paras 182–189.  The
essence of the matter was this.  The real basis of the design was to be found in
the paintings by Mr McQuarrie.  Mr Lucas commissioned Mr Pemberton to
produce the stormtrooper helmet shown there.  Mr Pemberton sculpted a
clay helmet, which he refined under Mr Lucas's supervision until the latter
was satisfied with the result.  Mr Lucas then asked Mr Pemberton to produce  D
a quantity of the helmets, but Mr Pemberton did not have the expertise to
manufacture them himself and so he turned to his close neighbour,
Mr Ainsworth.  Mr Pemberton provided Mr Ainsworth with the McQuarrie
paintings and his own clay model.  Mr Ainsworth was asked if he could
produce a helmet in accordance with the paintings and the clay model, for
use by a customer of Mr Pemberton as a prop in a dramatic production.
Mr Ainsworth spent a couple of days producing a prototype.  He worked  E
from the material he had been given, but added some detail of his own.
Mr Ainsworth exaggerated his input, but the fact of the matter was that his
prototype was a substantial reproduction of the McQuarrie material.
Further modifications were agreed in a collaborative process involving
Mr Lucas's costume designer, Mr Mollo.  Mr Lucas himself approved
the final design and told Mr Pemberton that he needed 50 helmets.  F
Mr Pemberton then agreed a price of £20 per helmet with Mr Ainsworth.
More were commissioned later.

201  The other articles followed a similar pattern.  The judge made
detailed findings about the process in respect of all of them, but the appeal
has been argued on the basis of the stormtrooper helmet.  In sum, however,
the judge found that in each case Mr Ainsworth had exaggerated his own
input, but had substantially produced copies from materials which had been  G
provided to him, while adding some detail of his own.

202  The judge then analysed this situation by finding that it fell within
what Lightman J had said in Robin Ray v Classic FM plc [1998] FSR 622,
especially at p 642, para 7:

"circumstances may exist when the necessity for an assignment of
copyright may be established . . . these circumstances are, however, only  H
likely to arise if the client needs in addition to the right to use the
copyright works the right to exclude the contractor from using the work
and the ability to enforce the copyright against third parties.  Examples of
when this situation may arise include: (a) where the purpose in

A    commissioning the work is for the client to multiply and sell copies on the
     market for which the work was created free from the sale of copies in
     competition with the client by the contractor or third parties; (b) where
     the contractor creates a work which is derivative from a pre-existing
     work of the client, e g when a draughtsman is engaged to turn designs of
     an article in sketch form by the client into formal manufacturing
B    drawings, and the draughtsman could not use the drawings himself
     without infringing the underlying rights of the client; (c) where the
     contractor is engaged as part of a team with employees of the client to
     produce a composite or joint work and he is unable, or cannot have been
     intended to be able, to exploit for his own benefit the joint work or indeed
     any distinct contribution of his own created in the course of his
     engagement . . . In each case it is necessary to consider the price paid, the
C    impact on the contractor of assignment of copyright and whether it can
     sensibly have been intended that the contractor can retain any copyright
     as a separate item of property."

     203   In *Griggs Group Ltd v Evans* [2005] FSR 706 Lightman J's analysis
     was set out in full and approved by this court. In that case the trial judge had
     found that where a freelance designer had been commissioned to create a
D    logo for a client, the designer would face an uphill task, and had in fact
     failed, to persuade him that he was free to assign the logo to a competitor. It
     would be obvious; it would go without saying, that the client would need
     some right to prevent others from reproducing the logo. This court agreed,
     and also agreed that a licence from designer to client, even an exclusive
     licence, was not sufficient: paras 17–18.

E    204   With the aid of these authorities, Mann J analysed the matter as
     follows [2009] FSR 103, para 185:

     "In the initial stages Mr Ainsworth did not know precisely for what he
     was being asked to provide his prototype, but there came a time when he
     did. I do not consider that, at the time, the prospect of exploitation via
     future licensing was in the minds of both parties (and particularly
F    Mr Ainsworth), because no one anticipated the success of the film and
     licensing facilities were not then what they have since become. However,
     Mr Ainsworth was working to render into 3D form the copyright designs
     of others. He could not himself make further copies without infringing
     that copyright. If he had produced the drawing exactly, then he would
     not have produced an original work, and could not have claimed
G    copyright. He did not do that, and contributed his own bits and pieces,
     but in doing so he was getting as close as he conveniently could, bearing in
     mind technical requirements, to the client's design. He must have known
     that the client would expect full exploitation rights in the future for the
     purposes of its dramatic offering and cannot realistically have expected to
     have retained any for himself. If the officious bystander had asked the
     required question (suggesting that Lucas would have all the rights and
H    that Mr Ainsworth would not be entitled to exploit them without
     Lucas's licence) then the required testy suppression would have been
     forthcoming. I think that this is a classic case for saying that there is an
     implication that the commissioner would have the copyright in the helmet
     (if any)."

205 The judge then extended that analysis to all the other articles, at para 187: "he was still working to commission, producing things for which the client had provided clear specifications, and it was implicit in the relationship that he would not retain copyright." Finally, the judge, at para 189, dealt separately with the submission that an implied licence from Mr Ainsworth to Lucas would have sufficed. But he rejected that possibility:

"it cannot have been the intention of either party that there could be parallel exploitation of the props so that, for example, Mr Ainsworth could make more and sell them to other film-makers. The only thing that makes sense is an obligation to assign copyright."

As for the submission that Mr Ainsworth had not been paid enough to require him to assign copyright, the judge rejected that too. Mr Ainsworth was paid a fee, strictly speaking a series of fees, "which the parties agreed was right for the job". In the end Mr Ainsworth made some £30,000 out of his "Star Wars" activities.

206 We find this analysis to be ultimately cogent. There is no sign in the judge's reasoning of the argument put in the forefront of Mr Wilson's submissions on appeal, namely that initially there had been no contract between the parties and Mr Ainsworth had done his two days' design work on the Stormtrooper helmet, and thus had earned his copyright interest, at a time when he was simply working "on spec". In the circumstances, Mr Wilson suggested, it was too late for Lucasfilm to expect such copyright interests to be assigned at the stage of agreeing a merely manufacturing price. Mr Bloch accepted the factual basis of that submission. Nevertheless, and however the matter is put, we consider that it was always inherent in the relationship that if it proceeded to a contract, it would be on terms that would reward Mr Ainsworth for his preliminary work but would confer the primary copyright interests on the commissioning party.

207 Thus we agree with the judge that the situation in this case was in line with the circumstances discussed by Lightman J in *Robin Ray v Classic FM plc* [1998] FSR 622 and ruled on by this court in the *Griggs* case [2005] FSR 706. Indeed it falls within each of the circumstances (a), (b) and (c) discussed by Lightman J in his para 7 and may thus be said to be an a fortiori case. It makes no sense to consider that copyright interests should be divided between "team Lucas", if we can express it that way, and Mr Ainsworth, who in truth became part of the team when he accepted the responsibility of working on the designs provided to him in order to manufacture the finished article. That would only have been an uncommercial recipe for mutually inconsistent rights: Lucasfilm could not order more props without running the risk that Mr Ainsworth would charge a blackmailing price; it could not exploit any licensing opportunities without similar dangers; and Mr Ainsworth of course could do nothing with any copyright interests that might have remained with him without the complete co-operation of Lucasfilm.

208 The fact that the parties may not have anticipated the success of the film is quite beside the point. The question, which has to be answered objectively and does not depend in any way on what might in fact have gone through the minds of particular parties, is what the parties would have agreed if the question of licensing opportunities had been raised. We agree that in those circumstances, it would never have occurred to anyone to say

A     that Mr Ainsworth should have retained any (necessarily limited) copyright interests. We agree that an obligation to assign was necessarily to be implied. It was also reasonable, and there is nothing in the commercial arrangements then made, e g in the prices agreed, to suggest that it was unreasonable.

B

*Conclusion*

    209   In sum, Lucasfilm's appeal fails. There was no copyright in any sculpture. Nor could it enforce its US judgment. Mr Ainsworth's cross-appeal, on the other hand, partly succeeds and partly fails. It succeeds to the extent that we reject the judge's direct enforcement of US copyright. In the circumstances, there is no financial remedy for Lucasfilm to compensate it for the modicum of selling which Mr Ainsworth has managed to achieve into

C     the US: but Mr Ainsworth is aware that were he to seek any further selling into the US, he would be in breach of its copyright laws.

> *Permission to first defendant to appeal.*
> *Appeals dismissed.*
> *Cross-appeal allowed.*

D

J R S

E

F

G

H