IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
5:10-CV-25-FL

SAS INSTITUTE INC., )
 )
      Plaintiff, )
 )
      v. ) **ORDER**
 )
WORLD PROGRAMMING LIMITED, )
 )
      Defendant. )

This case comes before the court on a motion (D.E. 178) by defendant World Programming Limited ("WPL" or "defendant") to enforce the Amended Stipulated Protective Order ("Protective Order") (D.E. 106) and for sanctions against plaintiff SAS Institute Inc. ("SAS" or "plaintiff"). The motion has been fully briefed and referred to the undersigned for disposition pursuant to 28 U.S.C. § 636(b)(1)(A). (*See* Minute Entry after D.E. 202). Pursuant to the undersigned's 8 April 2014 Order (D.E. 210), a hearing was held on this motion on 24 April 2014. In addition to counsel of record for the parties, three in-house counsel for SAS attended the hearing. For the reasons and on the terms set forth below, the motion will be allowed.

### BACKGROUND

**I.    SAS's Claims**

SAS alleges in its first amended complaint as follows:

SAS is a North Carolina corporation that produces business intelligence software and other software products, having its principal place of business in Cary, North Carolina. (Am.

Compl. (D.E. 143) ¶ 2). WPL is incorporated under the laws of England and Wales and also develops software. (*Id*. ¶¶ 3, 19).

SAS has developed SAS System software that enables users to access, manage, analyze, and present data. (*Id*. ¶ 12). The SAS System has copyright protection. (*Id*. ¶¶ 35, 36). Customers of the SAS System are required to enter into a license agreement, the SAS Master License Agreement ("SAS MLA"), which, among other things, prohibits the customer from using the SAS System for purposes other than the customer's own business. (*Id*. ¶ 11).

SAS publishes a wide range of reference materials that describes the features of the SAS System and provides instructions and assistance to its users ("SAS Manuals"). (*Id*. ¶¶ 9, 10). The SAS Manuals have copyright protection. (*Id*. ¶¶ 37, 38).

In addition, SAS has developed software, known as SAS Learning Edition, that teaches individuals how to use the SAS System. (*Id*. ¶ 12). It includes a selection of SAS Manuals. (*Id*. ¶ 14). Before an individual is permitted to use SAS Learning Edition software, he is required to accept the terms of a license agreement that confers a nontransferable right to use it solely for the purpose of learning how to use the SAS System. (*Id*. ¶¶ 15, 16, 18). The SAS Learning Edition software has copyright protection. (*Id*. ¶ 36).

WPL has developed software, named the World Programming System ("WPS"), designed to reproduce central aspects of the SAS System and thereby to replace the SAS System for certain customers of SAS. (*Id*. ¶¶ 19, 20). WPL has also developed a manual for WPS. (*Id*. ¶ 31). WPL's marketing of WPS is primarily, if not entirely, directed at current SAS licensees and attempts to persuade them to license WPS in place of the SAS System. (*Id*. ¶ 34).

To create WPS, WPL used one or more copies of the SAS System, although in 2008 SAS had refused to give WPL a license to use it. (*Id*. ¶¶ 23, 24, 30). In addition, to be able to

create WPS, WPL must have studied SAS Manuals to understand various aspects of the SAS System. (*Id.* ¶ 29). WPL also copied substantial parts of the SAS Manuals in creating the manual for WPS. (*Id.* ¶¶ 31 41).

Upon SAS's information and belief, WPL also acquired a copy of the SAS Learning Edition software and agreed to the terms of the associated license. (*Id.* ¶ 25). Instead of or in addition to doing so, WPL, again upon SAS's information and belief, convinced a party that had entered into the SAS MLA to violate prohibitions in it by allowing WPL access to the SAS System, which WPL used to develop and test WPS software. (*Id.* ¶ 54).

SAS filed its initial complaint (D.E. 1) on 19 January 2010. With leave of court (*see* D.E. 138), SAS filed its first amended complaint on 14 August 2013, which added a claim that WPL obtained access to the SAS Learning Edition software by fraud. (*See* 1st Am. Compl. ¶¶ 1, 50-52; Request for Relief ¶ D).

SAS asserts the following claims in its first amended complaint: copyright infringement with respect to the SAS System and SAS Learning Edition software (*id.* ¶¶ 43-45) (count I); copyright infringement with respect to the SAS Manuals (*id.* ¶¶ 46, 47) (count II); breach of contract, namely, the license agreement between SAS and WPL for the SAS Learning Edition software, by fraud (*id*. ¶¶ 48-52) (count III); tortious interference with contract, that is, a SAS MLA for the SAS System SAS entered into with another party (*id*. ¶¶ 53-57) (count IIIA); tortious interference with prospective economic advantage by inducing nonrenewal by SAS customers of their licenses with SAS (*id*. ¶¶ 58-62) (count IV); and unfair and deceptive trade practices and unfair competition under the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 75-1.1, *et seq.* (*id*. ¶¶ 63-65) (count V). SAS seeks compensatory damages, punitive damages, statutory treble damages, injunctive relief, expenses, attorney's

fees, and any other just and proper relief. (*Id.*, Request for Relief 17-18). WPL denies the material allegations in SAS's complaint. (*See generally* Ans. to Am. Compl. (D.E. 149)).

## II. WPL's Motion for Enforcement and Sanctions

The basis for WPL's motion is its contention that, in violation of the Protective Order entered in this case, SAS disclosed to its employees all or part of a highly confidential list of WPL's customers ("customer list"). WPL produced the customer list in discovery and marked it "Highly Confidential—Attorneys' Eyes Only" ("Highly Confidential") pursuant to the terms of the Protective Order. The Protective Order provides that materials so designated shall not be disclosed to anyone other than outside counsel, up to three designated in-house counsel, certain consultants, and court personnel, unless otherwise permitted by court order or by consent of the providing party. (Prot. Ord. ¶ 11).

The provision of the customer list to unauthorized SAS employees came to light through the Fed. R. Civ. P. 30(b)(6) deposition of SAS's designee, Beverly Carlton ("Carlton"), the senior director of the contracts administration department at SAS. During her deposition, Carlton testified that she was "given a list of WPL customers which corresponded to revenue lost for SAS based on research that my team did." (Carlton Rule 30(b)(6) Dep. (D.E. 187) 82:18-22). Carlton's testimony was confirmed in the second day of Rule 30(b)(6) testimony when another designee, in-house counsel Patricia Brown ("Brown"), testified that she was aware that Carlton and her group were given lists of names of customers. (Brown Rule 30(b)(6) Dep. (D.E. 185) 9:2-24). Brown denied that Carlton was shown the actual customer list, but admitted that lists containing information derived from the customer list had been shared. (*Id.*).

To bolster its claim of wrongful disclosure by SAS, WPL cites to two other disclosures of confidential information by SAS. One is SAS's public filing in August 2013 with the court of a "Highly Confidential" document. The other is SAS's counsel's disclosure of information protected as confidential under the Protective Order to a deponent who had not signed the confidentiality agreement appended to the Protective Order ("the undertaking") as required under Paragraph 14 thereof.

In its memorandum in response to the motion, SAS admitted that it committed a "technical" violation of the Protective Order. (SAS's Opp. Mem. (D.E. 202) 1, 6, 7, 9). In a declaration submitted with SAS's response memorandum, Brown acknowledged that SAS provided the customer list to Carlton and one of her managers, Debbie Faircloth ("Faircloth"), not simply a compilation of the information in it, as Brown stated at her deposition. (Brown Decl. (D.E. 202-1) ¶ 6 n.1). Brown's declaration did not specifically identify who provided Carlton and Faircloth with the customer list. At the 24 April 2014 hearing, however, SAS clarified that its general counsel, John Boswell, provided the list to Carlton and Carlton, in turn, provided it to Faircloth. To his credit, Boswell personally acknowledged his disclosure of the customer list and apologized to the court for it. But SAS denies the disclosure was willful or in bad faith.

SAS also contends that the other instances of disclosure cited by WPL do not establish a pattern of conduct. It notes that the filing of the "Highly Confidential" document was inadvertent and remedied by the court's sealing the document. (SAS's Opp. Mem. 9-10). It also states that it complied with its obligations under the Protective Order with respect to the deponent by making a reasonable effort to obtain his signature and that ultimately the deponent signed the undertaking before questioning about the protected document continued. (*Id.* at 10).

5

In its motion, WPL seeks varied relief, including an order directing that:

1. Plaintiff shall make all reasonable efforts to retrieve any Confidential or Highly Confidential – Attorneys' Eyes Only materials improperly disclosed;

2. Plaintiff shall refrain from disseminating further Highly Confidential – Attorneys' Eyes Only materials subject to the Protective Order;

3. Within 10 days, Plaintiff shall provide to the Court and Defendant an affidavit describing the purpose, means and non-attorney recipients of any documents designated by Defendant as Highly Confidential – Attorneys' Eyes Only, or any information derived or summarized therefrom.

4. Plaintiff shall pay Defendant's reasonable attorneys' fees and costs incurred as a result of Plaintiff's violations of the Protective Order plus any additional fees Defendant has incurred connection with this motion.

(WPL's Proposed Order (D.E. 178-1) 1-2). At the hearing, WPL expanded its request to include relief from having to provide any further "Highly Confidential" documents to SAS, and dismissal of some or all of SAS's claims, including specifically its claims for tortious interference with contract (Am. Compl. count IIIA), tortious interference with prospective economic advantage (*id*. count IV); and violation of the North Carolina Unfair and Deceptive Trade Practices Act (*id.* count V).

## DISCUSSION

### I. Applicable Legal Principles

Where the court determines that sanctions are, in fact, warranted in light of clear violations of the Protective Order, the sanctions the court has available to it include those under Fed. R. Civ. P. 37(b)(2)(A). *See, e.g., Smith & Fuller, P.A. v. Cooper Tire & Rubber Co.*, 685 F.3d 486, 489 (5th Cir. 2012) ("There is . . . significant authority in support of the imposition of Rule 37(b) sanctions for violation of Rule 26(c) protective orders."); *Instant Tech., LLC v. DeFazio,* No. 12 C 491, 2013 WL 5966893, at *3 (N.D. Ill. 8 Nov. 2013) ("[I]in agreement with the Fifth Circuit and other courts in the district, this court concludes that Rule 37(b) may

6

be applied to violations of confidentiality orders."); *Schiller v. City of New York*, No. 04 Civ. 7921KMK/JCF, 2007 WL 1623108, at *3 (S.D.N.Y. 5 June 2007) (collecting cases); *Whitehead v. Gateway Chevrolet, Oldsmobile,* No. 03C5684, 2004 WL 1459478, at *3 (N.D. Ill. 29 June 2004) (same). *But see Lipscher v. LRP Publ'ns, Inc.*, 266 F.3d 1305, 1322-23 (11th Cir. 2001) (holding that Rule 37(b) does not apply to protective orders).[1]

It is within the court's broad discretion whether to impose sanctions pursuant to Fed. R. Civ. P. 37(b); "[i]t is not, however, a discretion without bounds or limits but one to be exercised discreetly and never when it has been established that failure to comply has been due to inability, and not to willfulness, bad faith, or any fault of (the non-complying party)." *Wilson v. Volkswagen of Am., Inc.*, 561 F.2d 494, 503 (4th Cir. 1977) (quotations and footnotes omitted); *see also Hathcock v. Navistar Int'l Transp. Corp.*, 53 F.3d 36, 39-40 (4th Cir. 1995); *Powell v. Town of Sharpsburg*, No. 4:06-CV-117-F, 2009 WL 1810144, at *1 (E.D.N.C. 19 Jun. 2009); *Stiltner v. Cabell County Com'n,* 2014 WL 843253, at *2 (S.D. W. Va. 4 Mar. 2014) ("'Indeed, any noncompliance by a party with a court-ordered discovery deadline is a ground for some form of sanctions.'" (quoting *Bluestein v. Cent. Wis. Anesthesiology*, *S.C.*, ___ F.R.D. ___, 2013 WL 4759006, at *3 (W.D. Wis. 4 Sept. 2013))). Before imposing severe sanctions such as dismissal or default, a court must consider four factors: "'(1) whether the non-complying party acted in bad faith; (2) the amount of prejudice that noncompliance caused the adversary; (3) the need for deterrence of the particular sort of noncompliance; and (4) whether less drastic sanctions would have been effective.'" *Belk v. Charlotte Mecklenburg Bd. of Educ.*, 269 F.3d

---

[1] *Lipscher* is based on the view that a protective order is not an "order to provide or permit discovery," the type of order for which violation Rule 37(b)(2)(A) authorizes sanctions. The Protective Order here provides for and permits the discovery of confidential commercial information that is at the core of the claims and defenses in this case. Without the Protective Order, it is unclear how the exchange of this information could occur. Therefore, the Protective Order in this case decidedly is an "order to provide or permit discovery." *Cf. Bayer AG and Miles, Inc. v. Barr Labs., Inc.*, 162 F.R.D. 456, 465 (S.D.N.Y. 1995) (describing protective orders of the type here as "essential to the functioning of civil discovery").

305, 348 (4th Cir. 2001) (quoting *Anderson v. Foundation for Advancement, Educ. & Employment of Am. Indians*, 155 F.3d 500, 504 (4th Cir. 1998)).

## II. Violation of the Protective Order

The court finds that SAS's disclosure of the WPL customer list to Carlton and Faircloth violated the Protective Order. As noted, the Protective Order severely limits access to information designated "Highly Confidential," and the WPL customer list was so designated. Carlton and Faircloth are not among those authorized under the Protective Order to receive such information. Further, SAS concedes its violation. At the hearing, it even acknowledged that the violation was not, as it had represented in its memorandum, merely a technical one.

Notwithstanding its admission of its violation, SAS continues to advance various justifications for it. SAS's main justification is that the disclosure was necessary for it to respond to discovery requests. It contends that the 18 December 2013 deadline applicable to production required in the court's 4 December 2013 Order on WPL's motion to compel applied to the information on its lost customers. This purported two-week window in which to produce the lost customer information allegedly necessitated SAS's delegating the task of identifying lost customers to Carlton and providing her with the customer list. (SAS's Opp. Mem. 3-5; Brown Decl. ¶¶ 3, 4, 6).

The court expressly rejects this justification. The court denied WPL's motion to compel with respect to the interrogatories seeking the identity of the lost customers, Interrogatories Nos. 15 and 16, and instead simply reminded SAS of its obligation to supplement its responses to these interrogatories. Neither the court's order nor the Case Management Order set any

8

deadline for such supplementation.  Thus, any notion that SAS had only a two-week window in which to produce the information was inaccurate.[2]

While acknowledging that an "anonymized" list (*i.e.*, excluding from the list any reference to WPL or this litigation) created from information in the customer list was provided to approximately ten SAS contracting department employees, SAS argues that such conduct was not in violation of the Protective Order.  Again, the court disagrees.

The Protective Order expressly states: "Discovery Material designated as 'Highly Confidential—Attorneys' Eyes Only,' or copies *or extracts therefrom and compilations and summaries thereof*, may be disclosed, summarized, described, characterized, or otherwise communicated or made available in whole or in part only" to specifically identified individuals, which do not include SAS employees.  (Prot. Ord. ¶11 (emphasis added)).  There can be no question that the anonymized lists, containing the list of WPL customers, would fall within this prohibition.

Having said that, the court recognizes that the anonymization of these lists did tend to mitigate potential prejudice to WPL.  Other contentions by SAS regarding lack of significant prejudice to WPL also appear to have some merit.  For example, SAS contends that it did not provide the customer list or any other "Highly Confidential" document to any unauthorized SAS employees besides Carlton and Fairchild.  (Brown Decl. ¶¶ 8, 14).  In addition, SAS contends that neither Carlton nor Faircloth are in the position of speaking to SAS customers or persuading them to choose SAS products over those of a competitor.  (*Id.* ¶ 7).

---

[2] At the hearing, SAS pointed to compliance with another discovery request, Production Request No. 19, which seeks documents showing SAS's economic loss, as justifying its disclosure of the customer list.  But because SAS did not mention this particular request for production in its response memorandum and Brown did not mention it in her declaration supporting the memorandum, the court finds SAS's invocation of it now to be disingenuous.  What is relevant, of course, is not hypothetical reasons that SAS in retrospect realizes could be offered as justification for its disclosure of the customer list, but rather the reasons that actually underlay its disclosure.  The hearing on WPL's motion was not an invitation to rewrite the history of this episode.

9

The court is not persuaded, though, by SAS's further argument that it had no workable options available to it in responding to the discovery requests. If SAS truly was unable to respond to discovery without providing "Highly Confidential" information to its employees, it should have first sought the consent of WPL and, if not forthcoming, leave of court for such disclosure, as explicitly provided in the Protective Order. (Prot. Ord. ¶ 11(h) (allowing access to "Highly Confidential" information to "any other person only upon order of the Court or upon written consent of the Party producing the confidential Discovery Material to and conditioned upon compliance with" the undertaking requirement)). Nor has SAS adequately demonstrated why the tasks conducted by Carlton and Faircloth could not have been performed by its in-house counsel or outside counsel. Instead of exercising these reasonable options, SAS took matters into its own hands and violated the terms of the Protective Order by providing the WPL customer list to unauthorized employees.

As WPL contends, two other incidents reinforce concern that SAS has not treated its obligations under the Protective Order as earnestly as is required. Certainly, an inadvertent filing of a confidential document is understandable. The proper course of action in such an instance, however, is not to challenge the appropriateness of the designation or to require the producing party to file a motion to seal, as occurred here. Similarly, while the plain language of the Protective Order requires the examining party to "make a reasonable effort to obtain [a] witness' compliance" with signing the undertaking before the witness is shown confidential information, such language cannot reasonably be construed to mean that a witness's refusal to comply relieves him of the undertaking requirement. (*Id.* ¶ 15). Such a reading could permit a witness unfettered access to protected confidential information.

While finding that the disclosure by SAS was intentional, *Digital Vending Services Intern., Inc. v. Univ. of Phoenix, Inc.,* No. 2:09CV555, 2013 WL 5533233, at*5 (E.D. Va. 3 Oct. 2013) (Willfulness is "intentional, purposeful, or deliberate conduct."), the court does not believe that it was in bad faith. A showing of bad faith can be made where a party's failure to comply with a court order includes a disregard for the Federal and Local Rules and "demonstrates a 'pattern of indifference and disrespect to the authority of the court.'" *Pisani v. Baltimore City Police Dep't*, No. WDQ-12-1654, 2014 WL 1401934, at *3 (D. Md. 8 Apr. 2014) (quoting *Mut. Fed. Sav. & Loan Ass'n v. Richards & Assocs., Inc.,* 872 F.2d 88, 93 (4th Cir. 1989)). Here, SAS's conduct appears to have been based on a mistaken belief as to a court-imposed deadline and an attempt to comply with its discovery obligations, and not for any illicit purpose or competitive advantage. The court sees the disclosure as an instance of overzealous pursuit of obligations, rather than bad faith.

The fact that the violation here was not in bad faith does not preclude the imposition of sanctions that are otherwise called for. *See Forrest Creek Assocs., Ltd. v. McLean Sav. and Loan Ass'n*, 831 F.2d 1238, 1245 (4th Cir. 1987) ("It is true, as the defendants point out, that an unintentional violation of a protective order may lead to sanctions."). The court finds that any prejudice to WPL appears to be minimal or wholly speculative. While there is a need for deterrence of the particular sort of noncompliance by SAS, sanctions less drastic than dismissal are warranted, as set forth below.

**III.     Sanctions**

The court believes that sanctions are, in fact, warranted in light of the clear nature of the violation of the Protective Order, the need to ensure that the parties adhere scrupulously to the Protective Order, and the additional specific considerations discussed below.

The sanctions the court finds appropriate, along with the specific reasons for them, are as follows:

1.  It is appropriate that the reasonable expenses incurred by WPL on its motion be reimbursed because they resulted wholly from violation of a court order by the opposing party. Indeed, Rule 37 requires the award of expenses given the lack of substantial justification for the violation or other circumstances making the award unjust. *See* Fed. R. Civ. P. 37(b)(2)(C). SAS shall accordingly pay the reasonable expenses, including attorney's fees, incurred by WPL in connection with the instant motion. The court encourages the parties to resolve the matter of expenses without further involvement of the court. If they are able to resolve the matter, WPL shall file a notice to that effect. If they are unable to reach a resolution, WPL shall file an affidavit setting out the reasonable attorney's fees and other expenses it claims, along with a supporting memorandum and any other supporting documents, no later than 21 May 2014. SAS shall file any response to the affidavit and supporting documents within 14 days after they are filed.

2.  To the extent it has not done so, SAS shall make reasonable efforts to retrieve from any unauthorized persons copies of any "Highly Confidential" materials provided them, including any copies or summaries of such materials.

3.  While the court did expressly consider disqualification of Boswell, it finds that his disqualification is not warranted at this time. The court has taken into account his acceptance of responsibility and sincere expression of remorse.

4.  The court will not relieve WPL from producing further "Highly Confidential" documents. The stay imposed by the court in its 24 February 2014 Order (D.E. 197) is hereby

12

Case 5:10-cv-00025-FL   Document 241   Filed 05/01/14   Page 12 of 13

lifted. Any documents WPL was withholding from production on the basis of this stay shall be produced by 14 May 2014.

5. The court notes that it considered imposing more severe sanctions than those set out above, including a contempt finding, *see* Fed. R. Civ. P. 37(b)(2)(A)(vii), but has elected not to do so. As clear as the violation of the Protective Order was, the prejudice resulting from it has not, to date, been shown to be significant, particularly since WPL will be reimbursed for the litigation costs it incurred as a result. The sanctions imposed are proportionate to the violation based on the record now before the court. These findings are, of course, subject to possible further development of the record.

## **CONCLUSION**

For the foregoing reasons, WPL's motion (D.E. 178) to enforce the Protective Order and for sanctions is ALLOWED on the terms set out above.

SO ORDERED, this 30th day of April 2014.

_____
James E. Gates
United States Magistrate Judge