IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:10-CV-25-FL

| | | |
|---|---|---|
| SAS INSTITUTE INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | ORDER |
| v. | ) | (SEALED)[1] |
| | ) | |
| WORLD PROGRAMMING LIMITED, | ) | |
| | ) | |
| Defendant. | ) | |

This matter comes before the court on plaintiff's motion for partial summary judgment (DE 211) and defendant's motion for summary judgment (DE 220). These motions have been fully briefed and issues raised are ripe for ruling. For the reasons that follow, each motion is granted in part and denied in part.

## STATEMENT OF THE CASE

Plaintiff is a North Carolina corporation that produces software products. Defendant is a competing software company, incorporated under the laws of England and Wales. On September 14, 2009, plaintiff filed a lawsuit in the United Kingdom ("U.K.") against defendant arising out of defendant's creation of a competing software product, asserting claims for copyright infringement and breach of a licensing agreement. That suit was filed in the Chancery Division of the High Court

---

[1] Where discovery was conducted pursuant to a consent protective order and stipulation of confidentiality, certain filings on which the parties rely in furtherance of their motions were sealed. Within fourteen (14) days, the parties jointly shall return to the court by U.S. Mail, addressed to the case manager, a copy of this order marked to reflect any perceived necessary redactions. Upon the court's inspection and approval, a redacted copy of this sealed order will be made a part of the public record.

of Justice ("U.K. court").[2]

On January 19, 2010, plaintiff initiated the instant suit. The complaint before this court, premised on many of the same facts as the U.K. litigation, includes claims for copyright infringement and breach of the same licensing agreement. In addition, plaintiff added claims for tortious interference with contract, tortious interference with prospective business advantage, and violation of the North Carolina Unfair and Deceptive Trade Practices Act ("UDPTA"), N.C. Gen. Stat. § 75-1.1. On March 17, 2010, defendant filed a motion to dismiss the action for lack of personal jurisdiction pursuant to Rule 12(b)(2), for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6), and for *forum non conveniens*, or, in the alternative a motion to transfer venue. By order entered March 18, 2011, the court granted the motion to dismiss for *forum non conveniens*, and did not reach other arguments raised for dismissal. Plaintiff appealed and, in a decision issued February 16, 2012, the Fourth Circuit Court of Appeals reversed and remanded.

On March 23, 2012, defendant resubmitted its motion to dismiss seeking all the same relief as in its prior motion to dismiss, excepting dismissal for *forum non conveniens*, and also requesting abstention or a stay pending completion of the U.K. litigation. On June 6, 2012, defendant filed a notice that it was withdrawing all grounds for its motion except for failure to state a claim or change of venue. At hearing held on the motion June 7, 2012, defendant withdrew its request for a change of venue. On October 18, 2012, Magistrate Judge James E. Gates entered memorandum and recommendation ("M&R") recommending that defendant's motion to dismiss be denied. The court entered order adopting the M&R on November 19, 2012.

---

[2] This court previously has stated that this litigation in the U.K. was initiated on October 19, 2009. Documents from this litigation, however, state that it was commenced September 14, 2009.

On May 7, 2013, plaintiff filed a motion to amend its complaint, seeking to add a claim that defendant obtained licenses to use certain of plaintiff's software products by fraud. The court granted the motion by order entered August 8, 2013. Plaintiff filed its amended complaint on August 14, 2013.

Meanwhile, the U.K. litigation proceeded somewhat more expeditiously. After a full trial, the U.K. court issued an interim judgment ("U.K. interim judgment") on July 23, 2010. The court made numerous findings of fact, as well as provisional holdings, but concluded that resolution of the case depended upon important issues of interpretation of European Union law, more specifically, various articles of Council Directive 91/250/EEC of 14 May 1991 on the legal protection of computer programs ("Directive 91/250/EEC")[3] and Directive 2001/29/EC of the European Parliament and of the Council of 22 May 2001 ("Directive 2001/29/EC") (collectively "European Directives"). Thus, by order entered July 28, 2010, the U.K. court referred certain questions regarding the interpretation of these articles to the Court of Justice of the European Union ("CJEU"). The CJEU ruled upon these questions May 2, 2012. As relevant here, as quoted by the U.K. court in its final judgment ("U.K. judgment") the CJEU held that under various articles of the European Directives:

> [N]either the functionality of a computer program, nor the programming language and the format of the data files used in a computer program in order to exploit certain of its functions . . . are . . . protected by copyright in computer programs . . . .
> . . .
> [A] licensee is entitled to determine the ideas and principles which underlie any element of the computer program if he does so while performing any acts of loading,

---

[3] In its interim judgment, the U.K. court noted that Directive 91/250/EEC had been replaced by "a codified . . . version, European Parliament and Council Directive 2009/24/EC of 23 April 2009." The U.K. court further noted, however, that "the original version was in force at the time of most of the alleged infringing activity by [defendant]" and that "there is no relevant difference of substance between the two versions." U.K. interim judgment ¶ 155.

> displaying, running, transmitting or storing that program which he is entitled to do.
> . . .
> [T]he reproduction, in a computer program or a user manual for that program, of certain elements described in the user manual for another computer program protected by copyright is capable of constituting an infringement of the copyright in the latter manual . . . .

U.K. judgment ¶¶ 10.46, 12.54, 14.70 (quoting the CJEU ruling).

Based upon the CJEU's rulings, on January 25, 2013, the U.K. court entered its final judgment adopting its interim judgment and finding for defendants on all claims but for infringement of the SAS manuals pursuant to the dictates of the European Directives. Plaintiff appealed portions of the U.K. judgment, all of which were affirmed by the Court of Appeal. On July 9, 2014, the Supreme Court of the United Kingdom denied plaintiff's request to appeal.

On April 14, 2014, plaintiff filed its motion for partial summary judgment on its claims for breach of contract and tortious interference with contract. That same day, defendant filed its motion for summary judgment on all claims.

## STATEMENT OF UNDISPUTED FACTS

A.  Plaintiff and the SAS System

Plaintiff is the world's largest privately-held software company. Patricia Brown April 14, 2014, Decl. ("Brown I Decl.") ¶ 2. Plaintiff creates an integrated suite of business software products which are known as the "SAS System." Id. The SAS System allows users to perform a variety of data access, management, analysis, and presentation tasks. Id. The core component of the SAS System is known as "Base SAS" or "BASE/SAS," but the SAS System includes other separate components that users may separately license and install and which provide additional capabilities. Id.

4

Computer programs are made up of lines of text written in a computer language, called the "source code" of that program. Source code cannot be read directly by computers, which can only read what is known as "machine code." Thus, in order for a program to run on a computer, that program must be translated through a different program serving as a compiler or interpreter of computer language. Very basically, a compiler is a program that translates source code into machine code readable by a computer. An interpreter is a program that translates the source code of a program and directs the execution of that code. See Def.'s Ex. 1, Nell Dale & John Lewis, Computer Science Illuminated 295-97 (5th ed. 2013).

The SAS System can be run on various kinds of computers ranging from personal computers to mainframe computers. Id. ¶ 3. SAS System users can access, manage, and analyze data by writing programs in a programming language developed by plaintiff known as the "SAS Language." Id. These programs can be run through the SAS System and thereby perform certain tasks known as "SAS Procedures." Id. Thus, among other things, the SAS System is a combination of compilers and interpreters for SAS Language programs.[4] See Def.'s Ex. 59, Richard Langston January 9, 2014, Dep. ("Langston I Dep.") 12:17-22.[5]

The idea of the SAS Language was conceived in 1964 by Anthony J. Barr ("Barr"). Barr Aff. ¶¶ 6-7. He began to develop this language in 1966 while working at North Carolina State University

--------

[4] In responding to defendant's motion for summary judgment, plaintiff has introduced certain evidence to the effect that its software is not a compiler/interpreter of the SAS Language. For reasons discussed in section D.2. of the court's discussion, *infra*, the court finds that this evidence is insufficient to create a genuine factual issue.

[5] Citations to defendant's exhibits 1-53 refer to the exhibits to the declaration of Dennis O. Cohen ("Cohen") submitted in connection with defendant's memorandum in support of summary judgment. Citations to defendant's exhibits 54-58 refer to exhibits to the declaration of Cohen submitted in connection with defendant's response in opposition to plaintiff's motion for partial summary judgment. Citations to defendant's exhibits 59-61 refer to the exhibits to the declaration of Cohen submitted in connection with defendant's reply in support of its motion for summary judgment.

5

("N.C. State"). Id. ¶ 9. The SAS Language is a high-level computer language used by thousands of institutions around the world. Id. ¶ 16. Thousands of users write programs in the SAS Language. Def.'s Ex. 2, Langston I Dep. 26:8-9. Anyone can write a program in the SAS Language, and it is undisputed that no license is needed to do so. Id. at 32:8-18; see also Def.'s Ex. 41, Michael Creech Dep. 179:12-17.

Concurrent with his creation of the SAS Language, Barr created a compiler/interpreter for the language. Barr Aff. ¶¶ 9, 12. This compiler/interpeter is a program separate from any SAS Language program. Id. ¶¶ 9-10, 12. The source code for the compiler/interpreter was written in the computer language of IBM/360 assembler. Id. ¶ 10. James Goodnight ("Goodnight"), and John Sall ("Sall"), who were colleagues of Barr at N.C. State, joined in developing the SAS compiler/interpreter in 1968 and 1969, respectively. Id. ¶ 14. This group first distributed an early version of their program to various universities in 1968. Id. ¶ 15.

In 1972, Barr, Goodnight, and Sall finished a commercial version of their SAS compiler/interpreter they called "SAS72." Barr Aff. ¶ 19. The group decided to rewrite a new version of the SAS compiler/interpreter, which was completed in 1976, and called "SAS76." Id. ¶ 23. Jane Helwig ("Helwig"), who joined the gorup in 1973 or 1974, who wrote a new SAS manual. Id. ¶ 24. Because the program was becoming popular, the expanded group decided to leave N.C. State and found a for-profit company to market the compiler/interpreter. Id. ¶ 25. This company, the SAS Institute – plaintiff in this action – was incorporated in 1976. Id. ¶ 26. Barr left the company in 1979, and Goodnight took control. Id. ¶¶ 29-31.

Plaintiff continued updating and expanding the capabilities of its software to allow SAS Language programers to write more complex programs in the SAS Language. Langston I Dep. at

30:16-32:7.[6] Plaintiff has packaged many of these capabilities in different individual components which make up the "SAS System." Plaintiff has also rewritten the source code for the SAS System – which is now written mainly in the programming language known as "C", with very small portions written in programming languages called "Assembler" and "Java." Def.'s Ex. 2, Langston I Dep. 9:17–10:2.

Plaintiff does not sell the SAS System to users, but sells licenses to use the SAS System or components thereof for set periods of time. Brown I Decl. ¶ 6; Barr Aff. ¶ 22. Plaintiff registers versions of its software with the United States Copyright Office, and maintains its source code as a trade secret. Brown I Decl. ¶ 6. Plaintiff also sells or provides its users with numerous manuals that it registers with the United States Copyright Office. Id. ¶ 7.

Plaintiff also has created a version of its software called SAS Learning Edition to help individuals learn how to program in the SAS Language. Brown I Decl. ¶ 8. SAS Learning Edition is registered with the United States Copyright Office. Id. It contains a full version of the SAS System for use on a personal computer. Id. SAS Learning Edition, however, is programmed so that it can only work with data sets of 1,500 records or less – much smaller than a typical user's data sets. Id.

Plaintiff created a license agreement that prevented SAS Learning Edition from being installed on any personal computer unless an individual agreed to a set of restrictions. Id. ¶ 9. An individual installing SAS Learning Edition encounters "screens" which provide the terms of the SAS Learning Edition license agreement. See Pl.'s Ex. 58, SAS Learning Edition license agreements.

---

[6] Defendant has provided the full text of this deposition in hard copy to the court, but does not appear to have filed this portion of that deposition electronically.

That individual must click on a "Yes" button, indicating his or her agreement to the term to proceed. Id. at 3. The individual is prompted to click on the "No" button if they do not agree to the terms of the SAS Learning Edition license agreement and would like to return the software for a refund. Id.

B.     Defendant and the Development of WPS

Defendant was formed in 2002 by Sam Manning ("Manning"), Peter Quarendon, Tom Quarendon and Martin Jupp ("Jupp"). Def.'s Ex. 4, Peter Quarendon Statement ¶ 16. Peter Quarendon had previously worked at International Business Machines ("IBM") where he had become familiar with the SAS System. Oliver Robinson ("Robinson") joined defendant in September 2002, and became a director and its operational manager. Def.'s Ex. 12, Robinson Statement ¶¶ 1, 12.

In 2003, defendant began to focus its efforts on creating a SAS Language interpreter/compiler to compete with the SAS System. Id. ¶ 22. Defendant called its software the "World Programming System" or "WPS." Defendant created the early versions of WPS using the programming language of Java. Def.'s Ex. 4, Peter Quarendon Statement ¶ 32. However, in early 2005, defendant made the decision to entirely rewrite WPS using a programming language called "C++" so as to speed up WPS's processing times and so that WPS could be run on mainframe computers. Def.'s Ex. 13 Tom Quarendon Statement ¶ 65. It took defendant approximately one year to rewrite WPS in C++. Id.

Defendant wanted WPS to enable SAS Language programmers to be able to run "programs written in the language of SAS . . . without any products from SAS Institute." Pl.'s Ex. 15, Presentation to BMW, at 26660.[7] Defendant marketed WPS as providing both data and reports that

_____

[7] Citations to plaintiff's exhibits refer to exhibits 3.a. to 3.ooo. to the declaration of Pressly Millen submitted in connection with plaintiff's memorandum in support of partial summary judgment.

"compare exactly" to the SAS System. Pl.'s Ex 26, CA World 08 Presentation, at 18250. In a document entitled "World Programming System – IBM Technical Evaluation" and further entitled "3rd Party Dependencies" ("3rd Party Dependencies"), defendant described the WPS development in a bullet list, quoted below:

- Read SAS documentation for the relevant area of functionality
- Build prototype functionality
- Debug basic functionality
- Compare operation with SAS Learning Edition functionality where possible
- Produce regression tests
- Release to beta testing
- Collect feedback from beta program
- Modify functionality as required
- Release GA functionality

Pl.'s Ex. 190, 3rd Party Dependencies, at 63722.

Thus, defendant's first stage of development was to review SAS manuals obtained from plaintiff's website. Pressly Millen April 14, 2014, Decl ("Millen I Decl."). Ex. 2.f., Tom Quarendon Dep. 118:5-23. These manuals described the intended behavior of SAS Language elements. Def.'s Ex. 14, Kevin Weekes Statement ¶ 21. The manuals, however, "often did not provide all of the detail necessary [for defendant] to fully understand how a given [SAS] language element was intended to behave." Millen I Decl. Ex. 2.f., Tom Quarendon Dep. 203:12-16. Thus, defendant also used SAS Learning Edition to develop WPS.

    1.     Defendant's Use of SAS Learning Edition

Defendant acquired two copies of SAS Learning Edition in 2003. It acquired an another copy in 2005, two more copies in 2007, and seven more in 2009. Am. Compl. ¶ 25. Each copy of SAS Learning Edition had an expiration date after which the software would no longer function. Def.'s Ex. 16, Robinson Dep. 303:10-17. The individual installing SAS Learning Edition would be

9

9

9

presented with the SAS Learning Edition license agreement and required to agree to its terms as part of the installation thereof.

Among other things, the SAS Learning Edition license agreement provided that:

> By clicking on the "Accept" button, the individual licensing the Software ("Customer") agrees to these terms, and SAS Institute, Inc. ("SAS") will authorize Customer to use the SAS Learning Edition Software ("Software") in accordance with the terms and conditions of this Agreement.
> . . .
> In exchange for Customer's payment of all applicable fees and compliance with all of the terms and conditions of this Agreement, SAS hereby grants Customer a nonassignable, nontransferable and nonexclusive license to use the Software on one (1) workstation at a time, for Customer's non-production purposes only.[8]
> . . .
> Source code from which the Software object code is derived ("Source Code") is a SAS trade secret. Customer may not reverse assemble, reverse engineer, or decompile the Software or otherwise attempt to recreate the Source Code, except to the extent applicable laws specifically prohibit such restriction.
> . . .
> This Agreement shall be governed by and construed in accordance with the laws of the State of North Carolina and of the United States of America. The parties expressly exclude the application of the United Nations Convention on Contracts for the International Sale of Goods to this Agreement.

Def.'s Ex. 43, Langston I Dep. Def.'s Exs. 3-6 at Ex. 3 §§ 1.1, 1.3, 2, 9.

Many times, the installer of SAS Learning Edition was not the user. Millen I Decl. Ex.2.b., Robinson Dep. 279:14-21. Defendant used SAS Learning Edition "to compare behaviour and output to that of WPS." Pl.'s Ex. 190, 3rd Party Dependencies, at 63693. In other words, "[o]nce the initial prototyping of the relevant function has been completed then the behaviour is compared with SAS in terms of generating output. Snippets of SAS Language code are fed through SAS Learning

---

[8] In certain versions of SAS Learning Edition this sentence of the SAS Learning Edition license agreement stated that "SAS hereby grants Customer a nonassignable, nontransferable and nonexclusive license to use the Software on one (1) workstation at a time, for Customer's *self-training* non-production purposes only." Pl.'s Ex. 58, SAS Learning Edition license agreements at 3. Thus, certain versions of the SAS Learning Edition license agreement included the words "self-training" and others did not.

Edition and WPS repeatedly until the results compare adequately." Id. at 63724. Thus, defendant wrote that "[w]here there are inconsistencies, and those inconsistences are determined not to be bugs in SAS, then the behaviour is matched in WPS whenever possible." Id. at 63693. In this manner, WPS was designed to emulate even the idiosyncracies of the SAS System. Millen I Decl. Ex. 4.c., Steve Bagshaw Witness Statement ¶ 120.

        2.       Defendant's Attempts to License the SAS System

Defendant also attempted to obtain a license to the full SAS System. In August of 2003 Manning emailed plaintiff stating that defendant would like to license a single copy of the base version of the SAS System – BASE/SAS – for a personal computer. Pl.'s Ex. 48, August 19, 2003, email from Robinson to Manning. An employee of plaintiff responded that defendant needed to provide more details of "what it is you are wanting to use SAS software for and also more details of the nature of your business." Id. Manning responded, stating that defendant had a client that used SAS that wanted a program "for the allocation of cars to repair outlets." Pl.'s Ex. 50, August 20, 2003 email from Manning. Manning also stated that defendant developed business intelligence software that was "nowhere as broad and cleaver [sic] as SAS." Id. Plaintiff provided defendant with a quote that Manning viewed as "a nice way to say no." Id.

In April 2008, defendant again sought to obtain a license for the SAS System through an SAS U.K. reseller, Amadeus Software, as testified to by Sonia Sparkes ("Sparkes"), the Senior Contracts Officer for SAS Software Limited, which is plaintiff's U.K. subsidiary. See Def.'s Ex. 21, Sparkes Statement, ¶ 1; Def.'s Ex. 22, Sparkes Statement Ex. SS-1 at 1. Plaintiff sent defendant an email on April 22, 2008, including a Master License Agreement ("MLA"). Id. at 4. Robinson signed the MLA and returned it to plaintiff. Millen I Decl. Ex. 2.b., Robinson Dep. 253:24-25. Robinson

testified that he could not recall whether he or another individual working for defendant reviewed the MLA, but that "someone at World Programming should have" because it was defendant's practice to "review any legal agreement we enter into." Id. at 260:7-17.

In response to a telephone inquiry by Sparkes, Robinson stated that defendant wanted to license plaintiff's software so as to "check SAS syntax." Def.'s Ex. 22, Sparkes Statement Ex. SS-1 at 10. On May 23, 2008, Sparkes emailed Robinson, and confirmed that plaintiff would not enter into a license agreement with defendant for use of the SAS System and would not countersign the MLA. Id. at 14. Because Robinson had indicated defendant wanted to license the SAS System to "check SAS Syntax," Sparkes further referred him "to the many resources on the market which document SAS Syntax and which are readily available through sellers such as Amazon.com." Id.

3.      Defendant's Relationship with CA Technologies

In 2003, defendant was contacted by a company called CA Technologies ("CA") (at the time named as CA, Inc.). Def.'s Ex. 6, Charles Waselewski ("Waselewski") Dep. 51:2-18. CA sold software product called MICS that ran on the SAS System. Id. at 54:15-16. MICS is a large, complicated program that is run on a mainframe computer. Id. at 68:9-69:22.

CA was interested in WPS as a less expensive alternative to the SAS System so as to be able to provide MICS at a lower cost to its customers. Id. at 55:3-11. CA, along with their consultant, Steve Bagshaw ("Bagshaw"), who would also become a consultant for defendant, worked with defendant over the next several years to create a version of WPS that could run MICS. Id. at 68:9-69:9; Millen I Decl. Ex. 2.c., Robinson Dep. 47:7-17. CA and defendant called this effort "Project X." Pl.'s Ex. 8, September 8, 2004, email from Bagshaw to Bill Sherman.

At the outset of this project, WPS could not be run on a mainframe computer. Def.'s Ex. 6,

Waselewski Dep. 51:14-15; see also Def.'s Ex. 13 T. Quarendon Statement ¶ 65. The development

of a version of WPS that could run MICS on a mainframe began as a lengthy, iterative process in

which CA would attempt to run MICS with WPS, and then report bugs and issues encountered to

defendant, and defendant would send fixes, and the process would repeat. Id. at 68:9-69:22.

In early 2008, CA gave defendant access to the SAS System on CA's mainframe in an

attempt to speed up the process. See Pl.'s Ex. 17, January 4, 2008 email from Robinson to Bagshaw.

Later, in May of 2008, plaintiff again requested, and CA granted, access to CA's SAS System

(perhaps because their previous access had lapsed). Pl.'s Ex. 18, May 15, 2008 email from Manning

to Timothy Hoffman; Def.'s Ex. 6, Waselewski Dep. 143:16-144:18.

Defendant wanted to run MICS on CA's copy of the SAS System and compare the operations

and output of MICS with the SAS System to that of MICS with WPS to identify the differences in

output, and revise WPS accordingly. Def.'s Ex. 18, Bagshaw Statement, ¶ 61; Waselewski Dep.

209:10-17. CA's MLA with plaintiff, however, provided that CA would not "provide or otherwise

make available any licensed IPP [SAS Institute Program Products] in any form to any person other

than [CA's] personnel." Def.'s Ex. 50, Waselewski Dep. Def's Ex. 25, ¶ 7.

Plaintiff's general counsel contacted CA's general counsel via email on August 25, 2010,

stating that CA violated its license agreement with plaintiff by giving defendant access to its SAS

System. See Def.'s Ex. 19, Waselewski Dep. Def.'s Ex. 22. Plaintiff and CA subsequently executed

an agreement whereby, inter alia, CA agreed to terminate its relationship with defendant. See Def.'s

Ex. 20 Waselewski Dep. Def.'s Ex. 23.

In addition to work on Project X, defendant also did work for other customers on CA's

mainframe. In one instance, one of defendant's customers, named SDDK, reported an issue

regarding certain missing information in WPS.  Pl.'s Ex. 44, January 23, 2009, Bug Report, 199.

While working on this issue, Bagshaw stated "I will check this out on Monday on the CA System

to verify SAS and WPS behaviour is the same." Id. at 204.  Shortly thereafter Bagshaw used the CA

system to test the output of both SAS and WPS and he reported back these results.  Id.; Millen I

Decl. Ex. 3.f., Tom Quarendon Dep. 94:3-12.

       4.     Defendant's Product Is Used In the United States

Defendant has a reseller located here in the United States, Minequest, and defendant's

software has been licensed to entities in the United States, such as General Motors.  See Pl.'s Ex.

187, November 18, 2009, Bug Report.

## COURT'S DISCUSSION

A.     Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  This standard is met when "a reasonable jury could reach only one conclusion based on the

evidence," or when "the verdict in favor of the non-moving party would necessarily be based on

speculation." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005).  On the other

hand, when "the evidence as a whole is susceptible of more than one reasonable inference, a jury

issue is created," and summary judgment should be denied.  Id. at 489-90.

Summary judgment is not a vehicle for the court to weigh the evidence and determine the

truth of the matter, but rather contemplates whether a genuine issue exists for trial.  Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  Similarly, credibility determinations are jury

functions, not those of a judge.  Id. at 255.  In making this determination, the court must view the

14

inferences drawn from the underlying facts in the light most favorable to the nonmoving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). Nevertheless, such inferences "must still be within the range of reasonable probability" and the court should issue summary judgment "when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982) (quoting Ford Motor Co. v. McDavid, 259 F.2d 261 (4th Cir. 1958)). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. Anderson, 477 U.S. at 247–48. Accordingly, the court must examine the materiality and the genuineness of the alleged fact issues in ruling on a motion. Id. at 248–49.

It is well-established that the party seeking summary judgment bears the initial burden of demonstrating the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate with specific evidence that there exists a genuine issue of material fact requiring trial. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

B.     Principles of Comity

Plaintiff has pursued litigation against defendant in the U.K. where a final decision has been entered and affirmed on appeal. An issue that looms large over the instant motions is the impact of that final decision on this case.

In particular, defendant argues that the U.K. judgment has preclusive effect on several issues, based on principles of comity in combination with the doctrine of collateral estoppel. Plaintiff also contends that the U.K. judgment has a preclusive effect – albeit on a more limited set of issues –

15

based on comity and collateral estoppel.  Therefore, at the outset, the court notes various applicable principles regarding the effect of a foreign judgment.

"Neither the full faith and credit statute, nor the Full Faith and Credit Clause of the Constitution, applies to judgments issued from foreign countries." Jaffe v. Accredited Sur. & Cas. Co., 294 F.3d 584, 591 (4th Cir. 2002).  Thus, "[t]he effect to be given foreign judgments has therefore historically been determined by more flexible principles of comity." Guinness PLC v. Ward, 955 F.2d 875, 883 (4th Cir. 1992).  Comity

> is neither a matter of absolute  obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws.

Hilton v. Guyot, 159 U.S. 113, 163-64 (1895).  In determining whether to extend comity, the fundamental question is whether the foreign "proceedings were sufficiently analogous to our fundamental concepts of justice." In re Enercons Virginia, Inc., 812 F.2d 1469, 1473 (4th Cir. 1987). However, it is clear that "a state can refuse . . . to recognize a foreign judgment on the ground that it conflicts with the public policy of that state."  Jaffe, 294 F.3d at 591 (4th Cir. 2002). "Additionally, 'comity is an affirmative defense' and therefore the party seeking to have a U.S. court extend comity bears the burden of proving that comity is appropriate." In re Travelstead, 227 B.R. 638, 656 (D. Md. 1998) (citing Allstate Life Ins. Co. v. Linter Grp. Ltd., 994 F.2d 996, 999 (2d Cir. 1993)).

Although the parties do not cite, nor has the court found, any Fourth Circuit decision squarely addressing the standard for determining the preclusive effect of a foreign judgment on an issue in a separate action in the United States, other courts have had opportunity to do so.  Several federal

courts have permitted use of foreign judgments to preclude litigation on an issue if the requirements

of both comity and collateral estoppel are satisfied.  See Diorinou v. Mezitis, 237 F.3d 133, 140 (2d

Cir. 2001); Phillips USA, Inc. v. Allflex USA, Inc., 77 F.3d 354, 361 (10th Cir.1996); Pony Express

Records, Inc. v. Springsteen, 163 F. Supp. 2d 465, 473 (D.N.J. 2001).

> Of course, in order to apply the doctrine of collateral estoppel, the court must
> determine that the issue in the pending litigation is identical to the issue in the
> previous litigation.  One way in which two issues may be distinct is if they present
> mixed questions of fact and law, and the legal standard under which the original
> court decided the issue [was] a different legal standard than the standard applicable
> in the present litigation.

Pony Express Records, 163 F. Supp. 2d at 473 (citing Wright, Miller & Cooper, Federal Practice and

Procedure: Jurisdiction § 4417).[9]  With these principles in mind, the court turns to the parties'

motions.

C.      Motions for Summary Judgment

1.      Breach of Contract

Both parties contend that they are entitled to summary judgment on plaintiff's claim for

breach of contract based on defendant's alleged breached of the SAS Learning Edition license

agreement.  Plaintiff contends that the undisputed evidence shows that defendant violated this

agreement in four ways: 1) by making corporate use of SAS Learning Edition; 2) by permitting users

other than the individual customer who actually installed SAS Learning Edition to use it; 3) by using

SAS Learning Edition for production purposes – specifically, creation of a competing software

product; and 4) by reverse engineering SAS Learning Edition in order to create WPS.

---

[9] Federal courts have also held that recognized foreign judgments may have res judicata effect.  See, e.g., Phillips USA, 77 F.3d at 359-61.  Defendant has only contended that the U.K. judgment should have issue preclusive effect, and has not raised the defense of res judicata.  Because "res judicata [is] an affirmative defense ordinarily lost if not timely raised," and defendant has had ample time to raise this defense, the court considers only the issue preclusive effect of the U.K. judgment.  Arizona v. California, 530 U.S. 392, 410 (2000).

A claim for breach of contract requires a plaintiff to show "the existence of a contract between plaintiff and defendant, the specific provisions breached, [t]he facts constituting the breach, and . . . damages resulting to plaintiff from such breach." Cantrell v. Woodhill Enterprises, Inc., 273 N.C. 490, 497, 160 S.E.2d 476, 481 (1968); see also Morgan's Ferry Prods., LLC v. Rudd, 18 F. App'x 111, 112 (4th Cir. 2001) ("Under North Carolina law, a breach of contract claim must allege that a valid contract existed between the parties, state that defendant breached the terms thereof, explain the facts constituting the breach, and specify the damages resulting from such breach.").

The U.K. court was presented with a substantially similar claim by plaintiff, who there asserted that defendant's actions violated the SAS Learning Edition license agreement by allowing more than one employee to use copies of the software and by using said software for purposes extending beyond the scope of the license. See U.K. judgment ¶ 56. Both parties contend that the U.K. court's judgment necessitates a finding in their favor on this claim.

The U.K. court held that the SAS Learning Edition license "only extended to use by the Customer, that is to say, the individual employee who clicked on the 'yes' button when installing the Learning Edition." U.K. judgment ¶ 58. It also found that more than one employee used "the same copy of the Learning Edition" and that such additional use "was outside the scope of the license." Id. Finally, it determined that defendant used SAS Learning Edition "to ascertain details of the operation of the SAS System . . . to compare the performance of WPS with that of the Learning Edition in order to improve the relative performance of WPS . . . to test WPS" and other such uses that were "outside the scope of the licence" and that such purposes fell outside the scope of the SAS Learning Edition license agreement's directive that the software be used for non-production purposes. U.K. interim judgment ¶ 289.

18

Nevertheless, the U.K. court looked to the European Directives and found that Article 5(3) of Directive 91/250/EEC protected defendant's use of SAS Learning Edition. U.K. judgment ¶ 79. Article 5(3) provides that "[t]he person having a right to use a copy of a computer program shall be entitled, without the authorisation of the right-holder, to observe, study or test the functioning of the program in order to determine the ideas and principles which underlie any element of the program if he does so while performing any of the acts of loading, displaying, running, transmitting or storing the program which he is entitled to do." Directive 91/250/EEC, art. 5(3).

The U.K. court then turned to Article 9(1) of Directive 91/250/EEC, which provides, in relevant part, that "[a]ny contractual provisions contrary to Article 6 or to the exceptions provided for in Article 5 (2) and (3) shall be null and void." The U.K. court held that Article 9(1) "renders null and void any contractual restrictions contrary to Article 5(3)." Id. ¶ 61. It further held that to the extent that defendant's "use was contrary to the licence terms they are null and void by virtue of Article 9(1), with the result that none of [defendant's] acts complained of was a breach of contract." Id. ¶ 79.

Defendant contends that all of the findings and conclusions of the U.K. court, including the finding that "none of [defendant's] acts complained of was a breach of contract" are preclusive, and thus plaintiff's motion must fail, and it must be granted summary judgment. Plaintiff contends that only the U.K. court's findings of fact and conclusions as to matters of construction of the contractual terms are binding. Neither party disputes that the findings of fact as to the actions by defendant by the U.K. court are entitled to a preclusive effect.[10] Additionally, the parties agree that this court

---

[10] Although defendant vigorously disputes many of the U.K. court's characterizations of those actions as beyond the scope of the SAS Learning Edition license agreement as written.

should defer to the U.K. court's conclusions of law with respect to its construction of the terms of the SAS Learning Edition license agreement.

The court finds that the U.K. court's findings of fact do not conflict with the facts as set forth above by this court. Accordingly, the court need not consider further whether these findings of fact are preclusive. The court further concludes that under the principles of comity and standards of collateral estoppel the U.K. court's construction of the SAS Learning Agreement license terms are preclusive.

As an initial matter, there is no suggestion the proceedings were not "sufficiently analogous to our fundamental concepts of justice." In re Enercons Virginia, Inc., 812 F.2d 1469, 1473 (4th Cir. 1987). Numerous courts have found that English courts are procedurally proper fora. See, e.g., M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 12 (1972) ("Plainly, the courts of England meet the standards of neutrality and long experience in admiralty litigation."); Haynsworth v. The Corp., 121 F.3d 956, 967 (5th Cir. 1997) ("American courts repeatedly have recognized [English courts] to be fair and impartial."); Roby v. Corp. of Lloyd's, 996 F.2d 1353, 1363 (2d Cir. 1993); Riley v. Kingsley Underwriting Agencies, Ltd., 969 F.2d 953, 958 (10th Cir. 1992). Indeed, the Seventh Circuit, speaking of the English courts stated that "[a]ny suggestion that this system of courts does not provide impartial tribunals or procedures compatible with the requirements of due process of law borders on the risible." Soc'y of Lloyd's v. Ashenden, 233 F.3d 473, 476 (7th Cir. 2000) (internal quotations omitted). There is no suggestion that the U.K. court's construction of the license terms is somehow contrary to the public policy of North Carolina.

Moreover, the U.K. court's construction of the terms of the license agreement satisfies the requirements of collateral estoppel. The Fourth Circuit has instructed that

20

> [a] party seeking to rely on the doctrine of collateral estoppel is obliged to establish five elements: (1) that the issue sought to be precluded is identical to one previously litigated (element one); (2) that the issue was actually determined in the prior proceeding (element two); (3) that the issue's determination was a critical and necessary part of the decision in the prior proceeding (element three); (4) that the prior judgment is final and valid (element four); and (5) that the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the previous forum (element five).

Collins v. Pond Creek Mining Co., 468 F.3d 213, 217 (4th Cir. 2006).[11]  In the U.K. litigation, the U.K. court construed the terms of the very same license agreement, and the parties agreed that the terms of the agreement would not have a different meaning under English law than under North Carolina law.  See Def.'s Ex. 58, Claimant's Resp. To Def.'s Request for Further Information No. 9 ("[Plaintiff] does not intend to contend that the Agreement, when construed in accordance with the laws of the State of North Carolina has a different meaning (at least insofar as relevant to this case) than the meaning which the Agreement would have if construed in accordance with the laws of England and Wales."); U.K. interim judgment ¶ 274 ("All the versions of the licence terms are governed by the law of the State of North Carolina.  There is no evidence of North Carolina law, and it is common ground that I should assume that it is no different from English law so far as is relevant to this case.").

The U.K. court also actually decided issues of contractual construction, determining that "on

---

[11] The court is aware that "[i]n determining the preclusive effect of a state-court judgment, the federal courts must, as a matter of full faith and credit, apply the forum state's law of collateral estoppel."  In re McNallen, 62 F.3d 619, 624 (4th Cir. 1995).  To the extent this principle would extend to applying foreign law of collateral estoppel to foreign judgments, no evidence regarding principles of collateral estoppel under English law has been presented.  To the extent that the proper standard for collateral estoppel in this case is the standard applied by North Carolina, the court concludes that such requirements are met.  In North Carolina, the requirements for collateral estoppel are "(1) the issues must be the same as those involved in the prior action, (2) the issues must have been raised and actually litigated in the prior action, (3) the issues must have been material and relevant to the disposition of the prior action, and (4) the determination of the issues in the prior action must have been necessary and essential to the resulting judgment."  State v. Summers, 351 N.C. 620, 623 (2000) (citations omitted).

21

a true construction of the licence terms, the licence only extended to use by the Customer, that is to say, the individual employee who clicked on the "yes" button when installing the Learning Edition." U.K. judgment ¶ 58. The U.K. court further held that the restriction of use of SAS Learning Edition to "non-production purposes" meant that "the Customer must not use the Learning Edition to produce anything, but only to learn about the SAS Language, how to write SAS scripts and how to use the SAS System." U.K. interim judgment ¶ 286. Thus, the U.K. court held that defendant's actions "fell outside the scope of the licence." U.K. judgment ¶ 73. These determinations regarding the contractual terms were critical to the U.K. judgment, which is indisputably a final judgment that was made after a full opportunity to litigate.

In light of the foregoing, these above determinations made by the U.K. court should be afforded preclusive effect on issues in this litigation. Under the doctrines of comity and collateral estoppel, defendant is precluded from arguing otherwise. Thus, it is undisputed that there was a contract between plaintiff and defendant, and it is preclusively established that by its actions in using SAS Learning Edition to produce WPS, and by allowing other employees than the installer of SAS Learning Edition to use that software specific terms of the agreement were breached. Finally, it is undisputed that defendant successfully created a competing product to the detriment of plaintiff as a result of its breach.

As noted above, however, the U.K. court's also held that defendant's "use of the Learning Edition was within Article 5(3) [of Directive 91/250/EEC], and to the extent that such use was contrary to the licence terms they are null and void by virtue of Article 9(1), with the result that none of [defendant's] acts complained of was a breach of contract." U.K. judgment ¶ 79. Defendant contends that this conclusion is also entitled to preclusive effect. Plaintiff, by contrast, asserts that

22

this holding is not preclusive as the case at bar presents a different issue than the one previously litigated in the U.K. where English law is substantially different from North Carolina law on this issue.[12]

"For collateral estoppel to apply, the issues in each action must be identical, and issues are not identical when the legal standards governing their resolution are significantly different." Computer Associates Int'l, Inc. v. Altai, Inc., 126 F.3d 365, 371 (2d Cir. 1997) (analyzing whether its holding regarding copyright infringement precluded plaintiff from pursuing a claim regarding its French copyright in French courts); see also Alphin v. F.A.A., No. 89-2405, 1990 WL 52830 * 2 (4th Cir. April 13, 1990) (finding no collateral estoppel where, "[a]lthough the issues arose out of the same facts, the legal standards in each case are quite different"); cf. Leo Feist, Inc. v. Debmar Pub. Co., 232 F. Supp. 623, 624 (E.D. Pa. 1964) (granting issue preclusive effect to an English judgment where "the English court applied legal principles which, if different at all, are only very slightly different from those which would be applied in an American court").

In this case, the U.K. court arrived at its ultimate conclusion based upon the dictates of the European Directives. Defendants have filed the opinion of Simon Thorley stating that "Articles 5(3) and 9 . . . are mandatory provisions of EU and English Law." Def.'s Ex. 57, Simon Thorley Op. ¶ 13. He goes on to state that these "mandatory provisions . . . cannot be affected or avoided by the fact that the proper law of the contract is other than English Law." Id. ¶ 18. There is no suggestion,

---

[12] Defendant argues that plaintiff should be judicially estopped from arguing that this holding is not preclusive where plaintiff stated in the U.K. litigation that it did not contend that the SAS Learning Edition license agreement had a different meaning when construed in accordance with the laws of North Carolina than it does when construed in accordance with English law. This argument is without merit. Plaintiff does not now argue that the SAS Learning Edition license agreement has a different meaning when construed under North Carolina law as it does when construed under English law. Plaintiff only argues that the European Directives do not apply to the terms as construed to nullify certain of those terms.

however, that courts in North Carolina are bound by these mandatory provisions of European Union and English law.

Thus, this court is presented with a choice of law question. If English law governs interpretation of this contract, the issues presented are the same as those decided by the U.K. court. If, however, North Carolina law governs, the issues presented are not the same where a North Carolina court would be under no obligation to apply the European Directives to nullify those parts of the SAS Learning Edition license agreement the U.K. court found would have been breached by defendant's actions.

North Carolina choice of law governs in this case. See In re Merritt Dredging Co., Inc., 839 F.2d 203, 205 (4th Cir. 1988) (in a diversity action a federal court applies the choice of law rules of the state in which it sits). It is generally the case in North Carolina that "where parties to a contract have agreed that a given jurisdiction's substantive law shall govern the interpretation of the contract, such a contractual provision will be given effect." Tanglewood Land Co. v. Byrd, 299 N.C. 260, 262 (1980). However, North Carolina courts may refuse to give effect to a choice of law clause where

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice,
> or
> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which . . . would be the state of the applicable law in the absence of an effective choice of law by the parties.

Broadway & Seymour, Inc. v. Wyatt, No. 91-2345, 1991 WL 179084, at *3 (4th Cir. Oct. 28, 1991) (quoting Rest (2d) of Conflict of Laws § 187(2) (1971)); see also Behr v. Behr, 46 N.C. App. 694, 696 (1980) ("The parties' choice of law is generally binding on the interpreting court as long as they had a reasonable basis for their choice and the law of the chosen State does not violate a fundamental

24

policy of the state of otherwise applicable law.").

In this case, North Carolina has a substantial relationship to the parties and the transaction where plaintiff is a North Carolina company. Thus, the first exception to application of the choice of law clause is inapplicable. Turning to the second, the North Carolina Supreme Court has instructed that in order to

> render foreign law unenforceable as contrary to public policy, it must violate some prevalent conception of good morals or fundamental principle of natural justice or involve injustice to the people of the forum state. This public policy exception has generally been applied in cases such as those involving prohibited marriages, wagers, lotteries, racing, gaming, and the sale of liquor.

Boudreau v. Baughman, 322 N.C. 331, 342 (1988). Thus, even assuming *arguendo* that the U.K. has a materially greater interest than North Carolina in determination of this issue, application of North Carolina law would not violate a fundamental policy of the U.K. Based on the foregoing, the court determines that the applicable law in this matter is North Carolina law, pursuant to the SAS Learning Edition license agreement.

Where North Carolina law significantly differs from English law on the question of the validity of the contractual provisions purportedly breached, the court finds that this determination by the U.K. court is not entitled to preclusive effect. See Zeevi Holdings Ltd. v. Republic of Bulgaria, 494 F. App'x 110, 114-15 (2d. Cir 2012) (holding that collateral estoppel did not apply where an Israeli court's construction of a contract was informed by a principle of Israeli law that was not applicable in the American litigation). Indeed, defendant itself contends that comity "is intended to address . . . circumstances . . . where the facts are the same (as Plaintiff concedes) *and the applicable law is similar in all respects relevant to the legal inquiry*." Def.'s Reply Supp. Mot. for Summary Judgment at 3 (emphasis added).

25

In sum, the court is not bound by the U.K. court's conclusion that European Union law rendered contractual provisions void. As discussed above, however, this court is bound by the determination of the U.K. court that defendant's use of SAS Learning Edition fell outside the scope of its license. See U.K. judgment ¶¶ 58, 73. Accordingly, the undisputed facts and preclusive conclusions of the U.K. court establish a contract between the parties that was breached by defendant, causing damage to the plaintiff. See Cantrell, 273 N.C. at 497. Therefore, summary judgment will be granted for plaintiff, and denied for defendant on plaintiff's claim for breach of contract.[13]

2.      Copyright Infringement

a.      Comity and Copyright Infringement

As with plaintiff's claim for breach of contract, defendant contends that, consistent with the principles of comity and collateral estoppel, this court should enter judgment as a matter of law in its favor on plaintiff's claim for copyright infringement of the SAS System, and dismiss plaintiff's claim for copyright infringement of the SAS manuals. "As a general matter, the Copyright Act is considered to have no extraterritorial reach." Tire Eng'g & Distribution, LLC v. Shandong Linglong Rubber Co., 682 F.3d 292, 306 (4th Cir. 2012). Thus, plaintiff is here complaining of acts of

---

[13] It does not appear that plaintiff specifically raised the SAS Learning Edition license agreement's prohibition on reverse engineering in the U.K. litigation. Although the court has already determined that it is preclusively established that defendant violated the SAS Learning Edition license agreement in other ways, defendant's conduct also constituted reverse engineering in violation of that license agreement. See Kewanee Oil Co. v. Bicron Corp., 416 U.S. 470, 475 (1974) (reverse engineering is "starting with a known product and working backward to divine the process which aided in its development or manufacture."); Decision Insights, Inc. v. Sentia Group, Inc., 311 F. App'x 586, 590 n.15 (4th Cir. 2009) ("The term 'reverse engineer' means 'to analyze a product to try to figure out its components, construction, inner workings, often with the intent of creating something similar.'" (quoting WEBSTER'S NEW MILLENNIUM DICTIONARY OF ENGLISH (Preview ed.2008), available at http://www.dictionary.com)).

infringement that occurred in the United States.[14]

As discussed previously, because "issues are not identical when the legal standards governing their resolution are significantly different." Altai, 126 F.3d at 371, collateral estoppel cannot apply unless English copyright law in this area is not significantly different from American law. Defendant, however, has failed to demonstrate that English law is sufficiently similar. As with plaintiff's claim for breach of contract, the U.K. court reached many of its conclusions based upon the dictates of the European Directives, see U.K. judgment ¶¶ 15-48, and defendant has failed to demonstrate that this law is not significantly different from American law.

### b.      Copyright Infringement of the SAS System

Defendant contends that it is entitled to judgment as a matter of law that it did not infringe plaintiff's copyrights in its software products, the SAS System and SAS Learning Edition. To succeed on a copyright infringement claim, a plaintiff generally must show two things: 1) plaintiff owned a valid copyright in the product at issue, and 2) defendant copied constituent parts of the product that are copyrightable. Darden v. Peters, 488 F.3d 277, 285 (4th Cir. 2007). Neither party disputes that plaintiff holds valid copyrights in its software products. Rather, the parties disagree as to whether there is a genuine issue of material fact that defendant copied constituent parts thereof that are copyrightable. Defendant further asserts that even if it reproduced copyrightable elements of plaintiff's software, its actions were permissible under the doctrines of fair use and misuse of copyright.

"Copyright protection subsists . . . in original works of authorship fixed in any tangible

---

[14] Defendant asserts that plaintiff has failed to introduce any evidence of infringement occurring in the United States. This assertion is untrue. Plaintiff has introduced evidence in which defendant's United States reseller states that General Motors had taken out a trial license of WPS. See Pl.'s Ex. 187, November 18, 2009 Bug Report.

medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 102(a). However, "[i]n no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." 17 U.S.C. § 102(b). "If there is only one way to express the idea, 'idea' and 'expression' merge and there is no copyrightable material." M. Kramer Mfg. Co. v. Andrews, 783 F.2d 421, 436 (4th Cir. 1986). Accordingly, computer programs properly may be the subject of copyright protection only when other programs can be made which perform the same function. Id.

In this case, plaintiff asserts that defendant has infringed its copyrights in plaintiff's software by using certain software language functions and by copying the resulting output formats that are produced when a user runs those language functions through the SAS System.

The software language functions that plaintiff contends defendant infringed are made up of various functions, routines, statements, formats, engines, macros, procedures, and options. See Def.'s Ex. 5, Langston February 11, 2014, Dep. ("Langston II Dep.") 7:5-43:21; see also Patricia Brown May 19, 2014, Decl. Ex. C. Plaintiff, through its Rule 30(b)(6) designee Langston, testified that these types of software language functions allegedly infringed are elements of the SAS Language used by programmers who program in the SAS Language.[15] Def.'s Ex. 5, Langston II Dep. 8:9-9:2, 10:12-16, 11:25-12:4, 14:3-7, 15:23-16:1, 16:25-17:2, 18:13-25, 22:7-13, 24:2-7, 25:13-26:5, 27:17-

---

[15] Defendant appears to move, in its memorandum in support of its motion for summary judgment, to exclude consideration of exhibit C to Brown's May 19, 2014, declaration on the grounds that this document was untimely disclosed. Where all of the functions listed on this document are also functions, routines, statements, formats, engines, macros, procedures, and options, and therefore are elements of the SAS Language, the court finds that consideration of this document does not effect the outcome of this motion, and therefore denies without prejudice any motion to exclude by defendant. Should defendant have cause to resubmit its motion at a later stage in these proceedings, it may do so.

20, 30:13-21, 33:2-9, 35:11-16, 36:13-16, 37:12-14, 39:9-12, 40:15-19, 41:15-18, 42:19-22, 44:9-14. Plaintiff therefore contends that defendant's use of these terms from the SAS Language infringes its copyrights.

It is undisputed however, that "thousands of users . . . write programs in the language of SAS." Def.'s Ex. 2, Langston I Dep. 26:8-9. Indeed, plaintiff has testified that anyone can write a program in the SAS Language, and that no license is needed to do so. Id. at 32:8-18; see also Def.'s Ex. 41, Creech Dep. 179:12-17. Thus, where anyone may use these terms, defendant's use thereof does not constitute infringement. See Oracle Am., Inc. v. Google Inc., 750 F.3d 1339, 1353, 1368 (Fed. Cir. 2014) ("It is undisputed that the Java programming language is open and free for anyone to use. . . . Thus, Oracle concedes that Google and others could employ the Java language–much like anyone could employ the English language to write a paragraph without violating the copyrights of other English language writers.").[16]

Plaintiff also asserts that where the resultant output of running these elements of the SAS Language in both parties' software is similar, defendant has infringed also on the output formats of the SAS System. Insofar as these outputs are similar, however, this only serves to establish that when defendant's software compiles and interprets SAS Language programs input by users, it does so properly.

In essence, by asking the court to find that defendant's software infringes its copyright through its processing of elements the SAS Language, plaintiff seeks to copyright the idea of a program which interprets and compiles the SAS Language – a language anyone may use without a

---

[16] Defendant contends that programming languages as such are not copyrightable. In this case, where the court finds that the SAS Language, like Java, is open to use, it need not reach the issue of whether the creator of a programming language could ever restrict its use by copyright.

license. However, copyright law provides no protection to ideas. <u>See</u> 17 U.S.C. § 102(b) ("In no case does copyright protection for an original work of authorship extend to any idea . . . ."); <u>Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.</u>, 499 U.S. 340, 344-45 (1991) ("The most fundamental axiom of copyright law is that no author may copyright his ideas . . . ." (internal quotations and alteration omitted)).

It is undisputed that the parties' programs implement the idea of an SAS Language in different ways as their programs are not written in the same programming languages. <u>See</u> Def.'s Ex. 2, Langston I Dep. 9:17-10:2 (SAS System is written in the language of C, and certain small portions in the languages of Assembler and Java); Def.'s Ex. 4, Peter Quarendon Statement ¶ 32 (WPS originally written in Java); Def.'s Ex. 13, Thomas Quarendon Statement ¶ 65 (WPS code was rewritten in the language of C++ beginning in early 2005). Thus, the court finds that, on this record, there is no genuine issue of material fact that defendant has not infringed plaintiff's software copyrights.[17] In light of this determination, the court need not reach defendant's arguments regarding fair use and misuse of copyright.

Plaintiff endeavors to resist this conclusion by arguing that this case is on all fours with the <u>Oracle</u> decision, wherein the court held that copying short portions of source code by the defendant in that case constituted copyright infringement, and by arguing that its software is not a compiler/interpreter for SAS Language programs. In its recent decision in <u>Oracle</u>, the federal circuit held that Google Inc. ("Google") infringed the copyrights of Oracle America, Inc. ("Oracle") in 37

---

[17] In support of its assertion that defendant has infringed its copyright, plaintiff has filed the affidavit of Dr. James Gentle purporting to compare certain outputs of the SAS System to WPS. For various reasons, defendant asserts that this affidavit is inadmissible and, in its reply moves to strike the affidavit. Where the court finds that consideration of this affidavit is not necessary to its conclusion, it denies this motion as moot. Should plaintiff wish to rely upon this affidavit at a later stage in these proceedings, defendant may resubmit its motion to strike or exclude the same at that time.

packages of computer source code called "API packages." <u>Oracle Am.</u>, 750 F.3d at 1347-48. In essence, each of these API packages contained a number of prewritten programs, written in the language of Java, that were arranged in a distinct taxonomy. <u>Id.</u> at 1348-49. Each package contained two types of source code: "declaring code" and "implementing code." <u>Id.</u> at 1349. A programmer wishing to incorporate the function of one or more of these programs into a program that (s)he was creating could do so by using a short bit of "declaring code," which would command the computer to execute one of these specific prewritten programs. <u>Id.</u> The code that the identified program used to carry out its function was termed "implementing code." These program packages were copyrighted by Oracle, which licensed these packages under various terms. <u>Id.</u> at 1350.

Google wanted to use these API packages in its Android software platform for mobile devices; however, negotiations to license the packages from Oracle reached an impasse. <u>Id.</u> at 1350. Because Google believed that "Java application programmers would want to find the same 37 sets of functionalities in the new Android system callable by the same names as used in Java," it "copied the declaring source code from the 37 Java API Packages verbatim, inserting that code into parts of its Android software. In doing so, Google copied the elaborately organized taxonomy . . . the overall system of organized names – covering 37 packages" and the organization of the numerous programs within these packages. <u>Id.</u> at 1350-51. Google did, however, write its own implementing code for nearly all of these programs. <u>Id.</u> at 1351. Although the court noted that the Java programming language was free for anyone to use, <u>see id.</u> at 1353, 1368, it found that by copying the declaring code for these programs, and the structure, sequence, and organization of these programs, Google infringed Oracle's copyright. <u>Id.</u> at 1359.

Plaintiff contends that certain SAS Language elements that can be run through both its

Case 5:10-cv-00025-FL   Document 296   Filed 09/29/49   Page 31 of 41

software and defendant's software are analogous to the declaring code at issue in <u>Oracle</u>. This analogy does not hold. The declaring code at issue in <u>Oracle</u> was not an element of the open-to-use Java language itself. Rather, it was a short string of Java code that called a prewritten Java program. Or, as the <u>Oracle</u> court analogized, a piece of declaring code was similar to an opening phrase in Charles Dickens' <u>A Tale of Two Cities</u>, whereas the Java language itself is like the English language. <u>Id.</u> at 1363, 1368. To borrow that analogy, in this case, the elements of the SAS Language are more analogous to words of the English language. There is no evidence that defendant has copied specific strings of SAS Language, or specific strings of source code from plaintiff's software, only that its software can function with these SAS Language elements.

Plaintiff, in response to defendants' motion, introduces the affidavit of one of its employees, Alan Richard Eaton ("Eaton"), a software developer. Eaton asserts that it is incorrect to refer to the SAS System as an interpreter/compiler. <u>See</u> Eaton Aff. ¶ 10-11. Plaintiff, relying on this affidavit, would characterize certain procedures (referred to as "PROCS") and their accompanying PROC statements invoking these procedures as "inputs" into the SAS System which then produces certain outputs, rather than as elements of the SAS Language that are interpreted or compiled by the SAS System. <u>See id.</u> ¶¶ 12-13. Thus, plaintiff asserts that by using these same "inputs," defendant infringes plaintiff's software copyrights.

The Fourth Circuit has instructed that a party "cannot thwart the purposes of Rule 56 by creating issues of fact through affidavits that contradict its own depositions." <u>Military Servs. Realty, Inc. v. Realty Consultants of Virginia, Ltd.</u>, 823 F.2d 829, 832 (4th Cir. 1987). The Eaton affidavit, insofar as it asserts that plaintiff's software is not an interpreter/compiler of the SAS Language, contradicts plaintiff's prior Rule 30(b)(6) testimony, through Langston, that the SAS System is "a

32

combination of compilers and what is referred to as interpreters," Def.'s Ex. 59, Langston I Dep. 12:8-10. Thus, plaintiff cannot create an genuine factual issue on this matter by contradicting its own prior deposition testimony through the Eaton affidavit.[18]

In sum, the court finds that defendant is entitled to judgment as a matter of law as to plaintiff's software copyright claim where defendant's use of the terms of the SAS Language does not infringe any of plaintiff's software copyrights.

           c.     Copyright Infringement of the SAS Manuals

Defendant next moves for summary judgment on plaintiff's claim for infringement of plaintiff's manuals. Defendant notes that in accordance with the judgment against it on this claim in the U.K. litigation, it has removed all copies of its manuals not only from its U.K. customers as ordered by the U.K. court, but from all customers worldwide. Manning Aff. ¶ 3. Defendant also notes that the U.K. court ordered that an inquiry as to damages resulting from the infringement it found be conducted. See Def.'s Ex. 52, U.K. Court Feb. 13, 2013, Order ¶ 3. Defendant asserts that because it has now withdrawn all of the infringing manuals and damages will be assessed as a result of the U.K. litigation, any relief granted by this court on this claim would constitute a double recovery.

As plaintiff points out however, there is no indication that the damages to be awarded to it as a result of the U.K. litigation will encompass any infringement in the United States of the

_____

[18] The court notes that plaintiff testified that the SAS System was more than a compiler and an interpreter. See Def.'s Ex. 59, Langston I Dep. 12:17-22 ("Q: Is the SAS system anything other than a compiler and an interpreter? A: Yes. Q: What else does it do? A: It establishes an environment for users such as Display Manager, Enterprise Guide."). No evidence has been introduced, indicating that defendant's software infringes plaintiff's software in its additional functions.

manuals.[19]  Accordingly, defendant's motion for summary judgment as to this claim is denied.

      3.      Tortious Interference with Contract

      Both parties move for summary judgment on plaintiff's claim that defendant tortiously

interfered with license agreements between plaintiff and its customers.

> The elements of tortious interference with contract are: (1) a valid contract between
> the plaintiff and a third person which confers upon the plaintiff a contractual right
> against a third person; (2) defendant knows of the contract; (3) the defendant
> intentionally induces the third person not to perform the contract; (4) and in doing so
> acts without justification; (5) resulting in actual damage to the plaintiff.

Embree Const. Grp., Inc. v. Rafcor, Inc., 330 N.C. 487, 498 (1992) (internal quotations omitted).

A defendant has knowledge of a plaintiff's contract with a third party for purposes of this tort if

defendant "knows the facts which give rise to plaintiff's contractual right against" the third party.

Childress v. Abeles, 240 N.C. 667, 674 (1954).

      To determine whether a defendant's interference is justified, courts consider "the

circumstances surrounding the interference, the [defendant's] motive or conduct, the interests sought

to be advanced, the social interest in protecting the freedom of action of the [defendant] and the

contractual interests of the other party."  Peoples Sec. Life Ins. Co. v. Hooks, 322 N.C. 216, 220-21,

(1988).  "If the defendant's only motive is a malicious wish to injure the plaintiff, his actions are not

justified."  Id. at 221.  On the other hand, "[g]enerally speaking, interference with contract is justified

if it is motivated by a legitimate business purpose, as when the plaintiff and the defendant, an

outsider, are competitors."  Embree Const. Grp., Inc. v. Rafcor, Inc., 330 N.C. 487, 498 (1992); see

---

[19] Plaintiff points out that 2009, the Court of Appeal (Civil Division) of the High Court of Justice in the United Kingdom held that claims for infringement of U.S. copyrights were non-justiciable.  See Argus Media Ltd. v. Tradition Fin. Servs. Inc., No. 09 CIV. 7966 (HB), 2009 WL 5125113, at *5 (S.D.N.Y. Dec. 29, 2009) (citing Lucasfilm Limited v. Ainsworth, [2009] EWCA Civ. 1328 at ¶ 174).  Although the U.K. Supreme Court reversed this holding, it did so on July 27, 2011, which was after the U.K. judgment in this case was entered.  Lucasfilm Limited v. Ainsworth [2011] UKSC 39.

also <u>Peoples Sec. Life. Ins.</u> 322 N.C. at 221 ("[C]ompetition in business constitutes justifiable interference in another's business relations and is not actionable so long as it is carried on in furtherance of one's own interests and by means that are lawful.").

The basis for plaintiff's tortious interference claim is defendant's access to the SAS System on CA's mainframe. Defendant contends that 1) plaintiff has failed to proffer sufficient evidence that defendant knew of the contract between plaintiff and CA; 2) plaintiff has failed to proffer sufficient evidence that defendant induced CA not to perform CA's contractual obligations; and 3) defendant was justified in any interference that may have occurred. Because the court agrees that defendant's actions were justified, it does not reach defendant's other arguments.

The undisputed evidence shows that CA had a SAS Language program – MICS – which was dependent on the SAS System to run. Def.'s Ex. 6, Waselewski Dep. 55:3-11. Defendant began working with CA with the goal of developing WPS into a program upon which MICS also could be run. Millen I Decl. Ex. 2.d. <u>Waselewski Dep.</u> 221:8-17. It further shows that at some point during this effort, defendant's personnel were given access to the SAS System on CA's mainframe. <u>Id.</u> at 233:1-13.

This access by defendant was a violation of CA's license agreement with plaintiff. <u>See</u> Def.'s Ex. 50, CA SAS System MLA, ¶ 7. Nevertheless, even assuming, *arguendo*, that defendant knew of the relevant contractual provision forbidding CA to grant it access, and assuming further that defendant induced CA to grant it access, the court finds that there is no genuine issue of material fact that it was justified in doing so. Based on the undisputed facts in the record, defendant was motivated by a "legitimate business purpose," namely, the development of a product to compete with the SAS System. <u>Embree Const. Grp.</u>, 330 N.C. at 498; <u>see also</u> <u>Peoples Sec. Life. Ins.</u> 322 N.C.

35

at 221.

Plaintiff argues that defendant's interference is not justified, arguing that not all acts of competition or of seeking a business advantage are justified, citing to <u>Static Control Components, Inc. v. Darkprint Imaging, Inc.</u>, 200 F. Supp. 2d 541 (M.D.N.C. 2002). In that case, defendant hired away one of plaintiff's employees, Hulse, thus causing Hulse to breach a non-competition agreement with plaintiff. <u>Id.</u> at 543. Plaintiff sued, claiming, *inter alia*, tortious interference with contract, and defendant moved for summary judgment. <u>Id.</u> The court denied defendant's motion for summary judgment as to tortious interference, based in part upon evidence that defendant hired Hulse in order to misappropriate plaintiff's trade secrets that Hulse knew. <u>Id.</u> at 547.

The court in <u>Static Control</u> decided that interference with a contract is not justified where the aim of that interference is itself improper. <u>Id.</u>; <u>see also</u> <u>Childress v. Abeles</u>, 240 N.C. 667, 675 (1954) (a defendant is not justified in inducing a breach of contract if "he has no sufficient *lawful* reason for his conduct" (emphasis added)). Thus, if in the case at bar, defendant induced CA to breach its contract with plaintiff so as to infringe defendant's copyright, its actions would not be justified. Where, however, the court has found that plaintiff has failed to proffer sufficient evidence of any infringement in its software by defendant, it follows that any interference by defendant was justified by its legitimate aim of creating of a non-infringing competing product. Thus, defendant is entitled to judgment as a matter of law on this count. Plaintiff's motion for summary judgment must be denied and defendant's motion for summary judgment must be granted.

4.      Tortious Interference with Prospective Economic Advantage

Defendant next argues that plaintiff has not proffered evidence sufficient to maintain a claim for tortious interference with prospective economic advantage. The elements of this claim that

36

plaintiff must show include: 1) a valid contract would have existed between plaintiff and a third party but for defendant's conduct; 2) defendant maliciously induced the third party to not enter into the contract; and 3) defendant thereby proximately caused plaintiff to suffer actual damages. Cobra Capital, LLC v. RF Nitro Commc'ns, Inc., 266 F. Supp. 2d 432, 439 (M.D.N.C. 2003) (citing Spartan Equip. Co. v. Air Placement Equip. Co., 263 N.C. 549, 559, 140 S.E.2d 3 (1965)). A plaintiff must further show that the defendant acted "for a reason not reasonably related to the protection of a legitimate business interest." Id.

Defendant does not argue that valid contracts did not exist between plaintiff and various third parties, nor does it contend that its conduct did not cause plaintiff damages. Rather defendant argues that its conduct was not malicious and was for a legitimate business purpose. Where the court has determined that defendant acted for legitimate business purposes, the court grants defendant's motion for summary judgment as to this claim.

5.    Fraudulent Inducement

Defendant also maintains that it is entitled to judgment as a matter of law on plaintiff's claim that defendant fraudulently obtained access to SAS Learning Edition. The well-established elements of fraud in North Carolina are "'(1) [f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party.'" Forbis v. Neal, 361 N.C. 519, 526 (2007) (quoting Ragsdale v. Kennedy, 286 N.C. 130, 138 (1974)). Although a promissory misrepresentation generally cannot support a claim for fraud, "[a] promissory misrepresentation may constitute actionable fraud when it is made with intent to deceive the promisee, and the promisor, at the time of making it, has no intent to comply." Johnson v. Phoenix Mut. Life Ins. Co., 300 N.C. 247, 255

37

(1980) abrogated on other grounds by Myers & Chapman, Inc. v. Thomas G. Evans, Inc., 323 N.C. 559, 569 (1988).

In this case, defendant has admitted that it acquired copies of SAS Learning Edition in 2003, 2005, 2007, and 2009. Answer to Am. Compl. ¶ 25. Defendant further admitted that "each time a version of the SAS Learning Edition was installed, the employee that conducted the installation accepted any necessary terms that were presented for acceptance at the time of the installation." Id. Those terms restricted the use of SAS Learning Edition to the individual customer actually installing the software to learning purposes, and forbade reverse engineering the product or using it for production purposes. See Def.'s Ex. 43, Langston I Dep. Def.'s Exs. 3-6 at Ex. 3 §§ 1.1, 1.3, 2.

The court has determined that there is no genuine issue of material fact that defendant's use of SAS Learning Edition breached the terms of the license agreements governing the use SAS Learning Edition where the U.K. court's preclusive construction of that license agreement's terms establishes that defendant used SAS Learning Edition in various ways that were forbidden by the license agreement. See U.K. judgment ¶ 58; U.K. interim judgment ¶ 289.

Plaintiff has also proffered evidence of defendant's repeated misuse of SAS Learning Edition after repeatedly signing license agreements to the contrary, including the fact that defendant compared the operation of SAS Learning Edition to that of WPS, going so far as to call SAS Learning Edition a "dependency," upon which the creation of WPS relied. See Pl.'s Ex. 190, WPS 3rd Party Dependencies, at 63693, 63722; see also Pl.'s Ex. 35 at 51 (defendant used SAS Learning Edition to determine the source of macros in the SAS System); Pl's Ex. 40 (defendant experimented with SAS Learning Edition so as to understand issues with WPS). As set forth by this court in its order allowing plaintiff to amend to add this claim, this evidence

38

provide[s] support for the element that defendant acted with intent to deceive plaintiff by purportedly showing that, despite its representations to plaintiff that it would adhere to the terms of the license for the Learning Edition software, it used the software for its own commercial purposes in a sophisticated, organized manner; the element that defendant did in fact deceive plaintiff by purportedly showing that defendant actually used the Learning Edition software in a manner prohibited by the license for it; and the element of damages by purportedly showing that defendant was able to develop software that competes with plaintiff's software as a result of its alleged misrepresentations that it would adhere to the license for the Learning Edition software.

SAS Inst. Inc. v. World Programming Ltd., No. 5:10-CV-25-FL, slip op. at 9-10 (E.D.N.C. Aug. 7, 2013).

Defendant, however, asserts that plaintiff has not proffered sufficient evidence for this claim, contending that the record shows that plaintiff knew defendant was a programming company intending to create a competing product but referred defendant to SAS Learning Edition anyway. Defendant points to a May 2008 exchange between Sparkes, the Senior Contracts Officer for plaintiff's U.K. subsidiary, and Robinson, defendant's operational manager. Sparkes, after discovering that defendant was a competitor of plaintiff, informed Robinson during a May 13, 2008, telephone conversation that plaintiff would not license the SAS System to defendant. See Def.'s Ex. 21, Sparkes Statement ¶¶ 13-14. On May 23, 2008, Sparkes emailed Robinson, and confirmed that plaintiff would not enter into a license agreement with defendant for use of the SAS System. Because Robinson had indicated defendant wanted to license the SAS System to "check SAS Syntax," Sparkes further referred him "to the many resources on the market which document SAS Syntax and which are readily available through sellers such as Amazon.com." Def.'s Ex. 22 Sparkes Statement Ex. SS-1 at 14.

This exchange does not support defendant's motion. The fact that Sparkes referred defendant

39

to resources on Amazon.com despite knowing defendant was plaintiff's competitor, in no way demonstrates that defendant, after obtaining SAS Learning Edition, did not state that it would abide by the terms of the license agreement while fully intending not to do so, nor does it show that plaintiff did not rely on that statement. Based on the foregoing, defendant's motion for summary judgment as to plaintiff's claim for fraudulent inducement is denied.

      6.        Unfair and Deceptive Trade Practices

      Finally, defendant moves for summary judgment on plaintiff's claim for violations of the UDTPA.

      To establish a violation of the UDTPA, plaintiff must establish "(1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) which proximately caused injury to plaintiffs." Walker v. Fleetwood Homes of N. Carolina, Inc., 362 N.C. 63, 71-72 (2007). "A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. A practice is deceptive if it has the capacity or tendency to deceive." Id. at 72 (quoting Marshall v. Miller, 302 N.C. 539, 548 (1981)). It is settled law in North Carolina that "a plaintiff who proves fraud thereby establishes that unfair or deceptive acts have occurred. Bhatti v. Buckland, 328 N.C. 240, 243 (1991). In this case the court has found there are genuine issues of material fact with respect to plaintiff's claim for fraudulent inducement; thus, the court denies defendant's motion for summary judgment as to plaintiff's claim under the UDPTA.[20]

---

[20] Plaintiff raises as a separate ground for denial of defendant's motion for judgment on this claim its assertion that defendant falsely categorized itself as in the "financial services" industry when registering on plaintiff's website in order to obtain access to certain SAS manuals. However, plaintiff introduced no evidence that it relied on this statement to its detriment. North Carolina law is clear that "a claim under section 75-1.1 stemming from an alleged misrepresentation does indeed require a plaintiff to demonstrate reliance on the misrepresentation in order to show the necessary proximate cause." Bumpers v. Cmty. Bank of N. Virginia, 747 S.E.2d 220, 226 (N.C. 2013).

## CONCLUSION

For the reasons given the court GRANTS IN PART and DENIES IN PART plaintiff's motion for partial summary judgment (DE 211). Plaintiff's motion is GRANTED as to its claim for breach of contract and DENIED as to its claim for tortious interference with contract. The court also GRANTS IN PART and DENIES IN PART defendant's motion for summary judgment (DE 220). Defendant's motion is GRANTED as to plaintiff's claims for copyright infringement of the SAS System, tortious interference with contract, and tortious interference with prospective economic advantage, and DENIED as to plaintiff's claims for copyright infringement of the SAS manuals, breach of contract, fraudulent inducement, and for unfair and deceptive trade practices.

The parties are DIRECTED to confer within twenty-one (21) days and make joint report to the court as to estimated trial length, alternative suggested trial date settings, suggested alternative dispute resolution techniques to be employed prior to trial in attempt to resolve remaining issues as between the parties, and any other matter bearing on the parties' pretrial and trial preparations. The parties are reminded that within fourteen (14) days, they jointly shall return to the court by U.S. Mail, addressed to the case manager, a copy of this order now sealed, marked to reflect redactions perceived necessary.

SO ORDERED, this the 29th day of September, 2014.

LOUISE W. FLANAGAN
United States District Court Judge

41