IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:10-25-FL

SAS INSTITUTE, INC.,            )
                                )
          Plaintiff,            )
                                )
v.                              )          **MEMORANDUM OPINION**
                                )          **AND ORDER**
WORLD PROGRAMMING LIMITED,      )
                                )
                                )
          Defendant.            )


Pending before the court is defendant's motion for judgment
as a matter of law or, in the alternative, motion for a new
trial. (Doc. No. 542). For those reasons stated herein, the
motion is **DENIED**.

### I.  Background

Plaintiff is a North Carolina-based company that primarily
produces and sells computer software. Over the course of the
company's thirty-year history, it has become the world's largest
privately-held software company. Plaintiff's most widely
recognized product is known as the "SAS System," software that
allows users to perform a variety of tasks, primarily relating
to data access, management, analysis, and presentation.

In addition to the SAS System, plaintiff also developed
secondary software called "SAS Learning Edition." This software

was packaged and promoted as an educational tool to help individuals learn to use the SAS System. Plaintiff marketed this software to students and priced licenses for the SAS Learning Edition between $125 and $150.

In 2010, plaintiff filed suit against defendant, a competing software company based in the United Kingdom. Plaintiff alleged that defendant used the SAS Learning Edition to create a knock-off version of the SAS System (known as "WPS") and targeted SAS customers to switch their software provider/servicer from plaintiff to defendant. Specifically, plaintiff claimed that defendant's employees intentionally misrepresented the company's intent in order to obtain licenses to SAS Learning Edition, knowing that plaintiff would not license the Learning Edition software to a company that wished to create a competing version of the SAS System. Plaintiff also alleged that defendant violated the terms of the Learning Edition license agreement by using the software for "production purposes," a non-educational use. After using Learning Edition to create software that was almost identical to the SAS System, plaintiff alleged that defendant then marketed the software to plaintiff's customers as a drop-in replacement for the SAS System at a considerably lower price.

On September 22, 2015, the case went to trial on three claims asserted by plaintiff: (1) damages for defendant's

2

breach of the SAS Learning Edition license agreement,[1]
(2) fraudulent inducement by WPL to obtain the SAS Learning
Edition license, and (3) unfair and deceptive trade practices as
prohibited by North Carolina General Statute § 75-1.1, pursuant
to plaintiff's fraudulent inducement claim.  After a two-and-a-
half week trial, the jury rendered its verdict, finding that:
(1) defendant's breach of the SAS Learning Edition License
Agreement damaged plaintiff in the amount of $26,376,635;
(2) defendant fraudulently induced plaintiff to enter into the
license agreement and this fraudulent inducement damaged
plaintiff in the same amount; and (3) defendant's fraudulent
inducement occurred in or affected commerce and constituted the
proximate cause of plaintiff's injury, again resulting in
damages in the same amount.  (Doc. No. 517).  The jury further
awarded plaintiff $3,000,000 in punitive damages on its
fraudulent inducement claim.  Id.

    Defendant moves the court for judgment as a matter of law
pursuant to Federal Rule of Civil Procedure 50(b).  In support
of its motion, defendant argues four specific points:
(1) plaintiff presented no evidence that defendant intended to
breach the Learning Edition license agreement at any time;

---

[1] The court previously entered summary judgment in favor of
plaintiff on its claim for breach of contract.  (Doc. No. 296).
As a result, the only issue for the jury on this claim was a
calculation of the damages owed to plaintiff.

(2) the relevant provisions of the Learning Edition license agreement amount to misuse of copyright and, as a result, are unenforceable; (3) plaintiff is not entitled to any damages because it has not proven proximate causation; and (4) the jury's damages award was unsupported by the evidence and contrary to North Carolina law. (Doc. No. 543). Finally, if the court finds that defendant is not entitled to judgment as a matter of law, defendant moves the court for a new trial pursuant to Rule 59. Id. Plaintiff opposes defendant's motion, arguing that ample evidence supported the jury's verdict and damage awards in every respect and, consequently, defendant is not entitled to judgment as a matter of law or a new trial.

## II. Standard of Review

Once a jury has returned its verdict, there are limited circumstances that allow the court to overturn it. The same standard applicable to a motion for summary judgment controls the analysis of a Rule 50(b) motion. Dennis v. Columbia Colleton Med. Ctr., Inc. et al., 290 F.3d 639, 644 (4th Cir. 2002).

> [W]hen a jury has returned a verdict, the district court may grant a Rule 50(b) motion for judgment as a matter of law only if, viewing the evidence in a light most favorable to the non-moving party (and in support of the jury's verdict) and drawing every legitimate inference in that party's favor, the only conclusion a reasonable jury could have reached is one in favor of the moving party.

4

<u>Pitrolo v. Cnty. of Buncombe, N.C., et al.</u>, 407 F. App'x 657, at *1 (4th Cir. 2011) (quoting <u>It'l Ground Transp. Inc. v. Mayor & City Council of Ocean City, Md. et al.</u>, 475 F.3d 214, 218–19 (4th Cir. 2007)) (unpublished).  Essentially, if a reasonable jury could only rule in favor of defendant, the court should grant its motion, but if reasonable minds could differ, the court must affirm the jury's verdict.  <u>Dennis</u>, 290 F.3d at 645 (citing <u>Sales v. Grant</u>, 158 F.3d 768, 775 (4th Cir. 1998)).  In analyzing defendant's motion, the court must draw all reasonable inferences in plaintiff's favor but may not weight the evidence or assess the credibility of the witnesses.  <u>Id.</u> (citing <u>Baynard v. Malone</u>, 268 F.3d 228, 234 (4th Cir. 2001)).

A similar set of strictures apply to the court's consideration of a motion under Rule 59.  The court should grant defendant's motion for a new trial only if: 1) the verdict is against the clear weight of the evidence; 2) is based upon evidence that is false; or 3) will result in a miscarriage of justice, even though substantial evidence might prevent the direction of a verdict.  <u>Cline v. Wal-Mart Stores, Inc.</u>, 144 F.3d 294, 301 (4th Cir. 1998) (quoting <u>Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc.</u>, 99 F.3d 587, 594 (4th Cir. 1996)).  Unlike a motion for judgment as a matter of law, however, the court is permitted to weigh the evidence and assess the credibility of witnesses when determining whether to grant

5

defendant's motion for new trial. Id. The grant or denial of a motion for new trial rests within the court's sound discretion. Id.

### III. Discussion

#### A. Evidence in Support of Plaintiff's Fraud & Unfair and Deceptive Trade Practices Claims

At trial, plaintiff made two separate assertions related to fraud: (1) that defendant fraudulently induced plaintiff to enter into the Learning Edition license agreement; and (2) this fraud constituted the predicate for an Unfair and Deceptive Trade Practices Act ("UDTPA") violation, which plaintiff argued occurred in or affected commerce and constituted the proximate cause of plaintiff's injury. The jury found in favor of plaintiff on both of these claims. In its motion, defendant argues that plaintiff did not present sufficient evidence that WPL intended to breach the terms of the license agreement, undermining the jury's verdict on both claims.

Issues of timing are extremely important to differentiate plaintiff's claim for breach of contract, on which the court previously entered summary judgment, from its claim of fraudulent inducement. To substantiate a claim of fraudulent inducement, plaintiff needed to prove that: (1) defendant made a false representation or concealed a material fact, (2) reasonably calculated to deceive, (3) made with intent to

6

deceive, (4) which in fact did deceive, and (5) this resulted in damage to plaintiff. Myers & Chapman, Inc. v. Thomas G. Evans, Inc., 374 S.E.2d 385, 391 (N.C. 1988) (citing Ragsdale v. Kennedy et al., 209 S.E.2d 494, 500 (N.C. 1974)). These elements shift the fact-finder's perspective. The mere failure to carry out a promise cannot support an action for fraudulent inducement. Strum v. Exxon Co., U.S.A., 15 F.3d 327, 329–30 (4th Cir. 1994). Instead, a party has to demonstrate the promisor "had a specific intent not to perform a[t] the time the promise was made." Wilson v. McAleer, 368 F. Supp. 2d 472, 477 (M.D.N.C. 2005) (citing Norman v. Tradewinds Airlines, Inc., 286 F. Supp. 2d 575, 594 (M.D.N.C. 2003)). Instead of looking to the acts that took place after the contract was entered into, as in a breach of contract claim, the relevant acts are those that took place both before, and at the time, the parties entered into the Learning Edition license agreement. Therefore, to prevail on its fraudulent inducement claim, plaintiff needed to present evidence that defendant never intended to honor the Learning Edition license agreement before and/or at the time the parties entered into the agreement. But intent can be difficult to prove, and, as a result, parties may use circumstantial evidence to demonstrate fraudulent intent. See Leftwich v. Gaines, 521 S.E.2d 717, 723 (N.C. Ct. App. 1999).

7

Having reviewed the evidence, the court finds that reasonable jurists could find in plaintiff's favor on its fraudulent inducement claim. Plaintiff presented considerable evidence that defendant misrepresented its intent in licensing the Learning Edition software, and took affirmative steps to hide its true intent from SAS representatives, knowing that plaintiff would not license the Learning Edition (or other products) to a company that intended to produce a competing product. Plaintiff presented evidence that defendant decided in early 2003 to develop a program similar to SAS. In August 2003, a WPL representative approached SAS to license the full SAS System, without disclosing its intent to develop a similar program, but instead stating, "I hope you can see that we are no threat to your firm's commercial success." (Pl. Exh. 50). After it received a price quotation that it viewed as "a nice way to say no," defendant licensed Learning Edition from a third-party seller, Amazon.com. (Pl. Exh. 50; Trial Tr. Day 2, 57:22-58:16). When a WPL representative registered the company on the SAS website to access additional SAS software, he described WPL's business as in the "Financial Services" industry. (Pl. Exh. 88; Trial Tr. Day 5, 131:1-25). This descriptor was not the default option and options such as "Computer Software and Peripherals," which would have better described defendant's business, were available. Id.

In April 2008, defendant again sought to license the full SAS System, but instead of approaching plaintiff directly as it had done five years earlier, defendant approached a UK reseller. (Pl. Exh. 542; Trial Tr. Day 5, 117:19). Plaintiff discovered defendant's attempt and refused the license, stating that it was "SAS policy not to sell to competitors." (Trial Tr. Day 5, 121:14–122:2; 123:7–9). Despite knowing that plaintiff would not issue licenses to competitors, defendant ordered seven additional copies of SAS Learning Edition in 2009, for which it entered into separate licensing agreements for each. (Pl. Exh. 55, Trial Tr. Day 5, 65:23–66:13). And, finally, plaintiff presented evidence that defendant obtained access to the SAS System through another company, Computer Associates, in a manner that a Computer Associates employee admitted violated the company's own internal policies and its license agreement with SAS. (Trial Tr. Day 12, 113:5–11; 117:8–11; 117:17–122:13). In sum, defendant made a number of false representations about its intent in obtaining the Learning Edition software and entering into the license agreement, false representations reasonably calculated to deceive plaintiff and made with the intent to deceive, which in fact did deceive plaintiff and resulted in damage to plaintiff.

While plaintiff presented evidence of defendant's actions over a course of years, this does not necessarily mean, as

defendant argues, that plaintiff only presented evidence of
defendant's actions after the parties entered into the Learning
Edition license agreement.  The parties entered into more than
one Learning Edition license agreement--in fact, the parties
entered into thirteen separate license agreements from 2003 to
2009.  As a result, the evidence plaintiff presented
demonstrated defendant's intent before entering into later
Learning Edition license agreements.  Plaintiff offered the jury
considerable evidence to find in its favor on its fraud claim
and, consequently, the predicate for its UDTPA claim.
Furthermore, it offered the jury evidence demonstrating that
this fraud occurred in or affected commerce.  Viewing all of
this evidence in a light most favorable to plaintiff, the court
cannot find that the only conclusion the jury could have reached
is one in defendant's favor.

Defendant also argues that the only affirmative evidence
presented at trial showed that WPL employees believed that their
actions were in compliance with the SAS Learning Edition license
agreement.  In support for this argument, defendant cites
testimony from WPL employees who believed that they were not
violating the terms of the Learning Edition license agreement.

However, this argument both strains credulity and runs
afoul of the Rule 50(b) standard, where the court must examine
the evidence in a light most favorable to plaintiff, the non-

moving party.  As described above, plaintiff produced

considerable evidence that defendant used underhanded and

fraudulent methods to acquire Learning Edition licenses and to

gain access to SAS software, access that plaintiff would not

have granted had it known defendant's true intentions.  The very

name of the software, SAS Learning Edition, and its market,

college students, would indicate that it was intended for use in

an educational setting, and not for use by highly sophisticated

software engineers seeking to create a product that mimicked SAS

in virtually every particular.  Moreover, plaintiff also

produced evidence that WPL employees read the terms of the

license agreement and kept these terms as part of their files.

Furthermore, this court had already determined that

defendant breached the Learning Edition license agreement.

(Doc. No. 296 at 22).  The evidence that plaintiff needed to

produce on their fraud and UDTPA claims went only to demonstrate

that defendant engaged in fraudulent conduct, not that defendant

breached the license agreement(s), as the court had already

decided this claim.  And, as described above, plaintiff produced

considerable evidence demonstrating that defendant engaged in

fraudulent conduct.  In light of all of this evidence, the jury

easily could have discredited WPL employees' testimony that they

thought they were in compliance with the Learning Edition

license agreement and instead credited the evidence plaintiff

11

proffered and concluded that WPL employees never intended to abide by the license agreement's terms. Putting aside defendant's evidence, as the court must do in a Rule 50(b) motion, and instead examining the totality of plaintiff's evidence, the court again concludes that a reasonable juror could have found in plaintiff's favor. Accordingly, defendant's motion must be denied on this point.

### B. Copyright Misuse

Defendant also argues that the terms of the Learning Edition license agreement amount to copyright misuse and, therefore, are unenforceable. As plaintiff points out in its response, this court has already rejected this argument more than once. Defendant counters that "new" evidence produced at trial requires the court to reconsider its prior ruling.

A Rule 50(b) motion is not a proper vehicle for defendant's attempt to re-litigate this previously decided issue. Copyright misuse was not part of the jury's verdict nor was it a substantive defense. Instead, the parties' arguments regarding copyright misuse all took place outside of the jury's presence, either in the court's rulings on motions for summary judgment, (Doc. No. 296), defendant's motion in limine, (Doc. No. 444), and defendant's motion to amend its answer. (Doc. No. 513).

Even if this motion was the proper means of attacking the court's prior ruling, the court would nevertheless rule against

defendant. As this court has stated before, "[a] copyright is misused when its holder attempts 'to secure an exclusive right or limited monopoly not granted by the Copyright Office and which . . . is contrary to the public policy to grant." (Doc. No. 444 at 2 (quoting <u>Lasercomb Am., Inc. v. Reynolds et al.</u>, 911 F.2d 970, 977 (4th Cir. 1990)). "Use of a copyright violates public policy where the holder attempts to restrict the ability of third parties by contract to independently implement the ideas expressed by the holder's copyrighted material." <u>Id.</u> (quoting <u>Lasercomb</u>, 911 F.2d at 978). The court previously found that the Learning Edition license agreement does not preclude all software development in a particular area, but, instead, prevents licensees from actively employing the SAS copyrighted software product during the development stage. <u>Id.</u> at 2-3.

Any "new" evidence presented at trial does not alter this outcome. Defendant cites testimony indicating that plaintiff intended to prevent Learning Edition licensees from creating a copy or imitation of SAS software, but this "new" evidence does not demonstrate copyright misuse and, instead, mirrors almost exactly the court's prior ruling. The testimony demonstrated that SAS intended to prevent Learning Edition licensees from specifically using Learning Edition to develop a competing product, not to prevent anyone at all, <u>in toto</u>, from developing

13

a SAS competitor.  Plaintiff presented evidence demonstrating
that this is precisely what defendant did with Learning Edition,
in violation of the license agreement.  Nothing that either
party presented at trial causes the court to alter its prior
rulings.  Accordingly, the court must deny defendant's motion on
this point, as well.

**C.  Damages**

Defendant contends that the evidence plaintiff presented
was insufficient in a number of areas to support an award of
damages.  Under Fourth Circuit precedent, a damages "award shall
stand unless no substantial evidence is presented to support it,
it is against the clear weight of the evidence, it is based upon
evidence that is false, or it will result in a miscarriage of
justice."  Barber v. Whirlpool Corp., 34 F.3d 1268, 1279 (4th
Cir. 1994); see also Triad Packaging, Inc. et al. v. Supplyone,
Inc. et al., 597 F. App'x 734, 743 (4th Cir. 2015)
(unpublished).

1.  Proof of Proximate Cause

In its motion, defendant argues that plaintiff is not
entitled to damages on its claims because plaintiff did not
prove proximate causation.  Specifically, defendant attacks an
underlying assumption used by plaintiff's experts, Drs. Storer
and Vellturo, that WPS would not have existed but for
defendant's use of the Learning Edition.  Plaintiff counters

14

that considerable evidence supported that assertion, evidence which the jury credited in its verdict.

Plaintiff presented substantial testimony regarding defendant's extensive use of SAS Learning Edition software in its development of WPS.  Plaintiff proffered evidence that defendant, in order to create its competing product, virtually identical to SAS, used the Learning Edition software time and time again to compare output from WPS to output from Learning Edition.  Defendant's employees did this to ensure that WPS output matched SAS in function, form, and aesthetic.  Plaintiff further presented testimony from its own witnesses that many details from SAS output could be replicated only through use of Learning Edition, and that access to SAS software was an absolute necessity to achieve what defendant wanted to create--a clone of SAS.  Witnesses for defendant also testified that Learning Edition was necessary to the development of WPS and that customers wanted a drop-in replacement for SAS.  Viewing all of this evidence in a light most favorable to plaintiff, a jury easily could have found that defendant could not have developed WPS but for use of the SAS Learning Edition software.

Dr. Storer arrived at this conclusion, as well, and presented this opinion to the jury.  In his testimony, he outlined the four basic grounds for his conclusion:  defendant's consistent comparison of WPS output to Learning Edition output,

WPS regression testing, defendant's use of Learning Edition to
fix bugs in WPS, and the sas7bdat file. (Trial Tr., Day 3,
14:3-15:10). Dr. Storer explained each of these reasons during
many hours of testimony and under vigorous cross-examination.
Finally, this conclusion was an underlying assumption in Dr.
Vellturo's damages calculation. The jury was informed of this
underlying assumption and, presumptively, accepted the
assumption. Having reviewed the testimony and evidence and
drawing all reasonable conclusions in plaintiff's favor, the
court finds that a reasonable jury could have credited Dr.
Storer's findings and concluded that defendant could not have
developed WPS but for its use of the SAS Learning Edition
software.

      Defendant argues that a version of WPS existed prior to
defendant's acquisition of the Learning Edition software, but
this does not undermine the jury's verdict.[2] Defendant does not
allege that this version of WPS was a static program, virtually
unchanged in the years following its creation. The evidence
presented at trial by both plaintiff and defendant indicated
just the opposite, that defendant's employees constantly worked

_____

[2] The parties vigorously dispute this point, with plaintiff
asserting that defendant released WPS software in October 2003
only after acquiring its first copy of the SAS Learning Edition
software and only obtained its first customer in 2004. (Doc.
No. 558 at 14).

16

on WPS, requested customer feedback to ensure that WPS looked and operated like SAS and, specifically, that defendant's employees utilized the Learning Edition software to make changes to WPS to better mimic SAS.

Plaintiff presented substantial evidence that defendant knew that its customers, both real and potential, wanted a system that generated the same output as SAS and in the exact same format. While defendant had very few customers between 2004 and 2006, the years that followed saw a sizeable increase in customers who licensed WPS. The jury could have concluded that the early versions of WPS's software simply did not provide potential customers what they wanted--a drop-in replacement for SAS--until WPS resembled SAS so closely that customers could switch to WPS with little to no adjustment.

The evidence plaintiff presented allowed the jury (and would have allowed any reasonable jury) to conclude that the version of WPS that was profitable for defendant was profitable because of its similarity to SAS software. Plaintiff presented sufficient evidence to demonstrate that this profitable version of WPS would not have existed but for defendant's use of the SAS Learning Edition software. This was the causal link in the tortious chain: SAS lost customers because of defendant's use of the Learning Edition software to create WPS. But for defendant's use of the Learning Edition software, it could not

17

have created a profitable version of WPS and almost certainly could not have created a version of WPS at all. Upon review of this evidence, the court finds no basis to vacate the jury's damage award.

## 2. Reasonable Certainty of Lost Profits

Next, defendant disputes the calculation of lost profits as estimated by plaintiff's expert Dr. Vellturo. Defendant claims that the figures offered to the jury by Dr. Vellturo were too speculative and lacked reasonable certainty, in contravention of North Carolina law. Plaintiff responds that Dr. Vellturo based his calculation of lost profits on plaintiff's long-standing profit history.

Under North Carolina law, the burden of proving damages rests with the party seeking those damages. Castle McCullouch, Inc. v. Freedman, 610 S.E.2d 416, 420 (N.C. Ct. App. 2005). While absolute certainty is not required, "the party seeking damages must show that the amount of damages is based upon a standard that will allow the finder of fact to calculate the amount of damages with reasonable certainty." Id. (quoting Olivetti Corp. v. Ames Bus. Sys., Inc., 356 S.E.2d 578, 586 (N.C. 1987)) (internal quotation marks omitted). This "reasonable certainty" standard excludes those damages calculations based upon "hypothetical or speculative forecasts of losses." Id. (quoting Iron Steamer Ltd. v. Trinity Rest.,

18

Inc., 431 S.E.2d 767, 770 (N.C. Ct. App. 1993)) (internal quotation marks omitted). However, a damages calculation "may include loss of prospective profits where the loss is the natural and proximate result of the breach." Mosley & Mosely Builders v. Landlin Ltd. et al., 361 S.E.2d 608, 613 (N.C. Ct. App. 1987).

At trial, Dr. Vellturo testified that he generated his damages calculation of plaintiff's lost profits by examining the financial records of both plaintiff and defendant. This examination included analysis of each business's sales history, including defendant's sales history with a customer and plaintiff's prior sales history with that same customer. In his examination, Dr. Vellturo calculated lost profits from twenty-six customers that left plaintiff in favor of defendant. He also applied a 5.6% attrition rate to his calculation, a rate based upon plaintiff's historical performance over the years of 2006–2014. Notably, this attrition rate was actually higher than the historical attrition rate for the twenty-six customers who left SAS for WPL. And, finally, Dr. Vellturo applied a 13.5% discount factor to account for any unanticipated future changes. Only after applying these rates did Dr. Vellturo estimate plaintiff's damages.

The cases that defendant cites in support of its argument that Dr. Vellturo's calculation was too speculative are

inapposite to the evidence plaintiff presented at trial. In both McNamara v. Wilmington Mall Realty Corporation, 466 S.E.2d 324, 330 (N.C. Ct. App. 1996), and Castle McCulloch, courts invalidated damages awards where the party seeking damages either did not have an established history of profits or the party could not discern which customers it lost as a result of the opposing party's actions. This is simply not the case here. Plaintiff could directly point to those clients it lost to defendant. Furthermore, Dr. Vellturo considered a number of factors and voluminous financial records, both from plaintiff and defendant, when arriving at his damages calculation. This calculation necessarily involves complex mathematics, but is far from the "purely mathematical construct" of which defendant complains. Instead, the damages calculation finds its basis in plaintiff's established financial history and provides an accounting of profits lost from those customers who left plaintiff in favor of defendant. Contrary to defendant's assertion that Dr. Vellturo's calculation "utterly failed to account for any future events or variables," (Doc. No. 543 at 15), the damages calculation provided for both an attrition rate and a discount factor to account for future unanticipated variables. This calculation incorporated a number of factors, extensive research, and the financial history of a company in existence for decades. Accordingly, the court finds that

plaintiff carried its burden of demonstrating its damages calculation to a reasonable certainty and defendant's motion for judgment as a matter of law must be denied on this point.

### 3. Clear and Convincing Evidence of Punitive Damages

In connection with its argument that plaintiff did not present sufficient evidence to support a claim for fraud or a violation of the UDTPA, defendant also argues that this lack of evidence precludes an award of punitive damages. Under North Carolina law, a party seeking punitive damages must prove:

> that the defendant is liable for compensatory damages and that one of the following aggravating factors was present and was related to the injury for which compensatory damages were awarded:
> (1) Fraud.
> (2) Malice.
> (3) Willful or wanton conduct.

N.C. Gen. Stat. § 1D-50(a) (2015). Furthermore, "[t]he claimant must prove the existence of an aggravating factor by clear and convincing evidence." N.C. Gen. Stat. § 1D-50(b). The court reflected this statutory requirement in its instruction to the jury on plaintiff's claim for punitive damages: "The First thing that SAS Institute must prove, by clear and convincing evidence, is the existence of fraud." (Doc. No. 507 at 16) (emphasis in original).

In its review of the evidence supporting a punitive damages claim, the court plays a somewhat limited role. The court need

21

not engage in specific findings of fact, but instead "the trial court 'shall state in a written opinion its reasons for upholding or disturbing the finding or award. In doing so, the court shall address with specificity the evidence, or lack thereof, as it bears on the liability for or the amount of punitive damages.'" Scarborough v. Dillard's Inc., 693 S.E.2d 640, 655-45 (N.C. 2009) (quoting N.C. Gen. Stat. § 1D-50).

As described in detail in § IIIA, supra, the court found that plaintiff carried its burden of demonstrating fraudulent inducement to support its tort claim and its UDTPA claim. Again, viewing all of this evidence in a light most favorable to plaintiff, the court finds that plaintiff presented considerable evidence to allow the jury to conclude, by clear and convincing evidence, that defendant engaged in fraud. As a result, the court cannot find that the jury's punitive damages award was unsupported by the evidence.

Defendant also argues that, should the court find that clear and convincing evidence supports the punitive damage award, the court "should exercise its discretion not to award punitive damages based on the lack of evidence regarding WPL's relative culpability." (Doc. No. 543 at 17). In support for this argument, defendant cites In re Brokers, Inc., 396 B.R. 146 (Bankr. M.D.N.C. 2008), in which a bankruptcy judge declined to award punitive damages for fraudulent transfers because the

22

defendant believed that the partnership agreement had been breached and thus, in the bankruptcy court's opinion, the defendant's conduct did not warrant punitive damages.

However, the discretion to award or vacate an award of punitive damages does not rest with the court in this case because the jury was the finder of fact. The bankruptcy court recognized this inherent limitation in In re Brokers, but it possessed discretion to award punitive damages because the bankruptcy judge was the trier of fact. Id. at 169 ("If the plaintiff meets the requirements of § 1D-15, the jury or trier of fact, may determine, in its discretion, whether to award punitive damages.") (quoting N.C. Gen. Stat. § 1D-35) (emphasis added). As a result, the court's only responsibility regarding plaintiff's punitive damages claim is to determine whether a reasonable jury could have reached the outcome it did. Having concluded that a reasonable jury could have found in plaintiff's favor, the court has no discretion to vacate the punitive damages award.

### 4. Consequential Damages and the Uniform Commercial Code

In its final argument against the jury's award of damages, defendant argues that Article Two of the Uniform Commercial Code ("UCC") prohibits plaintiff from recovering any consequential damages arising from defendant's breach of contract. For its

part, plaintiff argues that the lost profits that resulted from defendant's breach of contract are direct, rather than consequential damages and, further, that even if the court classifies plaintiff's lost profits as consequential damages, Article Two does not apply to prevent their recovery.

Initially, the court must determine whether the lost profits that plaintiff incurred as a result of defendant's breach of contract constitute direct or consequential damages. Direct damages are those damages "that flow naturally from a breach," including damages that "would follow any breach of similar character in the usual course of events." 24 Williston on Contracts § 64:12 (4th ed. 2015). Alternatively, consequential damages are those that "do not always follow a breach of this particular character." Id.; see also Ada Liss Grp. (2003) v. Sara Lee Corp. et al., No. 1:06CV610, 2009 WL 3241821, at *7 (M.D.N.C. Sept. 30, 2009) (citing Piedmont Plastics, Inc. v. Mize Co., 293 S.E.2d 219, 223 (N.C. 1982)) ("Consequential damages are defined under North Carolina law as damages that do not necessarily result from the breach.").

Defendant cites In re Buffalo Coal, 424 B.R. 738 (Bankr. N.D.W. Va. 2010), for its proposition that plaintiff's lost profits are consequential damages. However, this case is not as persuasive as defendant argues. While defendant contends that it is "well-settled Fourth Circuit law" that "[l]ost profits are

24

consequential damages when, as a result of the breach, the non-breaching party suffers loss of profits on collateral business arrangements," (Doc. No. 543 at 23), this is actually not Fourth Circuit law.  Instead, this quotation comes from the Second Circuit, as the Bankruptcy Court of the Northern District of West Virginia cited this precedent from <u>Tractebel Energy Marketing v. AEP Power Marketing</u>, 487 F.3d 89, 109 (2d Cir. 2007), in furtherance of its conclusion.  While the bankruptcy court employed this reasoning in its opinion, the court finds this authority neither mandatory nor persuasive in this case.

Furthermore, the circumstances surrounding the defendant's breach of the license agreement in this case are quite different from the contract at issue in <u>In re Buffalo Coal</u>.  Specifically, the purchase agreement in <u>In re Buffalo Coal</u> included a limited liability provision that allowed recovery of direct damages but explicitly prevented recovery of both consequential damages and lost profits.[3]  424 B.R. at 743.  Even while giving effect to this portion of the purchase agreement, the bankruptcy court nevertheless concluded that this provision did "not exclude lost profits as an element of a party's direct actual damage as a

---

[3] Neither party has noted the existence of any provision of the Learning Edition licensing agreement that would preclude recovery of consequential damages and/or lost profits.

result of breach." <u>Id.</u> at 746.  As a result, <u>In re Buffalo Coal</u> does little to settle the question before the court.

Instead, the terms of the Learning Edition license agreement and the quality of defendant's subsequent breach are of specific import to determining whether plaintiff's lost profits are consequential damages.  The Learning Edition license agreement included specific prohibitions on reverse engineering the software and only permitted use of the software for non-production purposes; plaintiff marketed the software and intended it for use as an educational tool.  Plaintiff included these terms to protect its copyrighted intellectual property from those who would seek to use the Learning Edition software to create a competing version of SAS.

This is precisely the nature of defendant's breach of the license agreement.  Defendant used the Learning Edition software to create a virtual clone of the SAS System, and, thus, lure SAS customers away with a discounted version of what was essentially the same product.  A breach of this character--reverse engineering software to create a competing product--will, in the usual course of events, result in lost profits for the non-breaching party.  Plaintiff's lost profits naturally flow from defendant's breach because plaintiff's customers constituted the primary (and likely the only) market for WPS software.  As a result, the court finds that plaintiff's claim for lost profits

on defendant's breach of the licensing agreement is one for
direct damages, rather than consequential damages.[4]

Furthermore, if the court found that plaintiff's lost
profits constitute consequential damages, it would virtually
nullify the Learning Edition license agreement's prohibitions on
reverse engineering and use for production purposes. To do so
would restrict plaintiff's damages for defendant's breach to
only that amount of money that defendant paid in exchange for
the software license which, in this case, is a paltry $125 to
$150 for each license. With this meager measure of damages,
what would prevent other software companies or, indeed, this
defendant, from intentionally and repeatedly violating the
license agreement to create competing versions of plaintiff's
software, knowing that their liability would be limited to the

---

[4] The scarcity of case law on this specific point likely results
from the inclusion of limited liability clauses in software
license agreements precluding the recovery of lost profits and
consequential damages. Neither party has suggested that such a
clause was included in the Learning Edition license agreement.
However, even if the license agreement did include a prohibition
on consequential damages, the court would not automatically
classify plaintiff's damages as such. See Computrol, Inc. v.
Newtrend, L.P., 203 F.3d 1064, 1071 n.5 (7th Cir. 2000) ("We are
not convinced that the [agreement's] restriction on 'special,
incidental, or consequential damages,' standing alone, precludes
the recovery of lost profits. . . . [L]ost profits are
considered to be general or direct damages in a breach of
contract case, while they are considered to be special or
indirect damages in a tort case. Thus, it is incorrect to
classify mechanically the prospective lost profits portion of
[plaintiff's] damage award as consequential damages.").

cost of each license?  Such a ruling would almost certainly incentivize competitors to obtain and then breach software license agreements.

With this in mind, defendant's argument that the Uniform Commercial Code precludes plaintiff's recovery of lost profits as consequential damages is now moot.  However, even if the court found that plaintiff's lost profits were consequential damages, rather than direct, the court would nevertheless find that Article Two does not prevent their recovery.

As this court has noted before, the applicability of the Uniform Commercial Code to software is a question that has confounded courts in the digital age.  For every court that finds that "[t]he weight of authority favors application of common law and not the UCC with regard to software licenses," another finds that "courts nationally have consistently classified the sale of a software package as the sale of a good for UCC purposes."  Compare Attachmate Corp. v. Health Net, Inc., No. C09-1161 MJP, 2010 WL 4365833, at *2 (W.D. Wash. Oct. 26, 2010) with Rottner v. AVG Technologies USA, Inc. et al., 943 F. Supp. 2d 222, 230 (D. Mass. 2013).  With respect to the software license at issue in this case, defendant argues that plaintiff is a "seller of goods" as defined by the UCC and, therefore, cannot recover any consequential damages arising from defendant's breach of contract.  Plaintiff counters that

28

licenses for intellectual property like Learning Edition software do not and should not fall within the purview of the UCC.

While defendant is correct that Article Two of the UCC "applies to transactions in goods," those provisions that prevent recovery of consequential damages apply to sales of goods. See N.C. Gen. Stat. §§ 25-2-102, 701-710 (2015). Under North Carolina law, a sale of goods occurs when title passes "from the seller to the buyer for a price." Id. at § 25-2-106(1). In this case, the parties entered into a license, rather than a sale of goods because title for the Learning Edition software did not pass to defendant. First and foremost, plaintiff termed the agreement as a "license agreement," rather than a "purchase agreement." See Pl.'s Exh. 58 at 3. This license agreement explicitly referred to a "license grant" and expressly stated "The Software is copyrighted. Title to the Software and all other rights remain with SAS or its licensors at all times." Id. at 3, 4. The agreement specifically prohibited defendant from transferring or assigning the license to anyone else and gave a specific expiration date for the license. Id. at 3. And, importantly, the parties did not think that the UCC applied to this license until the court raised the

issue.[5] Because the Learning Edition license agreement did not transfer title of the software to defendant, the transaction was not a sale and Article Two of the UCC does not apply.

A number of other courts have reached similar conclusions when faced with comparable fact patterns. See Attachmate, No. C09-1161 MJP, 2010 WL 4365833, at *2 (finding that the UCC did not apply to bar recovery when plaintiff sued defendant for breach of a software license agreement; Novamedix, Ltd. v. NDM Acquisition Corp., 166 F.3d 1177, 1182 (Fed. Cir. 1999) ("Many commercial transactions are not governed by Article 2 of the UCC: sale of land or securities, assignment of a contract right, or granting a license under a patent or copyright, just to name a few."); Lamle v. Mattel, Inc., 394 F.3d 1355, 1359 n.2 (Fed. Cir. 2005) ("[A] license for intellectual property . . . is not a sale of goods."); Berthold Types Ltd. v. Adobe Sys., Inc., 101 F. Supp. 2d 697, 698 (N.D. Ill. 2000) ("[T]he UCC does not apply to this transaction because it involves only granting a license and not a sale of goods. . . . A pure license agreement . . . does not involve transfer of title, and so is not a sale for Article 2 purposes."); Digital Ally, Inc. v. Z3

---

[5] At the court's motion hearing on July 24, 2015, counsel for defendant stated that he wasn't sure "that the software is covered by the UCC." Counsel further stated that, under "[his] understanding of the law," the UCC did not apply to the license agreement. (Doc. No. 468, Exh. A at 3). Counsel for plaintiff echoed this sentiment. Id. at 4.

<u>Technology, LLC</u>, No. 09-2292-KGS, 2010 WL 3974674, at *9 (D.

Kan. Sept. 30, 2010) ("[T]he parties intended PLA-2009 to be a

license agreement in which title does not pass from Z3 to

Digital. Because title to the 'Licensed Materials' was not

transferred, PLA-2009 is not governed by Article 2 of the

Nebraska UCC."); <u>Kane v. Fed. Express Corp.</u>, No. 99-0078971 S,

2001 WL 1178350, at *2 (Conn. Super. Ct. Aug. 28, 2001) ("The

plaintiff sought to enter into a license agreement with the

defendant whereby the defendant could reproduce certain

photographic transparencies owned by the plaintiff. The

transaction cannot be characterized as a sale because it does

not contemplate the passage of title from the plaintiff to the

defendant."); <u>see</u> <u>also</u> <u>Flying Double B, LLC v. Doner Int'l Ltd.</u>,

No. 08-CV-10375, 2008 WL 2922864, at *5 (E.D. Mich. July 28,

2008).

In conclusion, the damages awards in this case were

supported by substantial evidence, were not against the clear

weight of the evidence, were not based upon evidence that is

false, and will not result in a miscarriage of justice.

Accordingly, the jury's award of damages shall stand.[6]

---

[6] Defendant also submitted an untimely motion <u>in</u> <u>limine</u> to
exclude evidence of lost profits as consequential damages,
arguing that the UCC barred plaintiff's recovery of
consequential damages. (Doc. No. 464). This motion is **DENIED**
as moot.

31

## D. Defendant's Motion for a New Trial

In its motion, defendant also moves the court for a new trial pursuant to Rule 59, arguing that the jury's verdict was against the clear weight of the evidence, was based upon improper evidence, and otherwise would result in a substantial injustice to WPL. (Doc. No. 543 at 25). Specifically, defendant objects to the court's exclusion of evidence regarding proceedings in international courts as well as an European Union Software Directive. Id. at 26. Defendant argues that "the Court unfairly eviscerated [its] defense to [plaintiff's] fraud and UDTPA claims" when it prevented defense witnesses from testifying to their understanding of EU and English law. (Doc. No. 568 at 8).

Defendant's arguments are little more than an attempt to relitigate an issue this court decided prior to trial. In its September 8, 2015 opinion, the court granted plaintiff's motion in limine regarding the international litigation and excluded from trial any evidence of the U.K. High Court's interim or final judgments, the judgment of the U.K. Court of Appeal, and the EU Software Directive. (Doc. No. 452 at 8). In this order, the court specifically found that this evidence was not relevant to any of plaintiff's claims against defendant. Id. at 2–3. The rulings of the U.K. court and the EU Software Directive do not indicate WPL employees' state of mind, intent, or

32

"understanding of the law at the time [they] entered into the SAS LE license agreement." Id. at 2. With this in mind, the court excluded the evidence pursuant to Federal Rule of Evidence 401. Id. at 2-3. Defendant's arguments and reasoning in its motion for a new trial present little more than a plea for the court to reconsider this prior ruling, a step which is neither warranted nor necessary to prevent a miscarriage of justice.

Furthermore, upon review of the record, the court finds that exclusion of this evidence was proper both to prevent presentation of irrelevant evidence and to prevent juror confusion. While defendant argues that evidence of prior litigation and EU legislation was essential to its defense, the court disagrees. The verdicts from U.K. courts and the EU Software Directive do nothing to explain WPL employees' intent or state of mind at the time they entered into licensing agreements for the Learning Edition software. It is this state of mind and intent that constituted the heart of plaintiff's claims against defendant in this case.

This evidence only potentially becomes relevant when coupled with defendant's assertion that WPL employees used these rulings and directive to inform their beliefs about precisely what actions the Learning Edition license agreement permitted and prohibited. But it is unclear that this was actually the case. As stated above, defendant entered into multiple license

33

agreements with plaintiff over a number of years. The U.K.

courts did not issue their rulings until 2012 and 2013, years

after defendant entered into Learning Edition license agreements

in 2003, 2005, 2007, and 2009. Consequently, defendant's

employees could not have relied upon these judgments to inform

their beliefs before 2012. Only if the court had permitted

defendant to produce considerably more evidence regarding WPL

employees' interpretation of these judgments and legislation

would the evidence potentially become relevant. Such

bootstrapping would not have made the jury's job any easier and

likely would have resulted in considerable confusion and

uncertainty about whether international courts had already

decided the issues before the jury. As a result, the court's

exclusion of this evidence was proper and defendants have not

offered any argument demonstrating that the verdict in this case

was against the clear weight of the evidence, based on evidence

which is false, or results in a miscarriage of justice. For all

these reasons, the court must deny defendant's motion for a new

trial.[7]

---

[7] The court notes that defendant reiterated many of its arguments
in favor for judgment as a matter of law in its arguments in
favor of a new trial: that plaintiff failed to produce evidence
of defendant's intent not to comply with the SAS Learning
Edition License Agreement, that the court precluded defendant
from presenting an appropriate measure of damages pursuant to
the Uniform Commercial Code, and that the court permitted Dr.
Storer to present improper testimony. As described above, the

## III. __Conclusion__

For the reasons herein stated, defendant's motion for judgment as a matter of law or, in the alternative, motion for a new trial, (Doc. No. 542), is **DENIED**. The Clerk is directed to forward a copy of this Memorandum Opinion and Order to counsel of record.

**IT IS SO ORDERED** on this 17th day of June, 2016.

ENTER:

David A. Faber
Senior United States District Judge

---

(cont'd)
court has rejected all three of these arguments. Nothing in these arguments indicates that the jury's verdict was against the clear weight of the evidence, was based on evidence which is false, or will result in a miscarriage of justice. Therefore, defendant's motion is denied with regard to these arguments, as well.