IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:10-CV-25-FL

| | | |
|---|---|---|
| SAS INSTITUTE, INC., | ) | |
| | ) | |
| Plaintiff / Judgment Creditor, | ) | MEMORANDUM OPINION |
| | ) | and ORDER |
| v. | ) | UNDER SEAL¹ |
| | ) | |
| WORLD PROGRAMMING LIMITED, | ) | |
| | ) | |
| Defendant / Judgment Debtor. | ) | |

This matter returns to the court's attention on a number of motions including: 1) motion for

relief under the All Writs Act, 28 U.S.C. § 1651, ("AWA") and Rule 60 of the Federal Rules of Civil

Procedure (DE 809-5) by plaintiff and judgment creditor SAS Institute Inc. ("SAS"); 2) oral motion

for modification of injunction made in open court March 4, 2019, by defendant and judgment debtor

World Programming Limited ("WPL'); and 3) unopposed motions to seal (DE 860, 868, 872) by

WPL.  For the following reasons,  SAS's motion is granted, WPL's oral motion is denied as moot,

and its motions to seal are granted.  Reasoning for the court's February 15, 2019, order that no sum

collected or to be collected by the judgment creditor in the United States is subject to payment to

the judgment debtor on the basis of the United Kingdom Protection of Trading Interests Act 1980

("PTIA"), also is set forth herein.

---

¹ The court's analysis relies, in part, on documents filed under seal.  Within 14 days, the parties jointly shall
return to the court by U.S. Mail, addressed to the case manager, a copy of this order marked to reflect any perceived
necessary redactions.  Upon the court's inspection and approval, a redacted copy of this sealed order will be made a part
of the public record.

# BACKGROUND

Reference is made to prior orders of this court and the opinion of the United States Court of Appeal for the Fourth Circuit in <u>SAS Inst., Inc. v. World Programming Ltd.</u>, 874 F.3d 370 (4th Cir. 2017), which detail the background and procedural history of this case up to this court's judgment entered July 15, 2016,[2] and appeal therefrom. The court turns its attention more particularly below to the judgment creditor's efforts to enforce its judgment against the judgment debtor, WPL, a competitor of SAS, based in the United Kingdom. Judgment enforcement activities are complex. At present they involve this court and courts in California and the United Kingdom.

A.    Judgment Enforcement

On November 9, 2016, this court granted WPL's emergency motion for temporary stay of execution of the court's judgment pending resolution of motion for stay pending appeal, premised in part upon WPL's deposit into an escrow account maintained in the United States of "80% of all revenues received by WPL in relation to licensing of WPS in the [US]." (DE 633-1; <u>see</u> Order (DE 668) at 2). On February 9, 2017, the court granted the judgment debtor's motion for stay of execution pending appeal, conditioned upon judgment debtor's filing of proof of supersedeas bond

---

[2] All references herein to the "judgment" or "court's judgment," unless otherwise specified, are to the court's July 15, 2016, judgment, which amended and superseded a prior judgment entered October 16, 2015. The court's judgment also is incorporated by reference in amended judgment entered December 8, 2017, and second amended judgment entered May 3, 2018. Judgment is premised upon summary judgment rulings and jury verdict findings that WPL breached a license agreement for SAS's software product, the SAS Learning Edition License Agreement, by using it to produce and market a competing software product, World Programming System ("WPS"), resulting in compensatory damages in the amount of $26,376,635. The court also premised its judgment upon jury verdict finding that WPL fraudulently induced SAS to enter into the license agreement, and that this conduct violated the North Carolina Unfair and Deceptive Trade Practices Act ("UDPA"), resulting in the same compensatory damages, which was trebled to $79,129,905.00 in accordance with the UDPA. The court denied, in pertinent part, SAS's claims for copyright infringement and injunction. With respect to that denial, SAS had moved after the jury verdict to enjoin WPL permanently from "marketing, selling, or licensing (including renewal or relicensing) of WPL's World Programming System for use in the United States." (Mot. & Prop. Order (DE 536-1) at 2). This court's reasons for denial of SAS's motion for permanent injunction are set forth in memorandum opinion and order entered June 17, 2016. (<u>See</u> Order (DE 601) (Faber, J.)).

in the amount of $2,191,770.00, and continued maintenance of the aforementioned escrow account modified to accumulate 100% of revenues based on sales in the United States, estimated to total approximately ███████████ in a one-year period. (Order (DE 696) at 8-10). Upon conclusion of appeal activities in favor of the judgment creditor, the clerk of court released the escrow amount to SAS and the bond amount also was paid to the judgment creditor.

In December 2017, SAS commenced execution upon the judgment by initiating enforcement proceedings in California and the United Kingdom. The court highlights below activities in each forum and continuing developments impacting the case before this court.

1.      California case

On December 28, 2017, SAS commenced a judgment enforcement action in the United States District Court for the Central District of California (hereinafter, the "California court"), by registering the judgment, and the California court thereafter issued a writ of execution against WPL. See SAS Institute Inc. v. World Programming Ltd., 2:18-CV-603-VAP (C.D. Cal.) (hereinafter the "California case"). Upon renewed motion for assignment order filed by SAS, the California court entered order September 5, 2018, providing for direct assignment to SAS of rights to payment from specified WPL customers located anywhere in the world, except in the United Kingdom, until this court's judgment is satisfied. (California case, Docket 98 (hereinafter the "September 5, 2018, assignment order")). In particular, the California court ordered:

> The Court assigns to SAS WPL's right to payments from entities identified on SAS's Customer List, as supplemented by Hewitt's Schedule 1-1, as customers with accounts receivable, active customers, and customers with recently expired licenses. All of WPL's rights and interest, whether or not the right is conditioned on future developments, to payment due or to become due from these companies shall be and hereby are assigned to SAS until such a time as the North Carolina judgment in the amount of $79,129,905.00 is fully satisfied or until further order of the Court.

3

The Court DENIES IN PART the Motion to the extent it seeks assignment of WPL's right to payments by resellers of its software and by "non-customers," i.e., the entities identified in paragraph 8 of the Robinson Declaration. As SAS withdrew its request for assignment of WPL's right to payments from customers located in the United Kingdom, those customers are excluded from this Order.

(Id. at 9) (emphasis added). The "Customer List" referenced in the September 5, 2018, assignment order includes 155 customers with billing addresses in the United States and 258 customers with billing addresses outside of both the United States and the United Kingdom (See California case, Docket 74-1 (Ex Parte) at 4-11 ("Schedule 1-1")).

On September 11, 2018, WPL filed notice of appeal of the September 5, 2018, assignment order to the United States Court of Appeals for the Ninth Circuit. In the California case, WPL also filed that day motion to stay that part of the assignment order pertaining to customers outside of both the United States and the United Kingdom. WPL filed a similar motion before this court to stay execution of the judgment for customers outside of both the United States and the United Kingdom pending completion of United Kingdom judgment-recognition proceedings.

Two days later, on September 13, 2018, the California court "defer[red] to the Eastern District of North Carolina to rule on this matter." (California case, Docket 111). This court denied WPL's motion to stay execution of the judgment holding: "[WPL] has not demonstrated a meritorious argument in support of stay of all non-[United States] execution of the judgment pending [United Kingdom] judgment-recognition proceedings." (Order (DE 786)).[3]

On September 13, 2018, the California court entered an amended assignment order, directing WPL to assign its rights to payments to SAS from all customers worldwide, except those in the

_____

[3] The court also stated: "Moreover, issues raised by those portions of the motion that concern the manner and form of demand plaintiff has made upon customers, as allowed by the September 5, 2018, order of the United States District Court for the Central District of California, including argument that plaintiff has exceeded the scope of that order, more properly are addressed by such court." (Order (DE 786)).

4

United Kingdom. (See California case, Docket 110, at 9). Seven days later, on September 20, 2018, the California court vacated its September 13, 2018, order and restored the September 5, 2018, assignment order, reasoning that it lacked jurisdiction to amend its order on appeal. However, in its September 20, 2018, order, the California court indicated it would be "inclined to issue" the September 13, 2018, order directing WPL to assign its rights to payments to SAS from all customers worldwide, except those in the United Kingdom if the court of appeals allowed a limited remand. (See California case, Docket 118).[4]

On October 12, 2018, the California court denied SAS's ex parte application for an order directing WPL to turn over all income received from customers located worldwide, except in the United Kingdom, due to lack of jurisdiction pending appeal. (See California case, Docket 123). However, on November 14, 2018, the California court entered a second indicative ruling stating that it would grant SAS's ex parte application for a turn over order if the court of appeals allowed limited remand. (See California case, Docket 127).

SAS then moved for limited remand based upon the California court's two indicative rulings. Decision on that motion by the United States Court of Appeals for the Ninth Circuit was stayed upon request of SAS, acting at the command of the court in the United Kingdom upon penalty of fine, asset seizure, and/or arrest. SAS also was forbidden by the United Kingdom High Court of Justice, Business and Property Courts of England and Wales Commercial Court (QBD) (the "UK court") to communicate reason for its stay request. This is discussed more particularly below.

2.      United Kingdom case

---

[4] Federal Rule of Civil Procedure 62.1 provides a mechanism for a district court to enter an "Indicative Ruling on a Motion for Relief That Is Barred by a Pending Appeal" where the district court states "that it would grant the motion if the court of appeals remands for that purpose."

While the California enforcement proceedings were ongoing, United Kingdom enforcement proceedings initiated by SAS also were developing. As pertinent here, WPL defensively advanced several motions and positions in the United Kingdom enforcement proceedings to stop or limit judgment enforcement relief sought by SAS.

On January 31, 2018, WPL filed a defense and counterclaim in which it advanced that "SAS should not be permitted to 'enforce' its [United States] judgment," where "it would be contrary to public policy to permit enforcement" and "an abuse of process, inconsistent with earlier English judgments," and where "the [United States] judgment is impeachable for lack of natural/substantial justice in the proceedings." (DE 747-3 at 2-3).[5]

On December 13, 2018, the UK court entered judgment in favor of WPL (hereinafter the "UK judgment"), "refus[ing] enforcement [of this court's judgment] on the grounds of public policy because of conflict with the [European Union] Software Directive." (UK judgment (DE 816-1) ¶ 190). The UK court also concluded that SAS's action in this court was a "collateral attack" on a prior "English judgment" in favor of WPL. (Id. ¶ 126). Furthermore, the UK court concluded that Section 5 of the PTIA prevented recovery on all parts of SAS's claim under the UDPA, not just the multiple damages portion. (Id. ¶ 244 ("If there is a judgment based upon multiplication, then no part of it may be enforced").

The UK judgment also granted relief to WPL on a counterclaim asserted under Section 6 of the PTIA to claw back two-thirds (2/3) of all amounts SAS collects in satisfaction of this court's judgment. The court held that the PTIA entitles WPL to recover against SAS "two-thirds of any

---

[5] Unless otherwise specified, page numbers in citations to documents filed in this court's Electronic Case Filing (ECF) system provide the page number as shown on the ECF system (e.g., DE 747-3 at 2-3) and not the page number showing on the face of the underlying document (e.g., page denominated "1" and "2" of the WPL defense and counterclaim).

amount which [WPL] may have paid," representing the multiple damages portion of the judgment. (Id. ¶ 267; see id. ¶¶ 250, 269-270) (quotations omitted). The court held that WPL was entitled to this clawback even "where it has not yet paid sums exceeding the value of the compensatory part of the judgment and interest thereon." (Id. ¶ 252). According to the UK court, the PTIA "assumes a pro rata recovery" of compensatory and multiplied damages, and "satisfaction is plainly not a qualifying condition." (Id. ¶ 272).

The UK court noted the possibility that an appropriation could be "made at the time of payment" by a creditor, "so as to make the payment one in respect of the compensatory element only." (Id. ¶ 270). With respect to the escrow account and bond payments already disbursed in this case, however, the UK court rejected SAS's attempt to make an appropriation later through notice of partial satisfaction of judgment, on the basis that "it would seem inequitable to permit it to be made defensively." (Id.). Finally, the UK court rejected SAS's arguments for a set-off against the portion of the judgment that remains unpaid. (Id. ¶ 273).

        a.      Injunction

Eight days after entry of the UK judgment, on December 21, 2018, based upon an ex parte application of WPL, the UK court entered an ex parte injunction and order ("UK injunction") which commences with the following notice to SAS:

## PENAL NOTICE

**IF YOU, SAS INSTITUTE INC., DISOBEY THIS ORDER YOU MAY BE HELD TO BE IN CONTEMPT OF COURT AND YOU MAY BE FINED AND HAVE YOUR ASSETS SEIZED AND ANY OF YOUR DIRECTORS, OFFICERS, EMPLOYEES, REPRESENTATIVES OR AGENTS MAY BE IMPRISONED, FINED OR HAVE THEIR ASSETS SEIZED.**

7

(UK injunction (DE 816-2 at 2)). Multiple prohibitions bar SAS from taking action in the United States including that SAS shall not:

1) "Pursue, continue, or take any further steps . . . for the purposes of seeking the *in personam* relief identified in the . . . First and Second Limited Remand Motions" that SAS had filed in the Ninth Circuit (<u>Id.</u> ¶ 3.a.);

2) "Seek to obtain from the [California court], or any other court of the USA (state or federal), the orders foreshadowed by and/or contemplated in (i) the [California court's indicative ruling 1] and (ii) the [California court's indicative ruling 2], or any similar orders." (<u>Id.</u> ¶ 3.b.);

3) "[C]ommence, bring, continue, pursue or take any steps in, any claims, proceedings, applications, or motions before any court of the USA (state or federal)" to seek:

    i. Relief of similar nature and/or effect [to items 1) and 2) above]

    ii. Relief which imposes (or purports to impose) . . . requirements on WPL to assign or transfer to SAS . . . any assets and/or receivables of WPL and/or any debts owed to WPL, and/or any assets, receivables or debts that may in the future be owed to WPL. . . .[or]

    iii. Relief which expands or amends or varies the In Rem Assignment Order to have in personam effects of the kinds identified [in the preceding subsection]. This encompasses adjustments or modifications to any prior order or ruling to impose such a requirement.

(<u>Id.</u> ¶ 3(c)).

8

4) "[C]ommence, bring, continue, pursue or take any steps in, any claims, proceedings, applications, or motions before any court of the USA (state or federal)" to "[p]revent or restrain, or seek to prevent or restrain, WPL from:"

    i. Pursuing, continuing, or taking steps in: this Anti-Suit Injunction Application, any related application before this Court, and/or this action;

    ii. Commencing, bringing, continuing, pursuing, or taking any steps in, any further application or claim before this Court for anti-suit injunction relief or related relief, or damages or compensation, in relation to: (1) the California Enforcement Proceedings, applications or motions therein, (2) the North Carolina Liability Proceedings[6]; or (3) any other proceedings, applications or motions in the USA that are or may in the future be on foot arising out of the North Carolina Liability Proceedings, including efforts to enforce the North Carolina Money Judgment there, and/or the enforcement of judgments given therein.

(Id. ¶ 6.a.).

The UK injunction commanded SAS to take affirmative action to halt proceedings before the United States Court of Appeals for the Ninth Circuit and the California court. In particular, the UK court commanded SAS not to file a brief due that day in connection with SAS's motion to remand to the California court for entry of indicative ruling. (Id. ¶ 3(d)). It also commanded SAS to procure from the United States Court of Appeals for the Ninth Circuit or the court below "a stay or stays" of certain pending motions, including motions relating to the September 5, 2018, assignment order and indicative rulings. (Id. ¶ 4). SAS has carefully complied with these directives. (See Millen Decl. (DE 809-8) ¶¶ 11-12).

The UK injunction provides for a "Return Date" at which the UK court "will consider whether [the UK injunction] shall be continued and/or what further order shall be made." (UK

---

[6] The UK injunction defines this term to include the instant case, and expressly includes applications for injunctive relief in relation to this court's March 2, 2018, discovery order "and any other similar orders." (UK Injunction (DE 816-2) ¶ 6.a. & Sched. B. ¶ 6.i.).

injection (DE 816-2) ¶ 13). At present, the UK court is scheduled to reconvene proceedings March 22, 2019, for this purpose. A statement by WPL's United Kingdom counsel, Alexander Carter-Silk ("Carter-Silk"), filed in the UK court on January 14, 2019, recites that WPL seeks, in part, "a mandatory order that SAS <u>withdraw</u> the Turnover Order Application and the First and Second Limited Remand Motions," which motions presently are stayed in the California court and Ninth Circuit. (Fourth Witness Statement of Carter-Silk (DE 827-18) ¶ 28(a)) (emphasis in original).

      3.     North Carolina case

During the time enforcement proceedings as described were ongoing before the California and UK courts, the following additional activities were taking place before this court pertinent to the instant motions. On October 5, 2018, SAS filed a notice of partial satisfaction of judgment reporting that on January 5, 2018, SAS received $2,191,770.00, and on March 2, 2018, SAS received $2,110,144.00, which it applied to interest and compensatory damages awarded in the court's judgment. (Notice (DE 790) at 1-2). These amounts, which should have been credited earlier under applicable North Carolina law,[7] correspond to the supersedeas bond and payment of escrow account funds paid into the court's registry as required by the court's February 9, 2017, order. WPL moved to strike the notice.

On January 11, 2019, SAS filed ex parte the instant motion for relief under the AWA and Rule 60 of the Federal Rules of Civil Procedure, for an order amending the judgment in this case to enjoin WPL from future sales of its software products for use within the United States until it

---

[7] No prejudice was shown by the judgment debtor arising from delay. The applicable North Carolina statute incorporates no penalty for any late filing unless the judgment creditor fails to file notice of receipt of payment "within 30 days following written demand by the debtor." N.C. Gen. Stat. § 1-239(c). No demand was made by the judgment debtor. When brought to the court's attention, the court directed the judgment creditor immediately and in the future, to make certain that credits timely are made. This direction scrupulously has been adhered to.

satisfies the court's judgment. SAS requests, in the alternative, to enjoin WPL from future sales of its software products to new customers for use within the United States until it satisfies the court's judgment. (See Mem. (DE 809-6 at 28)). In support of its motion, SAS relies on declaration of its attorney, Pressly M. Millen ("Millen"), in conjunction with: 1) WPL's motion for stay of mandate filed in the court of appeals; 2) the September 5, 2018, assignment order; 3) the UK judgment and injunction; and 4) WPL's standard terms for license agreement prior to and after December 10, 2018, with redline comparison of the same.

The instant motion was accompanied by and contained within an ex parte motion to file motions under seal, (DE 809), along with an emergency motion under the AWA to preserve the court's jurisdiction, with reference to the declaration of Millen in support thereof (DE 809-1 to 809-4). That same day, the court entered an order granting SAS's emergency motion, providing:

> pending further order of the Court, "WPL" is HEREBY ENJOINED from licensing "WPS" to any "new customer" for use within the United States. For the purposes of this injunction, . . . a "new customer" is any person or entity that held no active license to WPS on 11 January 2019. This injunction expires automatically once World Programming Limited has satisfied the $79,129,905 judgment in this case.

(DE 810). WPL filed a memorandum in opposition to the instant motion, together with a motion for prompt dissolution of the ex parte injunction. WPL relies upon a declaration of its attorney, Wayne F. Dennison ("Dennison"), in conjunction with: 1) the UK judgment, injunction, and directions order; as well as 2) declaration of Oliver R. Robinson ("Robinson"), a company director of WPL.

On January 28, 2019, the court set a schedule for briefing and noticed hearing on the motions then pending for February 15, 2019.

11

SAS filed reply in support of the instant motion combined with a response to the motion for dissolution. In support thereof, SAS relies upon a second declaration of Millen, in conjunction with: 1) correspondence between WPL customers and Millen in September and October 2018; 2) correspondence between Millen and WPL counsel; 3) California case docket; 4) WPL filings and witness statements in the UK proceedings; and 5) excerpts of WPL's supplemental objections and responses to SAS's first post-judgment interrogatories.

WPL filed reply in support of its motion for prompt dissolution on February 6, 2019, accompanied by declaration of WPL counsel, James A. Barta ("Barta"), in conjunction with: 1) prior filings made in the instant case; 2) correspondence between counsel for SAS and WPL in 2017 and 2018; 3) declaration of WPL UK counsel, Carter-Silk; 4) declaration of WPL California counsel, Joel S. Miliband ("Miliband"), and correspondence between counsel attached thereto; and 5) filings made by SAS in UK proceedings in December 2017 and October 2018.

SAS filed notice on February 13, 2019, containing additional documents: 1) additional witness statements by Carter-Silk and Miliband filed in UK proceedings; 2) filings in the California case; and 3) a WPL press release, dated December 17, 2018.

With benefit of all these materials, the court held hearing February 15, 2019. Certain orders were made and supplemental submissions directed to be filed in advance of continued hearing set for March 4, 2019, as briefly summarized below:

1)    The court held in abeyance SAS's instant motion, pending receipt of certain accounting information;

2)    The court ordered WPL to file under seal an accounting of all sums received from and after

September 5, 2018, from all customers, without geographical limitation, specifying the name

and invoice address of each customer;[8]

3)    The court ordered WPL to pay by February 22, 2019, to SAS all sums the judgment debtor

had received from customers invoiced in the United States from and after September 5,

2018;[9]

4)    The court ordered SAS to timely file notice of receipt of any sum paid, to be credited to the

judgment in accordance with North Carolina General Statute § 1-239(c);[10]

5)    The court ordered that no sum previously collected or to be collected by SAS in the United

States is subject to payment to WPL on the basis of the PTIA;[11]

6)    The court denied the judgment debtor's motion to strike satisfaction of judgment (DE 791);[12]

and

---

[8]  WPL did so on February 22, 2019 (DE 852).

[9]  WPL did so on February 22, 2019, by paying ███████████ to SAS, as represented in its
accounting. (See DE 852 and DE 853-1 at 32).

[10]  SAS filed a notice of partial satisfaction of judgment (No. 2) on February 19, 2019, which states that
additional payments (as of that date) were received by SAS in the amounts of $228,786.00 and $357,734.00 (totaling
$586,520). SAS filed a further notice of partial satisfaction of judgment (No. 3) on March 1, 2019, which states that
additional payments (as of that date) were received by SAS in the amount of $1,171,249.65.

[11]  The court indicated memorandum opinion explaining the court's reasoning for its order in this part would
follow separately.

[12]  However, the court reserved for further consideration upon the appropriate motion judgment crediting
processes.

13

7)      The court denied the judgment debtor's motion for prompt dissolution of ex parte injunction (DE 771).[13]

Supplemental filings have been made also to include, on behalf of SAS: 1) declaration of forensic accountant Samuel Hewitt ("Hewitt"), with attached schedules and exhibits, 2) further declaration of Millen, and 3) declaration of John Boswell, Chief Legal Officer of SAS. WPL also relies upon declaration of Barta, in conjunction with: 1) declaration of Robinson; 2) Hewitt Schedule 1-1 filed in the California case; 3) December 13, 2018, order by the UK court entering judgment in favor of WPL on its counterclaim in the sum of $2,867,922.67, with 8% interest; 4) letter from WPL's UK counsel to SAS's counsel regarding the UK proceedings; and 5) UK civil procedure rules.

On March 3, 2019, WPL filed notice regarding inadvertent issuance of a license and free licenses, in violation of this court's injunction, and corrective measures taken and proposed. On March 4, 2019, the date of hearing, SAS filed notice containing customer invoices from WPL and a list of WPL's active software licenses as of February 25, 2019. That same date WPL filed notices containing: 1) WPL customer correspondence and invoices; 2) declaration of Robinson attaching charts showing US monthly receipts and revenues; 3) a March 2018 order of the UK court; and 4) letters from counsel for WPL to counsel for SAS dated March and April 2018.

With benefit of these additional materials, on March 4, 2019, the court heard further arguments of counsel. The judgment debtor made oral motion to modify the current injunction to state "no new licensing to U.S. customers," as opposed to enjoining licensing for use in the US. (Tr.

---

[13]    Written order was then entered in open court supplanting the court's January 11, 2019, emergency order, enjoining judgment debtor "from licensing 'WPS' to any 'new customer' for use within the United States," and explaining its reasons for doing so. (DE 846).

14

(DE 874) at 93).  The court took under advisement the oral motion and the instant motion.[14]  This

order now follows.

## COURT'S DISCUSSION

A.      "Clawback"

The court memorializes here the reasoning for its February 15, 2019, order that "no sum

previously collected or to be collected by the judgment creditor in the United States is subject to

payment to the judgment debtor on the basis of the United Kingdom Protection of Trading Interests

Act of 1980."  (Order (DE 848) at 2).

1.      The AWA

The AWA provides that "[t]he Supreme Court and all courts established by Act of Congress

may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to

the usages and principles of law."  "This Court has repeatedly recognized the power of a federal

court to issue such commands under the All Writs Act as may be necessary or appropriate to

effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction

otherwise obtained."  United States v. New York Tel. Co., 434 U.S. 159, 172 (1977).  The AWA

is a "legislatively approved source of procedural instruments designed to achieve the rational ends

of law."  Id. (quotations omitted).  "Unless appropriately confined by Congress, a federal court may

avail itself of all auxiliary writs as aids in the performance of its duties, when the use of such historic

aids is calculated in its sound judgment to achieve the ends of justice entrusted to it."  Id. at 172-73

(quotations omitted).

---

[14]  The court also heard from the judgment creditor on issue raised in the judgment debtor's notice March 3, 2019, concerning WPL's  inadvertent issuance of free licenses.  In light of the court's ruling and where SAS declines to permit any "carve-out" from the court's injunction to allow any continued free use, as is its right, no free licenses shall be allowed.

In In re March, 988 F.2d 498, 500 (4th Cir. 1993), the United States Court of Appeals for the Fourth Circuit observed the AWA empowers a federal court to enjoin parties before it from attempting to relitigate decided issues and to prevent collateral attack of its judgments." There, the court held that a creditor engaged in foreclosure proceedings, "Farmers Bank, wishing to complete its foreclosure on [certain] Virginia real estate," properly was granted a motion for injunction under the AWA "in the Virginia district court to enjoin [property owner] from proceeding with his complaint filed in New York and to enjoin both [property owner] and itself from participating in any further proceedings regarding that case." Id. at 499-500.

In In re Am. Honda Motor Co., Inc., Dealerships Relations Litig., 315 F.3d 417 (4th Cir. 2003), the court of appeals held "we have no hesitancy in concluding that the [AWA] Injunction was necessary to prevent direct frustration of the district court's Settlement Approval Order, for which the district court undeniably possessed subject matter jurisdiction to issue." Id. at 438-39. "We also have no trouble in concluding that the Injunction was necessary to cure the injustices created by the Millers through their abuse of the MDL process." Id. at 439.

"Such authorization, however, does not control where a statute specifically addresses the particular issue at hand." Id. at 437 (quotations omitted). "For example, a party may not, by resorting to the All Writs Act, avoid complying with the statutory requirements for removal of a case in state court to federal court." Id. (citing Syngenta Crop Protection, Inc. v. Henson, 537 U.S. 28 (2002)).

In Laker Airways Ltd. v. Sabena, Belgian World Airlines, 731 F.2d 909, 914–15 (D.C. Cir. 1984), the United States Court of Appeals for the District of Columbia Circuit affirmed a district court injunction entered under the AWA, based upon its "power to conserve its adjudicatory

authority over a case properly filed with the court when, instead of actively raising all defensive claims in the federal court, the named defendants initiate suits in foreign tribunals for the sole purpose of terminating the federal court's adjudication of the litigation."

Based upon foregoing established law, the AWA provides authority for this court to enter an injunction "to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained." New York Tel. Co., 434 U.S. at 172. Such an injunction will serve to enforce aspects of this court's judgment and orders in favor of the judgment creditor. The relief granted here under the AWA is beyond what is available through common law or statutory remedies, and WPL has acted in collateral proceedings to frustrate the orders and judgment of this court.

      a.    Frustration

In particular, WPL's advancement of a counterclaim in UK proceedings to claw back amounts already paid to SAS as part of supersedeas bond and escrow account directly frustrate the court's February 9, 2017, order. In setting bond and escrow amounts to be paid over to SAS upon successful appeal, the court addressed in detail evidence and arguments regarding WPL's ability to pay a bond and fund an escrow account. The court considered and relied upon, as part of its motion for stay pending appeal, WPL's representation that the judgment debtor would place "all anticipated U.S. revenues (anticipated to total ████████) into the escrow account it ha[d] already been maintaining in this litigation for purposes of the court's November 9, 2016, temporary stay of execution." (Order (DE 696) at 9) (emphasis added). WPL stated:

> WPL has . . . offered to deposit as security <u>all US revenues it receives</u> during the pendency of the appeal. . . . [Preservation of status quo] is achieved if <u>whatever monies fall due from WPL's sale of goods and services in the US are retained in the US and therefore immediately available to SAS Institute should it prevail on appeal</u>.

17

(Robinson Decl. (DE 673) ¶¶ 17-18) (emphasis added).

The clawback sought by WPL in proceedings in the United Kingdom also frustrates the court's orders and judgment in a broader sense. SAS, as creditor of a judgment entered in the United States District Court for the Eastern District of North Carolina, affirmed by the United States Court of Appeals for the Fourth Circuit, where the Supreme Court of the United States declined to consider WPL's petition for a writ of certiorari, is entitled to collect the entire amount of the judgment. There is no equivalent provision in United States law for return to a judgment debtor of two-thirds (2/3) of any sum because damages were trebled. See Laker, 731 F.2d at 936 & 945.

Thus, any action by WPL in the United Kingdom seeking relief in the form of a clawback is in direct contravention of this court's judgment and contrary to United States law governing enforcement. See id. at 935-36. Likewise, any action by WPL to seek enforcement in the United Kingdom of a UK judgment including a clawback provision also is in contravention of this court's judgment and contrary to United States law governing enforcement. Indeed, any action by WPL to collect from SAS anywhere any sums attributed to such clawback would be contrary to this court's judgment and United States law.

    i. Sums collected in the United States

Justification for the court's clawback order is most acute where it relates to sums collected in the United States – circumstances currently before this court. Such circumstances relating to sums received to date originating in this country, and any future United State- originated revenues, involve monies without any nexus to any enforcement proceeding in the United Kingdom. Any action by WPL to pursue a clawback or judgment of clawback of such sums most directly controvert United States court orders requiring such sums to be paid in full to SAS. Such actions "frustrate the

18

enforcement of American law in American courts against [the judgment debtor] doing business in America." Id. at 940.

> b.    Relief granted under the AWA is beyond what is available through common law or statutory remedies

WPL's actions in pursuing clawback in the United Kingdom also are in conflict with representations it has made to this court.  At hearing on February 15, 2019, WPL represented that it would "hand[] over to [SAS] every dollar that comes between U.S. invoiced licensees" (Tr. (DE 850) at 27) (emphasis added).  In accounting filed February 22, 2019, WPL represented that it had paid, without qualification, "sums received from U.S.-invoiced parties beginning on September 5, 2018," in order to comply with the court's February 15, 2019, order. (DE 852) (emphasis added).  At hearing on March 4, 2019, WPL again  suggested it had "made all of the payments" and would continue to pay to SAS all revenues derived from sales to US based customers going forward. (Tr. (DE 874) at 82) (emphasis added).  However, in the same proceeding WPL refused to cease pursuit of a clawback in the UK. (Id. at 86).

The end result, as a practical matter, is that WPL represents that it has paid and will pay over 100 % of revenues derived from sales to United States based licensees, but in the same action represents that it can take two-thirds (2/3) of it back. At the same time, as discussed in more detail below, SAS is prevented by the UK injunction from seeking relief from this court to preserve its ability to keep amounts collected under this court's judgment.

There are not otherwise statutory or common law remedies available to SAS to obtain the relief granted by this court in the anti-clawback portion of its February 15, 2019, order.

19

Accordingly, for the foregoing reasons, "no sum previously collected or to be collected by the judgment creditor in the United States is subject to payment to the judgment debtor on the basis of the United Kingdom Protection of Trading Interests Act of 1980." (Order (DE 848) at 2).

B.     Motion for Relief

Both the AWA and Rule 60, independently and in combination, authorize and compel issuance of the injunction SAS requests. The court sets forth herein the court's authority to issue an injunction under each basis in turn, including discussion of the nature and scope of the specific injunction and alternative injunction sought by SAS.

1.     AWA

a.     Court's authority

The AWA provides authority to the court to enter the requested injunction "to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained," "to achieve the rational ends of law," and "to achieve the ends of justice entrusted to it." New York Tel. Co., 434 U.S. at 172-73.

WPL has taken a variety of actions that "frustrate the enforcement of American law in American courts against [the judgment debtor] doing business in America." Laker, 731 F.2d at 940. Actions by WPL in seeking both the UK injunction and the UK judgment directly impact the United States and proceedings in United States courts.

i.     UK injunction impacts

First and foremost, the UK injunction reaches directly into proceedings in the United States to prevent SAS from enforcing this court's judgment to the extent permitted by the laws of this

country. It prevents SAS from seeking the full panoply of judgment collection tools, which the California court already has forecasted in indicative rulings are available to SAS, including:

1)   "[T]he *in personam* relief identified in the . . . First and Second Limited Remand Motions" that SAS had filed in the United States Court of Appeals for the Ninth Circuit ((UK Injunction (DE 816-2) ¶ 3.a.);

2)   "[O]rders <u>foreshadowed by and/or contemplated in</u> (i) the [California court's indicative ruling 1] and (ii) the [California court's indicative ruling 2], <u>or any similar orders</u>." (<u>Id.</u> ¶ 3.b.) (emphasis added);

3)   Moving for or briefing relief raised in its remand motions before the court of appeals, as well as "[a]ny motion or request to the [California court] to make the order contemplated" in its indicative rulings. (<u>Id.</u> ¶ 4).

The UK injunction also prevents SAS from seeking from any United States court relief of "similar nature and/or effect" or relief that "purports to impose" any "requirements on WPL to assign or transfer to SAS" and receivables or sums. (<u>Id.</u> ¶ 3.c.)

The practical impact of these components of the UK injunction on collections in this country, the country of origin of the judgment at issue, is extraordinary. Indeed the UK injunction has already prevented SAS from seeking from this court the basic, reasonable, relief in the form of directing WPL to pay to SAS United States receivables that WPL had already received from United States-based customers, which sums include amounts subject to unchallenged portions of the California court's assignment order. At the time of February 15, 2019, hearing, WPL had not shown any justification as to why it had not already turned over such receivables already paid to WPL to SAS. It was only after this court, <u>of its own initiative</u>, compelled WPL so to do, that WPL turned

over to SAS ████████.  It is extraordinary that the UK injunction renders SAS powerless to enforce even those aspects of collections in the United Statesy that WPL does not directly oppose, but which WPL can ignore with impunity because there is no mechanism – short of the present requested injunction – by which SAS can seek to enforce them.

Indeed, prior to filing of the instant motion and imposition of AWA relief by this court, with the UK injunction in place, SAS had at its disposal no mechanism to prevent WPL from transferring sums received from United States-based customers to accounts in the United Kingdom, from altering licensing terms to direct payments to accounts in the United Kingdom,  from communicating directly with customers special instructions for transmitting payments, or from taking any other actions in the United Kingdom to avoid paying sums to SAS.  While WPL offers evidence that it has not taken such actions, as well as the good faith and word of its counsel that it will not take such actions in the future, these assurances are beside the point.[15]  It remains the case that, for as long as its draconian terms are in force, the UK injunction has prevented and will prevent SAS from seeking any direct order by this court to enforce that voluntary conduct by WPL.

The UK injunction also prevents SAS from obtaining the type of relief from United States courts that otherwise would be available to the judgment creditor to counteract the judgment debtor's  efforts to "escape" enforcement of this court's judgment.  It prevents SAS from seeking an injunction to stop the clawback provisions of the UK judgment, or even briefing this court on issues associated with such an injunction.  (UK Injunction (DE 816-2) ¶ 6).  While this court now has entered an order addressing the clawback provisions, of its own initiative, SAS has not been able

_____

[15]  At the most recent hearing, counsel for WPL recognized the possibility that his client may not even act in conformity with counsel's assurances to this court, despite counsel's statement that this "will not happen."   (Tr. (DE 874) at pp. 81-82).

to address the substance of that order or its effectiveness in light of the presence of its offices in the United Kingdom, as discussed below.

The UK injunction also prevents SAS from seeking an anti-anti-suit injunction against WPL to attempt to free up restraints that WPL has placed on SAS's ability to use the tools normally available to a judgment creditor in United States courts, particularly in the California court and the United States Court of Appeals for the Ninth Circuit. (UK Injunction (DE 816-2) ¶ 6). And the UK injunction, by design and effect, prevents SAS from seeking from this court the most direct form of AWA relief that would be appropriate under the circumstances of this case, in the form of an anti-anti-suit injunction to prevent all the aforementioned aspects of the UK injunction from paralyzing SAS's collection activities in the United States. See Laker, 731 F.2d at 940. By obtaining the UK injunction, WPL has left SAS with few choices for asserting relief normally entitled to it in United States courts, short of the explicit relief sought by SAS in the instant motion.

Finally, the UK injunction is an absolute interference with SAS's ability to seek appropriate judgment enforcement relief in United States courts because of the criminally punitive consequences it imposes upon SAS's officers, employees, and agents, many of whom work and reside in the United Kingdom. SAS has a substantial presence in the United Kingdom, with operations there since 1980, a "physical headquarters in Buckinghamshire," "637 employees," and "bank accounts" in the UK. (Boswell Decl. (DE 852-14) ¶¶ 2-3).

ii.     UK judgment impacts

As an independent and additional ground for AWA relief, WPL is "attempting to relitigate decided issues" and engage in "collateral attack of [this court's] judgments" through its pursuit of the UK judgment. In re March, 988 F.2d at 500. A federal court has the "power to conserve its

adjudicatory authority over a case properly filed with the court when, instead of actively raising all defensive claims in the federal court, the named defendants initiate suits in foreign tribunals for the sole purpose of terminating the federal court's adjudication of the litigation." Laker, 731 F.2d at 914–15.

Here, WPL raised as a defense to the breach of contract claim in this case that comity and collateral estoppel required this court to give "preclusive effect" to the earlier determination by the UK court that breached terms in the license agreement were void. SAS Inst. Inc. v. World Programming Ltd., 64 F. Supp. 3d 755, 772 (E.D.N.C. 2014). This court rejected this argument, holding that "[w]here North Carolina law significantly differs from English law on the question of the validity of the contractual provisions purportedly breached, the court finds that this determination by the U.K. court is not entitled to preclusive effect." Id. at 774.

Before the United States Court of Appeals for the Fourth Circuit, WPL argued "that the proceedings below never should have moved forward, as this action was barred by res judicata due to the U.K. litigation." SAS Inst., Inc., 874 F.3d at 378. The court of appeals exactly rejected that argument, reasoning in part that "[g]ranting the U.K. judgment preclusive effect would frustrate [North Carolina] policy goals by barring a North Carolina company from vindicating its rights under North Carolina law on the basis of the E.U.'s contrary policies." Id. at 379-80. "No principle of international comity requires this outcome." Id. at 380. The Supreme Court of the United States denied certiorari. See 139 S. Ct. 67 (2018).

WPL also sought to raise again before this court and the California court that "international comity considerations weigh in favor of a stay" of execution of the judgment on non-U.S. assets. (DE 784 at 9). WPL reasoned that "WPL has taken the position that the enforceability of the U.S.

judgment outside of the United States is constrained by the prior judgment of the U.K. High Court," in turn providing a basis for moving to stay enforcement proceedings in the California court. (Id. at 7). This court, however, rejected this argument, holding that WPL "has not demonstrated a meritorious argument in support of stay of all non-U.S. execution of the judgment pending U.K. judgment-recognition proceedings." (Order (DE 786)).

Having failed to halt judgment enforcement activities in courts of this country, WPL turned to courts in its native land to achieve the same result. The UK court accepted the very arguments that courts in this country had rejected, holding that the "US Proceedings were put forwards as a collateral attack on the English judgment," where the UK court had "already determined the position [of SAS] as a matter of North Carolina law (subject to the overlay of the Software Directive)." (UK Judgment (DE 816-1) ¶ 126). The UK court thus concluded that SAS is "precluded by issue estoppel or by . . . abuse of process from enforcing the judgment on the Fraud Claim and the UDPA claim." (Id. ¶ 155).

In this respect, WPL has subjected both the court's judgment and enforcement thereof in the United States to collateral attack. For all the reasons discussed in memorandum opinion herein, the UK judgment is an affront to this court's judgment by clawing back bond and escrow account sums already disbursed in the United States in accordance with the court's judgment and February 9, 2017, order, and by inviting clawback of all sums to be collected before SAS has received even a fraction of compensatory damages due.

In such circumstances, injunctive relief under the AWA is necessary to protect the court's judgment and orders, and United States enforcement thereof, from collateral attack and frustration. See New York Tel. Co., 434 U.S. at 172; In re March, 988 F.2d at 500; Laker, 731 F.2d at 940.

25

b.     Scope of relief

As noted above, SAS moves to enjoin WPL from all future sales of its software products for use within the United States until it satisfies the court's judgment. SAS requests, in the alternative, to enjoin WPL from future sales of its software products to "new customers" for use within the United States under the same condition. (See Mem. (DE 809-6 at 28)). This alternative request mirrors the relief that the court already granted preliminarily in its January 11, 2019, and February 15, 2019, orders.

Having determined that the court is authorized to issue an AWA injunction under present circumstances to protect this court's judgment and orders from frustration, the court turns now to considering the scope and nature of an injunction necessary to accomplish this objective. The most direct and proportional form of AWA injunction where foreign proceedings frustrate Unites States litigation is an anti-anti-suit injunction, which could command WPL to cease and undo its efforts in the United Kingdom to stay judgment enforcement proceedings in United States courts and thus allow the California court to command the execution relief it has forecasted in its indicative rulings. Cf. Laker, 731 F.2d at 915.

However, because of the breadth of the UK injunction, SAS has been unable to advance in arguments in this court in favor of such an anti-anti-suit injunction. Moreover, because of WPL's limited presence in the United States, on the one hand, and SAS's substantial presence, assets, and operations in the United Kingdom, on the other hand, it is doubtful that SAS would prevail in a protracted conflict between competing punitive injunctions issued by United States and United Kingdom courts. The practical outcome of an anti-anti-suit injunction is far from clear.

26

Moreover, the court finds more in keeping with its own jurisdiction and principles of international comity, as recognized by United States courts, to award injunctive relief that focuses on conduct in the United States and touching upon United States based transactions and commerce, rather than an injunction that focuses on litigation activity in courts in the United Kingdom.

Due to all the circumstances addressed herein, including considerations discussed below with respect to Rule 60, the court determines that an injunction prohibiting future sales of WPL software products to new customers for use within the United States achieves the goals of preventing the frustration of this court's orders and ensuring the ends of justice in providing due relief to SAS for its claims under United States law.

In so holding, the court has considered WPL's argument that a more effective alternative to any injunction at this juncture is to allow WPL to continue unfettered in licensing its product for use in the United States, such that it can continue making payments from such revenues towards the court's judgment through collection efforts pursuant to the California court's September 5, 2018, assignment order. For all the reasons set forth herein, this alternative approach is unacceptable while all aspects of the UK judgment and UK injunction remain in force. At bottom, merely providing a means for the judgment creditor to continue collection on the judgment debtor's terms, in reliance upon voluntary acquiescence by the judgment debtor to refrain from taking evasive or counteractive measures, without giving the judgment creditor any avenue to assert its interests as a judgment creditor as allowed under United States law, does not effectuate this court's judgment or promote the interests of justice.

While the court has taken into account evidence offered by WPL at hearing that it is not presently taking measures to reduce customer license payments or otherwise shelter or reduce United

States receivables, the court finds it more significant that WPL did not recognize any amount of the judgment entered against it in the United States as due in its annual report, and it made no attempt to quantify the amount of revenues that it would be turning over to SAS in accordance with the judgment. (DE 853-4 at 5). Instead, it expressly noted the $2.6 million it was awarded as clawback recovery payable from SAS to WPL. (Id.). Under these circumstances, a "no injunction" alternative is unwarranted.

In the same vein, WPL suggests, and reiterates through its instant oral motion advanced at March 4, 2019, hearing, that the court should limit an injunction to provide for "no new licensing to U.S. customers," as opposed to enjoining licensing for use in the United States. (Tr. (DE 874) at 93) (emphasis added). But, as noted previously, the UK injunction leaves no mechanism for SAS to ensure that WPL does not structure its customer relationships, licensing agreements, and invoicing practices, to allow or encourage new and continued licensing to global businesses for use in the US. In such a scenario, WPL could engage countless new global company customers to undertake new substantial use of WPS products in the United States, without falling under the restriction of the injunction as proposed by WPL.[16]

In sum, the alternatives proposed by WPL all suffer from the same fundamental defect in that they are dependent upon voluntary cooperation by the judgment debtor, all while the judgment creditor is severely restricted in the tools available to it to enforce this court's judgment.

The court also recognizes the evidence WPL presents of the current and potential injury and interference such an injunction inflicts upon its ability to attract new customers and retain existing customers globally. However, there must be some degree of impact upon WPL's operations for it

---

[16] WPL's oral motion for modification of the existing injunction is denied as moot for the separate reason that the court's injunction imposed by the instant order supplants its February 15, 2019, injunction.

to have any practical coercive effect under the circumstances presented. The court addresses further below factors bearing upon an injunction under Rule 60, including the balance of injury, which factors the court incorporates herein by reference also in support of an AWA injunction.

The court has also weighed the propriety of the injunction sought in the instant motion (prohibiting sales to existing and new customers for use in the United States) versus the alternative injunction argued for by SAS and presently in force through the court's February 15, 2019, order (prohibiting sales to new customers for use in the United States). The court finds, in conjunction with its analysis of Rule 60 injunction factors, discussed further below, that an injunction prohibiting sales of WPL software products to "new customers" for use within the United States, (Mem. (DE 809-6 at 28)), is appropriate to achieve the purposes of the AWA and Rule 60, and the balance of the equities presented, instead of an injunction applied to all existing and new customers.

In sum, the AWA authorizes the court to issue an injunction to protect its orders and judgment from collateral attack and frustration, and to serve interests of justice and the law in the United States. In addition, the alternative injunction requested by SAS provides the most effective mechanisms for serving these goals under the circumstances of this case.

2.  Rule 60

"The consideration of Rule 60(b) motions proceeds in two stages. Nat'l Credit Union Admin. Bd. v. Gray, 1 F.3d 262, 264 (4th Cir. 1993). "First there is the question of whether the movant has met each of three threshold conditions: [I]n order to obtain relief from a judgment under Rule 60(b), a moving party must show that his motion is timely, that he has a meritorious defense to the action, and that the opposing party would not be unfairly prejudiced by having the judgment set aside." Id.

Here, WPL does not provide a basis for contesting these threshhold conditions. Thus, the inquiry turns to whether SAS has met one of six specific sections of Rule 60(b) that authorize relief:

> (1) mistake, inadvertence, surprise, or excusable neglect;
>
> (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
>
> (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
>
> (4) the judgment is void;
>
> (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or
>
> (6) any other reason that justifies relief.

Fed. R. Civ. P. 60(b). Under present circumstances, subsection 6 is the broadest and best fit for relief from the court's prior judgment. "While this catchall reason includes few textual limitations, its context requires that it may be invoked in only 'extraordinary circumstances' when the reason for relief from judgment does not fall within the list of enumerated reasons given in Rule 60(b)(1)-(5)." Aikens v. Ingram, 652 F.3d 496, 500 (4th Cir. 2011).

All the reasons discussed above justifying imposition of an AWA injunction provide extraordinary circumstances requiring relief from that part of the court's judgment denying injunctive relief. Moreover, circumstances pertaining to injunctive relief in this case have changed substantially since the time of the court's judgment and appeal thereof, further justifying relief from that part of the court's judgment. Indeed, as set forth below, several critical points relied upon by the United States Court of Appeals for the Fourth Circuit in analysis of injunction factors now have changed to the contrary to support injunctive relief.

To be entitled to an injunction as a part of the court's judgment, a plaintiff must demonstrate:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

SAS Inst., Inc., 874 F.3d at 385 (quoting eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006)).

With respect to the first factor, the court of appeals held that SAS had not demonstrated an irreparable injury. But changed circumstances shed new light on the court's reasoning regarding this factor. For example, the court of appeals reasoned:

> The jury's damages award was based in part on testimony provided by SAS's expert that SAS had suffered a total of only $13,500,245 in lost profits by the time of trial. The balance of the $26 million dollar award, over $12 million at least, was therefore based on SAS's expected damages after trial. The fact that SAS already asked for and received these future damages undermines its claim of irreparable injury moving forward. . . . Rather than supporting a finding of irreparable harm, the future damages SAS has already received point to an injury that has already been redressed.

Id. at 386. The issue with this reasoning now is that, while SAS was awarded future damages, it has not collected even $13,500,245.00 in lost profits, much less over $12 million representing future damages. In addition, damages attributable to WPL customers engaged after trial in this matter are not incorporated into the future damages awarded at trial. (See Day 6 Tr. at 185-190; DE 685 at p. 2 & n. 1). Moreover, an injunction limited to "new customers," as SAS seeks in the alternative, guards against overlap with evidence forming the basis for the damages award in the judgment. Thus SAS has demonstrated irreparable harm, not already attributable to damages in the judgment, from new customers engaged by WPL.

31

The second eBay factor now reinforces the first. The court of appeals stated that "[i]njunctions have also sometimes been deemed appropriate based on barriers to collectability after judgment, but SAS has offered only vague concerns on this front." 874 F.3d at 387 (internal citation omitted). At that time, the court of appeals observed, SAS had "tendered little but speculation regarding both WPL's financial status and the U.K.'s unwillingness to enforce portions of its damages award." Id. Now, however, SAS has done both, and more: the court has a clear picture of WPL's financial status and definitive proof of the UK's unwillingness to enforce any portion of the damages award. Further, the court now knows that WPL has sought and will continue to seek to clawback two-thirds of every dollar SAS collects. Furthermore, there is no clearer "barrier to collectability" than the UK injunction that has forced SAS under penalty of criminal contempt to bring a halt to judgment collection activity available in the California court. Indeed, WPL seeks not only a stay of such activity, but also a permanent withdrawal. (See Fourth Witness Statement of Carter-Silk (DE 827-18) ¶ 28(a)).

The prior observation by the court of appeals that an "injunction . . . would frustrate, rather than facilitate WPL's ability to pay damages" now must be viewed from a different perspective. 874 F.3d at 387. The issue now is no longer so much WPL's ability to pay damages but rather the conditions under which it will pay the damages, i.e., whether it will pay damages under terms that it sets voluntarily and under its desired terms enforced through a coercive UK judgment and injunction, or whether it will pay damages under terms set by US judgment collection law. Where WPL has removed most tools available under US collection law, and where the UK judgment and injunction persist, SAS must resort to its own more extraordinary and coercive measures such as the instant injunction to compel relief from WPL.

In the same vein, the balance of the hardships now also has changed. Equities have shifted now that WPL has taken actions to obtain the UK injunction and clawback. While it will suffer harm from lost revenues resulting from the injunction, its own actions play a role in bringing about that harm. SAS has returned to this court seeking injunction only in the face of counter-offensive maneuvers by WPL to reach into the US and alter ongoing US proceedings and collections.

As noted above, WPL suggests that in order to ensure its continued viability, any injunction must be limited to prohibit new customers in the US rather than new licenses for use in the US. However, WPL has not demonstrated that the injunction sought will prevent it from maintaining operations outside of the US and serving customers outside of the US. WPL cites, for example, customers based outside of the US who may wish to have the option of having employees take a laptop with WPS in or through the US, even if only rarely or occasionally, without having to worry about violating terms of a license. (<u>See, e.g.,</u> Tr. (DE 874) at 95). WPL suggests that new customers, even if foreign based, will be discouraged from pursuing WPS with a non-US licensing restriction in place.



While the court recognizes these concerns and customer preferences as represented by WPL, these are not sufficiently concrete demonstrations of irreparable harm to tip the balance of equities in favor of WPL under present circumstances. Emphasized terms above demonstrate new business

33

challenges and risks, but they do not demonstrate insurmountable obstacles to operations globally outside the US. WPL has not demonstrated that an injunction prohibiting new licenses for use in the US necessarily will deter and hinder non-US business permanently, rather than requiring an adjustment in licensing terms and marketing approach to non-US customers.

Finally, the public interest factor has changed in light of WPL's activities in securing the UK injunction and judgment. Previously, the court of appeals observed that "the public interests weighing in favor of an injunction rely upon broad, abstract rule of law concerns. While these interests are certainly legitimate, the award of compensatory and punitive damages in this case already serves them well." 874 F.3d at 388. Recent circumstances have demonstrated how much these public interest considerations now have flipped in favor of SAS. For all the reasons set forth in support of an AWA injunction, "rule of law concerns" now have become paramount. The ability of US courts to enforce their own laws and to allow litigants to pursue freely rights accorded to them under US law have been significantly eroded through WPL's conduct in seeking the UK injunction and clawback relief in the UK judgment. For the same reason, "the award of compensatory and punitive damages in this case" no longer serve well the rule of law concerns. Id.

WPL argues nonetheless that other factors identified by this court in denying injunctive relief have not changed, and that such factors remain in place to compel denying injunctive relief now. For example, WPL points to this court's determination that in the absence of a copyright violation injunctive relief to deter future sales of a non-infringing product is not warranted. (See, e.g., Order (DE 601) at 4-5, 6-7). The court of appeals, however, made clear that a categorical approach to denial of injunction based only upon the presence or absence of copyright infringement is not appropriate:

> SAS asserts that the district court applied a "categorical" approach by discussing the distinction between infringement and non-infringement injuries. SAS is, of course, correct that any categorical approach to injunctive relief is flawed, as the determination of whether to grant equitable relief does not turn on the type of wrongdoing at issue.

SAS Inst., 874 F.3d at 386.

In sum, no factor or factors in combination identified in the court's prior order overcomes the clear balance of the equities now weighing in favor of the injunction presently in place and sought through the instant motion. Accordingly, SAS has demonstrated a basis for amending the court's judgment to include a component of injunctive relief until WPL has paid over the full value of this court's award of damages.

C.     Motions to Seal

WPL moves to seal multiple filings related to the instant motion that contain highly confidential, proprietary, and commercially sensitive information of WPL. The public has received adequate notice of the motions to seal, and no less drastic alternative to sealing is available because the confidential information appears throughout the filings sought to be sealed. WPL's interest in preserving the confidentiality of its assets and financial information outweighs any public interest in disclosure, where filing such documents in the public record would disclose information not generally known to the public. Therefore, WPL's motions to seal are granted, and the clerk is directed to file documents DE 853, 854, 856-859, 864, 867, under seal.

## CONCLUSION

Based on the foregoing, the motion for relief under the AWA and Rule 60 (DE 809-5) is GRANTED on the terms set forth herein. In accordance therewith, the court AMENDS its judgment to include the following injunction:

"WPL" is HEREBY ENJOINED from licensing "WPS" to any "new customer" for use within the United States. For the purposes of this injunction, "WPL" means defendant / judgment debtor and its officers, agents, servants, employees, and all other persons who are in active concert or participation with defendant /judgment debtor; "WPS" means World Programming System and any software developed in whole or in part through the use of SAS Learning Edition; and a "new customer" is any person or entity that held no active license to WPS on January 11, 2019. This injunction expires automatically once defendant / judgment debtor has satisfied the judgment in this case. All other terms of the court's July 15, 2016, judgment, as amended December 8, 2017, and May 3, 2018, not altered herein shall remain in full force and effect.

The clerk is DIRECTED to enter an amended judgment in accordance with the foregoing. Oral motion for modification of injunction (March 4, 2019) is DENIED AS MOOT. Motions to seal (DE 860, 868, 872) are GRANTED, and the clerk is DIRECTED to file documents DE 853, 854, 856-859, 864, 867, under seal.

SO ORDERED, this the 18th day of March, 2019.


LOUISE W. FLANAGAN
United States District Judge